**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **WILLIE B. SMITH, III,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| v. | )   **Case No. 2:13-CV-00557-RDP** |
| | ) |
| **JEFFERSON S. DUNN,** | ) |
| **Commissioner, Alabama Department** | ) |
| **of Corrections,** | ) |
| **Respondent.** | ) |

# MEMORANDUM OPINION

Petitioner Willie B. Smith, III has petitioned for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 1992 capital murder conviction and death sentence in Alabama state court. Smith alleges various constitutional violations that he asserts require reversal of his convictions or his sentence. The parties have fully briefed Smith's claims. (Docs. # 28, 34). After careful consideration of the record, the pleadings, and the applicable provisions of 28 U.S.C. § 2254, the court finds that Smith has not shown that he is entitled to an evidentiary hearing or to habeas relief. Accordingly, and for the reasons stated below, his petition for a writ of habeas corpus is due to be denied.

## I.      Background and Procedural History

In order to discuss the issues raised by Smith's federal habeas petition, the court need only briefly recount the crime at issue. Smith was convicted and sentenced to death in Jefferson County, Alabama, for the intentional murder of Sharma Ruth Johnson during the course of a first-degree robbery pursuant to Alabama Code § 13A-5-40(a)(2), and for the intentional killing of Johnson during the course of a first-degree kidnapping pursuant to Alabama Code § 13A-5-

40(a)(1). *Smith v. State*, 838 So. 2d 413, 421 (Ala. Crim. App. 2002) ("*Smith II*"). The evidence at trial showed that Smith and his girlfriend, Angelica Willis, approached Johnson in her car near an automated teller machine. *Id.* at 421-22. Following Smith's instructions, Willis asked Johnson for directions to a restaurant. *Id.* at 422. Then Smith, armed with a shotgun, walked up to Johnson's car and forced Johnson into the trunk. *Id.* After driving to another location, Smith and Willis returned to the automated teller machine. *Id.* There, they located Johnson's dropped bank debit card and directed Johnson, still in the car's trunk, to call out the card's access code. *Id.* At Smith's direction, Willis withdrew $80 from Johnson's bank account. *Id.* A bank video camera captured images of Smith while Willis withdrew money from the machine. *Id.* After driving around the Birmingham area and picking up Smith's brother from a shopping mall, Smith drove Johnson's car to a cemetery. *Id.* Smith told Willis that he would have to kill Johnson because she would report the crime to law enforcement. *Id.* Willis overheard Johnson pleading for her life and promising not to tell the authorities about the kidnapping. *Id.* Willis then heard a gunshot. *Id.* Smith, his brother, and Willis abandoned the vehicle at North Roebuck School. *Id.* Smith later returned to the car and set it on fire to destroy any fingerprints left on it. *Id.*

Police learned about Smith through statements he made to acquaintances and to a police informant. *See id.* at 422-23. The informant later wore a wire and recorded a conversation with Smith. (State Court Record, Vol. 7, at 1118-20, 1133-36). In the recorded conversation with the informant, Smith admitted to abducting and killing Johnson. *See Smith II*, 838 So. 2d at 424-25.[1]

Smith was tried and convicted in Jefferson County Circuit Court on May 7, 1992. (State Court Record, Vol. 34, Tab R-69 at 1). The jury recommended that the Smith be sentenced to death. (*Id.* at 2). Following a sentencing hearing, the trial court sentenced Smith to death on July 17, 1992. (*Id.* at 20).

---

[1] Additional facts will be discussed as they relate to the individual grounds for relief raised by Smith.

On direct appeal, Smith's case was remanded to the trial court for the prosecutor to provide reasons for using 14 of his 15 peremptory challenges to strike female veniremembers, based on the Supreme Court's intervening opinion in *J.E.B. v. Alabama*, 511 U.S. 127 (1994). *Smith v. State*, 698 So. 2d 1166, 1169 (Ala. Crim. App. 1997) ("*Smith I*"). On remand, the trial court found that the prosecutor provided sufficient non-discriminatory reasons for his strikes of female veniremembers. (State Court Record, Vol. 34, Tab R-71 at 26). On return to remand, the Alabama Court of Criminal Appeals affirmed the trial court's judgment and Smith's convictions and sentence. *Smith II*, 838 So. 2d 413 (Ala. Crim. App.), *cert. denied*, *Ex parte Smith* (Ala. June 28, 2002). The United States Supreme Court denied Smith's petition for writ of certiorari. *Smith v. Alabama*, 537 U.S. 1090 (2002).

Smith filed a petition for state postconviction relief under Alabama Rule of Criminal Procedure 32. (State Court Record, Vol. 34, Tab R-74 at 1). The Jefferson County Circuit Court denied his petition. The Alabama Court of Criminal Appeals affirmed. *Smith v. State*, 112 So. 3d 1108 (Ala. Crim. App. 2012) ("*Smith III*"), *cert. denied*, *Ex parte Smith*, 112 So. 3d 1152 (Ala. 2012).

In March 2013, Smith filed his original federal habeas petition in this court. (Doc. # 1). Respondent Jefferson Dunn,[2] Commissioner of the Alabama Department of Corrections, asserts that each of Smith's claims for relief lacks merit and the petition is due to be denied.

## II.    Standards of Review

### A.    General Standard of Review

A federal court may only grant habeas corpus relief to a state prisoner for claims considered on the merits by a state court if the petitioner shows that the state court proceedings

---

[2] Kim T. Thomas, the Alabama Department of Corrections' Commissioner when the case was filed, has retired. Accordingly, the court has substituted the name of the current commissioner. *See* Fed. R. Civ. P. 25(d).

resulted in a decision that was:

(1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or

(2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d)(1), (2). *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002) (stating that § 2254(d) requires a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal citation and quotation marks omitted)) This court's review of Smith's claims under § 2254(d)(1) is limited to the record that was before the state courts that adjudicated those claims on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The "contrary to" clause in § 2254(d)(1) applies when the state court reaches a conclusion "opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts*." Jones v. GDCP Warden*, 753 F.3d 1171, 1182 (11th Cir. 2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). An unreasonable application of law under § 2254(d)(1) occurs when the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (quoting *Williams,* 529 U.S. at 413). The Supreme Court has explained that an "unreasonable application of" of its prior holdings must be "objectively unreasonable," not merely wrong; even "clear error" will not suffice to allow for relief under this clause of § 2254(d)(1). *Lockyer v. Andrade,* 538 U.S. 63, 75–76 (2003). Rather, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or could have supported[ ] … the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" a prior Supreme Court holding.

*Harrington v. Richter*, 562 U.S. 86, 102 (2011). This point, the Supreme Court has observed, is "the only question that matters under § 2254(d)(1)." *Lockyer,* 538 U.S. at 71. To the extent that Smith disputes a factual determination by the state courts, this court may only overturn a state court's factual findings if Smith "produces 'clear and convincing evidence' that those findings are erroneous." *Jones*, 753 F.3d at 1182 (quoting 28 U.S.C. § 2254(e)(1)).

The court's review of Smith's § 2254 petition is highly deferential to the state courts' resolution of his claims. *See Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008) (asserting that federal habeas review is "highly deferential" to state courts' decisions). If "fairminded jurists could disagree" on the correctness of the state court's decision that a claim lacks merit, federal habeas relief is precluded. *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

## B.      Standard of Review for Claims Unexhausted in State Court

A petitioner ordinarily must exhaust all claims presented in his or her § 2254 petition by fairly presenting the legal and factual basis for the claims in state court before a federal court may consider them. Indeed, Section 2254(b)(1) provides that a federal court may not grant habeas relief to an applicant in state custody "unless it appears that the applicant has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). To exhaust a claim in state court, a state prisoner must "invoke[ ] one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). To invoke a complete round of appellate review in Alabama state courts, an Alabama prisoner must file a petition for certiorari with the Alabama Supreme Court. *Smith v. Jones*, 256 F.3d 1135, 1140-41 (11th Cir. 2001). A federal

claim has been fairly presented to the state courts if "a reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Kelley v. Sec'y Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004). "The exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record." *Id.* at 1345 (quoting *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988)). Among other requirements, the petitioner must inform the state courts that a claim is being asserted "under the United States Constitution" in order to fairly present a federal constitutional claim for state-court relief. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). If a state petitioner's federal habeas claim is unexhausted, the district court has traditionally dismissed the habeas petition without prejudice or stayed the cause of action in order to allow the petitioner to first avail himself or herself of state law remedies. *E.g.*, *Ogle v. Johnson*, 488 F.3d 1364, 1370 (11th Cir. 2007). However, "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, this court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citing *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998)).

### C.    Standard of Review for Claims Denied by the State Courts on Adequate and Independent State Law Grounds

It is well established that, if a federal habeas petitioner fails to raise a claim in the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide that the claim is not entitled to a review on the merits. Stated differently, "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). As the Supreme Court has explained:

> In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default are similar in purpose and

design and implicate similar concerns[.] In habeas, state-court remedies are described as having been exhausted when they are no longer available, regardless of the reason for their unavailability. Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding.

*Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006) (internal citations and quotation marks omitted).

Generally, if the last state court[3] to examine a claim finds clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules, and that procedural bar provides an adequate and independent state ground for denying relief, then federal review of the claim also is precluded by federal procedural default principles. *See Cone v. Bell*, 556 U.S. 449, 465 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review").

The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to

---

[3]  In this case, the Alabama Supreme Court denied Smith's petitions for writs of certiorari review of *Smith II* and *Smith III*. Alabama law provides the Alabama Supreme Court discretionary certiorari jurisdiction over decisions by the Alabama Court of Criminal Appeals. *See* Ala. Code § 12-2-2; Ala. R. App. P. 39(a). The permissible grounds for discretionary review by the Alabama Supreme Court are broader in capital appeals than in other appeals. Ala. R. Crim. P. 39(a)(2).

In *Wilson v. Warden, Georgia Diagnostic Prison*, 834 F.3d 1227, 1235 (11th Cir. 2016), the Eleventh Circuit sitting *en banc* held that a summary denial of an "application for a certificate of probable cause by the Georgia Supreme Court" is a "final state court adjudication on the merits" that is reviewed under § 2254(d). The *Wilson* opinion also held that such a summary adjudication on the merits is reviewed for any reasonable basis for the state court to deny relief, under the Supreme Court's opinion in *Harrington v. Richter*. *Id.* Accordingly, a federal court should not "look through" a summary denial on the merits to the last reasoned decision by a state court. *Id.* The *Wilson* opinion recognized, though, that the denial of a request for a discretionary appeal "similar to certiorari review" is not an adjudication on the merits by a state court. *Id.* at 1234. The Supreme Court recently granted a writ of certiorari to review the Eleventh Circuit's *Wilson* decision. *Wilson v. Sellers*, No. 16-6855 (U.S. Feb. 27, 2017). The Eleventh Circuit has not addressed, following *Wilson*, whether a denial of a petition for a writ of certiorari by the Alabama Supreme Court is a final summary decision on the merits subject to review under § 2254(d). "Because it does not matter to the result, and to avoid any further complications if the United States Supreme Court disagrees with [the Eleventh Circuit's] <u>Wilson</u> decision," the court has reviewed the final decisions by the Alabama Court of Criminal Appeals in analyzing this habeas petition. *See Butts v. GDCP Warden*, No. 15-15691, slip op. at 4 (11th Cir. Mar. 9, 2017) (applying a similar procedure when reviewing the denial of a state prisoner's habeas petition).

> follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and that bar provides and adequate and independent state ground for denying relief. The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, [493], 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991) (*en banc*) (internal citations omitted).

Absent some justifiable reason for not applying the doctrine, federal deference to a state court's clear finding of procedural default under its own rules is exceedingly strong.

> "[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. *Harris* [*v. Reed*], 489 U.S [255,] 264 n.10, 109 S. Ct. 1038 [(1989)] (emphasis in original). *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. 1994) (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lacked merit based on the evidence, "[t]his ruling in the alternative did not have the effect ... of blurring the clear determination by the [Georgia habeas corpus] court that the allegation was procedurally barred")[.]

*Bailey*, 172 F.3d at 1305.

Courts have recognized three circumstances in which a state court's denial of a federal law claim on an otherwise valid state-law ground will not bar a federal habeas court from considering that federal claim on habeas review: (i) where the petitioner demonstrates that he had good "cause" for not following the state procedural rule and that he was actually prejudiced by that alleged constitutional violation; (ii) where the state procedural rule was not "firmly established and regularly followed"; or (iii) where failure to consider the petitioner's claim will result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 455 (2000)

(Breyer, J., concurring) (citations omitted); *see also, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (holding that a state court procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (internal citations and quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.").

## III.    Claims for Relief

Smith, through counsel, has asserted a number of claims in his § 2254 petition.  The court addresses each one, in turn.

### A.    Whether the Alabama Court of Criminal Appeals Unreasonably Adjudicated Smith's Claims that the Prosecution Unconstitutionally Struck Jurors on the Bases of Gender, Race, and National Origin

Smith's first two claims assert that the trial prosecutor exercised his peremptory strikes at the trial to "purposely eliminate[ ] women from the jury," "eliminate African-American venire members," and eliminate the sole Hispanic veniremember. (Doc. # 1 at ¶¶ 47, 78).   Because these two claims involve the same legal analysis, the court addresses them together.  As part of his first ground for relief, Smith argues that the Alabama Court of Criminal Appeals unreasonably applied *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B.* when reviewing his *Batson* claims. (*Id.* at ¶ 41).  As an initial matter, because Smith raised these claims in the state courts on direct appeal, and the Court of Criminal Appeals denied them on the merits, these claims are exhausted for purposes of federal review. *See Smith II*, 838 So. 2d at 425-36, 464-66. Smith contends that the Alabama courts' determination that the trial prosecutor had genuine,

race-neutral and gender-neutral reasons for striking women from his jury was unreasonable in light of the facts and unreasonably applied *Batson* and *J.E.B.*[4] The court disagrees.

In reviewing whether a prosecutor intentionally used peremptory strikes to discriminate against a protected class of jurors, a federal habeas court necessarily relies heavily on the state trial court's "evaluation of the prosecutor's state of mind based on demeanor and credibility." *Hernandez v. New York*, 500 U.S. 352, 364–65 (1991). Credibility determinations regarding a prosecutor's motivations "lie peculiarly within a trial judge's province." *Davis v. Ayala*, 135 S. Ct. 2187, 2201 (2015) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). Thus, the Supreme Court requires that this court defer to the state court's evaluation of a petitioner's *Batson/J.E.B.* challenge unless "exceptional circumstances" exist for not deferring. *Id.* The court acknowledges that the deference owed to the state trial court is not insurmountable, but concludes in this case that Smith's allegations do not present the type of "exceptional circumstances" that merit federal habeas relief for the alleged *Batson* and *J.E.B.* violations. *Id.*

### 1.    Standard of Review

A prosecutor's motive in striking a juror is a factual issue, and a state court's factual findings are presumed correct on federal habeas corpus review. 28 U.S.C. § 2254(d)(2), (e)(1); *Miller-El v. Dretke* ("*Miller-El II*")*,* 545 U.S. 231, 240 (2005). In seeking habeas relief, Smith bears the burden of rebutting that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240; *Hernandez*, 500 U.S. at 364  ("*Batson*'s treatment of intent to discriminate as a pure issue of fact, subject to review under a deferential standard, accords with our treatment of that issue in other equal protection cases."). *See also Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172, 1207 (11th Cir. 2013) (applying the "highly

---

[4]    For the purposes of § 2254(d)(1), the court notes the holdings of *Batson* and *J.E.B.* were clearly established at the time of the Alabama Court of Criminal Appeals' opinion in *Smith III*.

deferential standard" from the Antiterrorism and Effective Death Penalty Act ("AEDPA") to the state appellate court's *Batson* decision). Smith must also show that the state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence and that its denial of the *Batson* claims was "objectively unreasonable" under § 2254(d)(2). *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("*Miller-El I*"); *see also Davis*, 135 S. Ct. at 2199 ("A federal habeas court must accept a state-court finding unless it was based on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"); *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) ("On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'") (quoting *Renico v. Lett,* 559 U.S 766, 773 (2010)).

### 2.      Discussion of Smith's Gender-Based *Batson*/*J.E.B.* Claims

The Equal Protection Clause prohibits the use of peremptory strikes against potential jurors based on a juror's race or gender. *See generally J.E.B.*, 511 U.S. 127; *Batson*, 476 U.S. 79. The Supreme Court has set out a three-step inquiry to evaluate whether a prosecutor's use of peremptory strikes was discriminatory. *Batson*, 476 U.S. at 96-98. The Supreme Court summarized this inquiry in *Miller–El I*. First, the defendant must make a prima facie case that the prosecutor exercised a peremptory challenge on the basis of race or gender; second, if the trial court finds that a prima facie case has been established, the prosecutor must offer a permissible, non-discriminatory justification for its peremptory strike; and, third, the trial court must decide whether the defendant has shown purposeful discrimination despite the proffered reasons. *Miller-El I*, 537 U.S. at 328–29.

With regard to Smith's claim of purposeful discrimination against female veniremembers, *Batson*'s threshold inquiry and its first and second steps are established. Women

are a cognizable group for *Batson* purposes. *See generally J.E.B.*, 511 U.S. 127. On direct appeal, the Court of Criminal Appeals held that Smith had established a prima facie showing of gender discrimination. *Smith I*, 698 So. 2d at 1169. On remand to the trial court, the prosecution proffered non-discriminatory reasons for those strikes. *Smith II*, 838 So. 2d at 426-27. Therefore, the issue before this court centers on whether the Alabama courts' finding that Smith failed to carry his burden of showing purposeful discrimination under *Batson*'s third step was unreasonable in light of the state court record. *See Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1250 (11th Cir. 2013).

> **a.       Peremptory Strikes of Prospective Jurors Based on Church Activities**

Smith alleges that the prosecutor's peremptory strikes of five female venirepersons -- Karen Marlar, Margaret Plyler, Dorothy Long, Glenda Freeman, and Leigh Cosby **--** because of their church volunteer activities were discriminatory. (Doc. # 1 at ¶¶ 50-58). Smith argues that the prosecutor exercised those strikes because of the five panelists' gender based on the prosecutor's pattern of strikes against female jurors and the absence of any questioning related to "the jurors' religious attitudes and beliefs." (*Id.* at ¶ 50). Smith also contends that the record shows inconsistent treatment between the struck jurors and those who were not struck. (*Id.* at ¶ 55). The court first discusses the peremptory strikes employed against the four female venirepersons who were struck solely on the basis of church involvement (Cosby, Long, Marlar, and Plyler).

At the trial court's *Batson* hearing, the prosecutor summarized his reasons for the strikes as follows: (1) Cosby was struck because she worked at a church in the kindergarten class; (2) Long was struck because she was a church volunteer, a Sunday School teacher, and a volunteer with the Red Cross; (3) Marlar was struck because she was a Sunday School leader; and (4)

Plyler was struck because she did volunteer work at a church and was the church's counselor of ministry. *Smith II*, 838 So. 2d at 426-27. According to Smith, the prosecutor asked no questions at all of veniremembers Long, Marlar, or Plyler and only one question, unrelated to religious beliefs, of Cosby. (*See* Doc. # 1 at ¶ 51). During the remand hearing, the prosecutor explained that he struck these potential jurors on the basis of their church activities because he believed that they would be more receptive to the defense's arguments for mercy at sentencing in a capital case:

> I struck a lot of these [veniremembers] because they worked in the church; Sunday School teachers and Sunday School leaders, and things of that nature, and from people that I knew the defense counsel, if it came to the second phase of the sentencing hearing, would be asking the jurors to show mercy. And, it was my opinion that this argument would be receptive to someone who worked in the church and was well versed in the Bible more than someone who was not; be a female or male juror that was a strong worker in the church. No male jurors that was [sic] left seated on the jury worked in the church. …
>
> So, that is why I took into consideration when someone was a Sunday School leader, or Sunday School teacher, or someone that was well versed in the church, that that argument would be more receptive toward that juror as far as returning an advisory verdict of life without parole instead of death.

*Smith II*, 838 So. 2d at 427.

Smith's counsel challenged the reasons proffered at the remand hearing as pretextual and argued that the prosecutor did not question these potential jurors about their church activities during panel or individual voir dire. *Id.* at 428. The record shows that the information about veniremembers' religious activities was elicited during the defense's voir dire questions. (State Court Record, Vol. 3, at 297-304). The defense further noted that the prosecutor did not strike a female venireperson who also answered that she was a volunteer Sunday school teacher and on her church's board. *Smith II*, 838 So. 2d at 427-29; (State Court Record, Vol. 3, at 299-300).

The trial court credited the prosecutor's reasons for striking Cosby, Long, Marlar, and Plyler based on their church activities, finding that "the Court finds no juror was struck by the State for the reason that she was a female." (State Court Record, Vol. 13, Remand Hearing Transcript at 26). The trial court credited the prosecutor's testimony and observed that he was "certainly not a person prone to strike minorities denounced in the *Batson* case and its progeny." *Smith II*, 838 So. 2d at 436; (State Court Record, Vol. 34, Tab R-71 at 026). The trial court based that finding on "extensive in court experience with [the prosecutor] and close acquaintanceship with others that know him." (State Court Record, Vol. 34, Tab R-71 at 026).

On return to remand, the Alabama Court of Criminal Appeals acknowledged that the prosecutor had failed to ask potential jurors about their religious affiliations or duties and asked no follow-up questions to the defense's voir dire. *Smith II*, 838 So. 2d at 430. "Moreover," the Court of Criminal Appeals noted, "each of these jurors who was struck by the prosecutor based on her religious undertaking had previously affirmed that she would have no problem imposing the death penalty." *Id.* Nevertheless, the Court of Criminal Appeals affirmed the trial court's finding that the proffered reasons for the challenged strikes "were sufficiently facially gender neutral." *Id.* at 436.

Smith relies on the prosecutor's failure to strike three other veniremembers with religious affiliations as proof of the State's disparate treatment of female potential jurors, and, thus, evidence that the State's proffered ground for the strikes under discussion was a pretext for gender discrimination. (Doc. # 1 at ¶¶ 51, 54-55). In Smith's comparative juror analysis, he argues that the prosecutor left three panelists on the venire -- Mr. Johnson, Mary Parham, and John Hall -- who possessed the same characteristics as those female venirepersons who were struck for religious affiliations. (Doc. # 39 at 15-17). John Hall, who was the defense's twelfth

strike, was a football coach at a Young Men's Christian Association (YMCA) chapter. (State Court Record, Vol. 3, at 298). Mary Parham, who stated during voir dire that she was a youth director at a Sunday school, was a deputy with the Jefferson County Sheriff's Department, and was the last defense strike. (*See id.* at 152, 203, 304). Parham served as an alternate juror.  (*Id.*; Vol. 9, at 1445).[5]

Although "side-by-side" comparisons of venirepersons who were struck and other panelists who were allowed to serve may be used to show disparate treatment, *see Miller-El II*, 545 U.S. at 241, the comparisons Smith relies upon here are tenuous. One of Smith's "comparators" was a female. The prosecutor's failure to strike an additional woman does not indicate gender discrimination, particularly as the empaneled juror, Mary Parham, could have been viewed as a favorable juror by the prosecutor because she was a sheriff's deputy. (*See* State Court Record, Vol. 3, at 152, 203, 304). Hall's coaching of a youth YMCA football team is simply not analogous to church volunteer activity, nor does it necessarily indicate his religious affiliation or his susceptibility to pleas for mercy grounded in the Christian faith. As stated earlier, the prosecutor testified that he struck Cosby, Long, Marlar, and Plyler because they might be more susceptible to a plea for Christian mercy. *Smith II*, 838 So. 2d at 427. Therefore, a comparison between the struck veniremembers and Hall provides little, if any, evidence indicating the prosecutor's discriminatory intent.

As for Plaintiff's claim that the prosecutor failed to strike "Mr. Johnson" due to his religious volunteer activity (*see* Doc. # 39 at 15-16), there was not anyone in the venire pool named Johnson (State Court Record, Vols. 2 at 134-54; 3 at 155-61), and the court cannot discern which veniremember indicated membership on a church board.  (*Id.*, Vol. 3, at 300). To

---

[5]  Earlene Kennedy, in addition to a volunteering at as a Sunday school teacher and serving on her church's board had also previously served on a criminal jury. (State Court Record, Vol. 3, at 188, 299-300). Kennedy is not mentioned as a comparator in Smith's briefing.

be sure, the transcript indicates that a juror named "Mr. Johnson" indicated membership on a church board (*id.*); however, the venire pool did not contain any member with the surname of Johnson. (*See id.*, Vols. 2 at 134-54; 3 at 155-61). Smith has not shown (much less asserted) which juror is the one the transcript referred to as "Mr. Johnson." (*See* Doc. # 39 at 13, 15-16). The court cannot determine whether it was a male juror who was not struck, and, if so, the other characteristics of that juror. Therefore, the court cannot rely upon a comparison between the struck female veniremembers and "Mr. Johnson" to conclude that the Court of Criminal Appeals made an unreasonable decision or an unreasonable determination of fact when it affirmed the trial court's denial of Smith's *Batson*/*J.E.B.* claim.

But, even putting aside that issue, the prosecutor's rationales do not suggest the type of post-strike rationalizations for pretextual discrimination condemned in *Miller-El II*. The Court of Criminal Appeals reasonably affirmed the trial court's factual finding that the prosecutor gave credible reasons for striking veniremembers. Simply stated, Smith's case is not comparable to others in this circuit in which courts have granted habeas relief to § 2254 petitioners for *Batson* claims. As another court in this circuit has observed, if the female potential jurors struck by the prosecutor had been the only women in the venire, or if all other women had been struck from the jury, a gender-neutral reason "otherwise unsupported by the record would provide strong evidence of intentional discrimination." *McNair v. Campbell*, 307 F. Supp. 2d 1277, 1298 (M.D. Ala. 2004), *rev'd in part on other grounds*, 416 F.3d 1291 (11th Cir. 2005). *See also United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995) (concluding that the presence of four African-American jurors on defendant's jury was "a significant factor tending to prove the paucity of the claim"). In this case, though, the record shows that five women served on Smith's

jury as deliberating jurors.[6] (State Court Record, Vol. 34, Tab R-71 at 018). While the prosecutor's use of fourteen of his fifteen strikes against women suggests some pattern of strikes, Smith's trial jury ultimately had five women and seven men, which significantly weakens the strength of his prima facie discrimination case. *Cf. Adkins*, 710 F.3d at 1255 (concluding that a prosecutor's use of peremptory strikes to exclude nine of eleven potential black jurors, resulting in only one black juror serving on the petit jury, was a disparity unlikely to have occurred by chance); *McGahee v. Alabama Dep't of Corr.*, 560 F.3d 1252, 1267 (11th Cir. 2009) (observing a strong prima facie case where, combining the prosecution's cause and peremptory strikes, the prosecution struck 24 African-American jurors, leaving an all-white jury in a county which was 55 percent African-American); *Bui v. Haley*, 321 F.3d 1304, 1309, 1314 (11th Cir. 2003) (finding a *Batson* violation where the prosecution failed to present race-neutral reasons from the prosecutor who actually used 9 of his 13 strikes to remove African-Americans from the jury and presented no reason for striking 1 black venireperson). Smith's counsel did not suggest that the State prosecutor's office had a history of discriminatory strikes against women. Nor did he suggest that the case presented a sensitive subject matter that would have incentivized the prosecutor to strike women. *See United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1045 n. 39 (11th Cir. 2005) ("In some *Batson* claims, the subject matter of the case may be relevant if it is racially or ethnically sensitive."). For these reasons, Smith did not provide a particularly strong prima facie case, such as the prima facie discrimination cases presented in *Adkins* or *McGahee*. Accordingly, the court cannot rely on Smith's prima facie gender-discrimination case alone as substantial evidence that the Court of Criminal Appeals unreasonably adjudicated this claim.

Moreover, Smith has not presented strong side-by-side comparisons between female veniremembers who were struck for their religious volunteer activities and male veniremembers

---

[6] Two female jurors served as alternates. (State Court Record, Vol. 34, Tab R-71 at 018).

who were not struck by the prosecutor. As discussed above, Hall's coaching activities do not suggest that he was as invested in his religious beliefs in the same manner as veniremembers who served as church volunteers, Sunday School teachers, or ministry counselors. *See Smith II*, 838 So. 2d at 426-27 (describing the volunteer activities conducted by veniremembers Cosby, Long, Marlar, and Plyler). The transcript suggests that another unidentified juror (*i.e.*, one who was identified by the wrong name) was a church board member, but the court cannot compare that unidentified juror to those struck by the State through its peremptory challenges. (*See* State Court Record, Vol. 3, at 300). Finally, Parham was a female juror, so the State's failure to strike her does not indicate the prosecutor's discriminatory intent against women.

The state court record here does not support a conclusion that Hall, "Johnson," and Parham were so similarly situated to the struck female venirepersons that the prosecutor's facially race-neutral reasons must have been pretextual. Although they shared some characteristics of the struck jurors, the state court record does not show that they were indistinguishable in other relevant characteristics. Smith's simplistic argument does not account for other counter-factors. In sum, a comparison between the struck jurors and the ones that the prosecutor did not strike was not so close that a court could only conclude that the proffered reasons were a pretext for purposeful discrimination against women. *Cf. Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).

### b.     Peremptory Strike of Venireperson Freeman

Smith also contends that the prosecutor used a peremptory strike to remove Glenda Freeman because of her gender. (Doc. # 1 at ¶¶ 59-61). The prosecutor asserted that Freeman was stuck for being a church youth minister and for having had legal training. (State Court Record, Vol. 13, Remand Hearing Transcript at 24). But, Smith argues that these reasons were

pretextual because the prosecutor did not strike two male venirepersons with similar legal training. (Doc. # 1 at ¶ 61). According to Smith, Freeman did not reveal any church activities during her voir dire testimony. (State Court Record, Vol. 13, Remand Hearing Transcript at 34). However, the prosecutor insisted at the remand hearing that he had personal knowledge of her church involvement. (*Id.* at 48). Because she was one of the final jurors stricken from the venire pool, Freeman served as an alternate on Smith's jury and was dismissed before deliberations. (*Id.*, Vol. 9, at 1445).

At the *Batson* remand hearing, the prosecutor also emphasized Freeman's legal training as a reason that he struck her. (*Id.*, Vol. 13, Remand Hearing Transcript at 24-25). Freeman had taken criminal law and criminal procedure law school classes from both the prosecutor and Smith's defense lawyer, as well as classes from a prominent criminal defense lawyer in Birmingham. (*Id.*, Vol. 4 at 456-57; Vol. 13, Remand Hearing Transcript at 25-27). Freeman stated during voir dire that she believed she would be "influenced" by those classes. (*Id.*, Vol. 3 at 250-51), The prosecutor believed that this influence "would not be good for [the prosecution]." (*Id.*, Vol. 13, Remand Hearing Transcript at 26-27). The trial court and the Alabama Court of Criminal Appeals credited these reasons as plausible and non-discriminatory. *Smith II*, 838 So. 2d at 436; (State Court Record, Vol. 34, Tab R-71 at 025-026).

Smith argues that both of the prosecutor's proffered justifications for striking Freeman, while facially gender-neutral, do not withstand scrutiny. As an initial matter, Smith points out that Freeman said during voir dire that her connection to the trial attorneys through her law school classes would not interfere with her consideration of the evidence, thus affirming her fitness to be a juror. (Doc. # 39 at 17-18). Smith also contends that, while Freeman was struck due to her law school training, the prosecutor did not strike two male venirepersons, James

Buettner and Dale Morgan, who also identified themselves as either studying law or having taken criminal justice courses in the past. (*Id.* at 18-19). Morgan ultimately served as one of Smith's jurors. (*Id.* at 18).

In reviewing a comparative juror analysis under *Batson*, a relevant factor is whether the prosecutor has articulated a credible "connection between the [gender]-neutral characteristic identified and the desirability of a prospective juror." *Jamerson v. Runnels*, 713 F.3d 1218, 1229 (9th Cir. 2013) (citing *Rice v. Collins*, 546 U.S. 333, 341 (2006)); *see also Taylor v. Sec'y, Dep't of Corr.*, 507 F. App'x 887, 891 (11th Cir. 2013) (holding that the State's use of a peremptory challenge to strike an African-American juror because the juror's brother was a police officer "was not unreasonable as an individual's understanding of the criminal justice system could be a reason that a prosecutor would not want that individual on the jury.")

A state court's finding that a prosecutor acted in a race-neutral and gender-neutral fashion in striking potential jurors is difficult to overcome "on the basis of a cold record." *Rice,* 546 U.S. at 343 (Breyer, J., concurring). Smith's comparison between Freeman and the male jurors who were not struck falls far short of showing that the prosecutor struck Freeman due to any discriminatory intent. When the facts permit "two permissible views of the evidence," as is the case here, "the factfinder's choice between them cannot be clearly erroneous." *Hernandez*, 500 U.S. at 369 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). Simply put, a wide gulf exists between the isolated criminal justice course Morgan took and the extensive legal training Freeman had received, *which included classes from counsel involved in the case*. (*See* State Court Record, Vol. 3, at 277-78). Additionally, the record does not indicate how much legal training Buettner had received before the trial began. (*See id.* at 196 (indicating that Buettner affirmatively responded to the prosecutor's question of whether he had studied law)).

The Alabama Court of Criminal Appeals could have reasonably determined that Freeman's legal training was a non-pretextual reason for the prosecutor's strike. *See Sifuentes v. Brazelton*, 825 F.3d 506, 527 (9th Cir.), (concluding that, although the stricken veniremember had not practiced law, "the prosecutor may have reasonably been concerned that a person with legal training would exhibit the behaviors on a jury that the prosecutor feared"), *cert. denied*, 137 S. Ct. 486 (2016). This is especially true because neither Morgan nor Buettner stated that their legal training would influence their perception of the case, whereas Freeman confirmed that it would influence hers. (State Court Record, Vol. 3, at 250-51). Given the deferential standard afforded to the trial and state court's determination under the AEDPA, this court cannot conclude with a "definite and firm conviction that a mistake has been committed." *Hernandez*, 500 U.S. at 370 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Indeed, just the opposite is true. Therefore, this claim is due to be denied.

### c.     Peremptory Strike of Prospective Juror Carolanne Roberts

Smith further contends that the prosecutor's strike of Carolanne Roberts was not gender neutral. (Doc. # 1 at ¶ 69). During voir dire, Roberts stated that she was a travel writer for Southern Living magazine. (State Court Record, Vol. 3, at 270). The prosecutor testified that he struck Roberts because, as a journalist, she might ask questions about the "who, what, where, when, and why" of the offense. (*Id.*, Vol. 13, Remand Hearing Transcript at 19-20). And, the prosecutor believed that the reasons why Smith committed the murder would not favor the sentence the State sought. (*Id.* at 20-21). The prosecutor further recounted his concern that a journalist might be more sympathetic to the defense's penalty phase argument for mercy based on Smith's deprived background. (*Id.* at 20). Smith contends that these proffered reasons were illegitimate because the prosecutor failed to question Roberts during voir dire about her

occupation or whether being a reporter might affect her ability to be a juror. (Doc. # 1 at ¶ 69). This failure to question Roberts, Smith argues, belies the prosecutor's explanation that Roberts' job was significant in his decision to peremptorily strike her. (*Id.*). *Batson*, however, requires only that the prosecutor offer a legitimate, non-discriminatory reason for a peremptory that does not violate the Equal Protection Clause. *Purkett*, 514 U.S. at 768–69. There may be a number of reasons why an attorney may not ask specific questions in an area which is already concerning to him (*e.g.*, not eliciting an unfavorable response in front of the venire, conservation of voir dire time, and the need to focus questions on other members of the panel). And, peremptory strikes based on a veniremember's occupation generally have been upheld as gender-neutral. *See United States v. Steele*, 178 F.3d 1230, 1235 (11th Cir. 1999); *J.E.B.*, 511 U.S. at 142 n. 14. The evidence in the state court record about the strike of Carolanne Roberts is insufficient for the court to find that the Alabama Court of Criminal Appeals adjudicated this claim unreasonably.

### 3. Discussion of Smith's *Batson* Claims Based on Race and National Origin Discrimination

As part of his second claim, Smith argues that the prosecutor engaged in purposeful discrimination when he struck Lourdes Ramos. (Doc. # 1 at ¶ 68).  Smith contends that the prosecutor considered not only Lourdes's Hispanic origin but also her gender in striking her. (*Id.*). In addition, Smith claims that the prosecutor discriminated against African-Americans by using five peremptory strikes against African-American women. (*Id.* at ¶¶ 78, 80).

At trial, Smith's counsel raised three objections to  the prosecutor's use of his peremptory strikes. He first asserted that the prosecutor had used 14 of his 15 strikes against women. (State Court Record, Vol. 4, at 453). Next, he claimed that the prosecutor struck the only Hispanic member of the venire pool, Ramos. (*Id.* at 453-54). He noted that the prosecutor had asked no questions of Ramos and had used his seventh strike to remove her from the jury. (*Id.* at 454).

Moreover, Smith's counsel highlighted the racial sensitivity of the case, which involved a black defendant and a white victim. (*Id.* at 460).

Finally, Smith's attorney contested the prosecutor's decision to strike five black jurors.[7] (*Id.* at 461). Counsel argued "that [Jefferson County's] prosecutor's office has been reversed on many, many, many occasion for systematically excluding blacks." (*Id.*). The trial court disagreed with counsel's characterization of the prosecutor's office, and counsel replied that he had previously "reversed them myself." (*Id.*). The court observed that one black juror "lean[ed] to the defendant, another black juror "ha[d] a problem with capital punishment," and a third black juror was "nervous" and did not "want to see the pictures." (*Id.* at 463). Ultimately, the trial court found that defense counsel had failed to present a prima facie case of race discrimination under *Batson*. (*Id.* at 464).

On direct appeal, the Alabama Court of Criminal Appeals determined that Smith had made a prima facie showing of discrimination and remanded his case for a *Batson* hearing in which the prosecutor would provide his reasons for striking fourteen of the fifteen women in the venire. *Smith I*, 698 So. 2d at 1169. The Court of Criminal Appeals specifically noted in its opinion that "juror no. 210 [Ramos] was struck without having been asked any questions." *Id.*

At the remand hearing, the prosecutor explained that he had struck Ramos because she had failed to answer any questions during the questioning, she was especially young, and she was single. (State Court Record, Vol. 34, Tab R-71 at 023-024). As the prosecutor elaborated:

> when you enter a voir dire, and you are looking at the child, and she is looking scared back there in the middle of a courtroom, you can look over her and say, Ms. Ramos, you haven't said nothing to us today. Why don't you tell us something about yourself? And, again, I have to do that with all the other jurors or I will be picking on her, and then sometimes that backfires.

---

[7] Before addressing the *Batson* objections, the trial court noted that 11 of the 42 members of the venire pool were African-American. (State Court Record, Vol. 4, at 449).

(*Id.*, Vol. 13, Remand Hearing Transcript at 13). The prosecutor added that Ramos was "just nonresponsive, and a kid of this nature, with her age, I just thought she was a bit young to take a chance on having her on the jury, and that's about it." (*Id.* at 13-14). The trial court credited the prosecutor's explanation for his strike of Ramos. (State Court Record, Vol. 34, Tab R-71 at 026). On return to remand, the Court of Criminal Appeals affirmed the trial court's finding that the prosecutor's explanations for the challenged strikes were facially gender-neutral and that the prosecutor did not violate *J.E.B. Smith II*, 838 So. 2d at 436.[8] This claim thus has been exhausted for federal review.

In addition to affirming the trial court's finding that the prosecutor had not discriminated against women in his peremptory strikes, the Court of Criminal Appeals also affirmed the trial court's finding that defense counsel had failed to present a prima facie case of discrimination for his other *Batson* claims. *Smith II*, 838 So. 2d at 464-66. With regard to the prosecutor's strikes of African-American veniremembers, the Court of Criminal Appeals determined that defense counsel had provided no evidence to support an inference of discrimination other "than the fact that five of black potential jurors were struck." *Id.* at 466. With regard to the prosecutor's strike of Ramos, the sole Hispanic veniremember, the Court of Criminal Appeals concluded that there was no "pattern of discrimination" because there had been only one Hispanic individual in the venire pool. *Id.* The Court of Criminal Appeals discovered "no indication [of discriminatory intent] from the questioning of the prosecutor." *Id.* "Furthermore, because the appellant's *Batson* motion concerning the striking of the one Hispanic potential juror was based solely on the fact that he was asked no question by the prosecutor, the appellant failed to establish a prima facie

---

[8]  Smith raised the *J.E.B.* claim again in Rule 32 proceedings, which the circuit court found was precluded by Ala. R. Crim. P. 32(a)(2) and (a)(4) because the claim had been raised and addressed at trial and on appeal. *Smith II*, 838 So. 2d at 425-36 (as to female potential jurors) and 464-66 (as to the Latina and African-American potential jurors).

case, as this Court has held that such facts alone do not create a sufficient inference of discrimination." *Id.* Finally, the Court of Criminal Appeals observed that the prosecutor asked Ramos questions "along with the rest of the veniremembers, . . . although she failed to respond to any of these questions." *Id.*

Again, under AEDPA, this court must consider whether the Court of Criminal Appeals unreasonably determined that (1) defense counsel failed to present a prima facie showing of discrimination on the grounds of race and national origin, and (2) the prosecutor provided a sufficiently race-neutral and gender-neutral explanation for striking Ramos. The court addresses these questions below.

First, the Alabama Court of Criminal Appeals reasonably applied *Batson* and made no unreasonable determination of fact when it held that Smith had failed to establish a prima facie case of discrimination against African-Americans or Hispanics in the prosecutor's use of peremptory strikes. *Smith II*, 838 So. 2d at 464-66. With regard to Smith's *Batson* claim for strikes against African-American jurors, the record demonstrates that the prosecutor used 5 of his 15 strikes against African-American veniremembers and that 5 African-American jurors remained after jury selection. (State Court Record, Vol. 4, at 448-49, 452). Thus, this case presents an especially weak statistical prima facie case of discrimination based on race (African-American). *Cf. United States v. Hill*, 643 F.3d 807, 838-39 (11th Cir. 2011) (concluding that the defendant presented no prima facie case of discrimination where the prosecutor had used 64 percent of his strikes against black jurors, the prosecutor could have struck 5 more black veniremembers, 9 jurors were black, and no other circumstances supported an inference of discrimination). Smith's defense counsel explained why some of the struck jurors were indistinguishable from male potential jurors in the venire pool, but he used those comparisons to

support a gender-based *Batson* claim, not a race-based *Batson* claim.  (*See* State Court Record, Vol. 4, at 453-58). The court has reviewed Smith's defense counsel's *Batson* arguments (*see id.* at 448-61), but concludes that the Alabama Court of Criminal Appeals' finding that there was no prima facie showing of discrimination against African-American jurors was reasonable, given the especially weak statistical evidence of the prosecutor's intent to strike black jurors.[9]

Second, the court concludes that the Court of Criminal Appeals reasonably affirmed the trial court's determination that defense counsel failed to establish a prima facie *Batson* claim regarding Hispanic jurors. The Court of Criminal Appeals correctly found no pattern of discrimination against Hispanic jurors, as there was only one Hispanic individual in the venire pool. *See Smith II*, 838 So. 2d at 466. Smith's defense counsel complained of a history of discrimination against black jurors, but did not suggest that the prosecutor's office had a history of discrimination against *Hispanic* jurors. (State Court Record, Vol. 4, at 461). Additionally, to the extent that the case implicated racial concerns because it involved an African-American defendant and a white victim, the Court of Criminal Appeals reasonably could have found that fact irrelevant to a prima facie showing of discrimination against Hispanic veniremembers because the crimes at issue did not involve a Hispanic individual.[10] (*See id.* at 460). For these

---

[9]  Although Smith argues that the prosecutor struck African-American jurors for a discriminatory purpose (*see* Doc. # 1 at ¶¶ 78-81), he has not identified any specific juror who was struck due to his or her African-American race. Indeed, Smith's reply brief does not even discuss the *Batson* claims premised upon allegedly discriminatory strikes of African-American veniremembers. (*See* Doc. # 39 at 5-30 (discussing the gender-based *Batson* claims and the allegedly discriminatory strike of the sole Hispanic veniremember)). Nevertheless, in the interest of completeness, the court has addressed the denied race-based *Batson* claim presented to the Alabama Court of Criminal Appeals.

[10]  Smith cites *Madison v. Commissioner, Alabama Department of Corrections*, 677 F.3d 1333 (11th Cir. 2012), in support of his gender-based *Batson* claim, but does not cite that case to support his race-based or national-origin-based *Batson* claims. (*See* Doc. # 39 at 8, 11-12). Nevertheless, the court has analyzed *Madison* in reviewing the race-based or national-origin-based *Batson* claims and concludes that *Madison* is distinguishable. In *Madison*, the Eleventh Circuit held that the Alabama Court of Criminal Appeals unreasonably applied *Batson* when concluding that the petitioner had failed to present a prima facie showing of race discrimination. *See* 677 F.3d at 1337-39. The *Madison* panel emphasized that the Court of Criminal Appeals erred by requiring the defendant to establish "purposeful racial discrimination" at the first step of *Batson*, instead of merely demonstrating an inference

reasons, Smith has established no basis for habeas relief on his *Batson* claims of race discrimination and national origin discrimination.

Third, and in any event, even if the Court of Criminal Appeals unreasonably applied the first prong of *Batson* when analyzing Smith's national-origin *Batson* claim (and, to be clear, the Court of Criminal Appeals reasonably applied that precedent), that court reasonably applied the third prong of the *Batson* test when finding that the prosecutor presented credible non-discriminatory reasons for striking Ramos. Smith maintains that the prosecutor's reasons for striking Ramos were merely a pretext for gender and national origin discrimination. (Doc. # 1 at ¶ 68). He points to the prosecutor's decision not to strike two male venirepersons who sat on the jury, Mark Roddam, and William T. Pesnell, even though they shared similar characteristics with Ramos. (*Id.* at ¶ 64). Like Ramos, Roddam and Pesnell were single. (State Court Record, Vol. 3, at 155-56). However, the similarities end there. That is, Smith's comparison does not take into account the additional reasons that the prosecutor provided for striking Ramos -- her youth and her lack of responsiveness -- which are relevant and gender-neutral reasons to strike a panelist and are also differences between Ramos and the two male jurors who Smith argues were similarly-situated. The prosecutor's explanations emphasized Ramos' age and the fact that he knew nothing about her as the primary factors as motivating his choice. And, the state trial and appellate courts credited those reasons as nondiscriminatory under *J.E.B.* and *Batson*. *Smith II*, 838 So. 2d at 436 ("In the present case, the prosecutor came forward with a facially neutral explanation for striking these potential jurors; his reasons based on religion were facially neutral

---

of racial discrimination. *Id.* at 1338. In contrast, the Court of Criminal Appeals in *Smith II* clearly enunciated the appropriate legal standard for determining whether a defendant had presented a prima facie case of discrimination. "Only when the defendant establishes facts and circumstances that raise an inference of discrimination must the State give its reasons for its peremptory strikes." *Smith II*, 838 So. 2d at 465 (quoting *McElmore v. State*, 798 So. 2d 693, 695-96 (Ala. Crim. App. 2000)). Therefore, this case is distinguishable from *Madison* because the Court of Criminal Appeals did not issue a decision contrary to *Batson*. *See Madison*, 677 F.3d at 1339 ("Because the state-court decision falls within the 'contrary to' clause of § 2254(d)(1), we must undertake a *de novo* review of the record.").

to a claim of discrimination based on gender."). The court perceives no ground for disturbing this finding.

Smith next argues that the prosecutor's explanation for striking Ramos is not compelling (at least, not compelling to his counsel). But, it need not be. As the Supreme Court has noted in *Rice*, 546 U.S. at 341-12, a state trial court's decision to credit a prosecutor's race-neutral explanation for a peremptory strike of a young African-American female for being young and rolling her eyes during voir dire was not an unreasonable factual determination. The Court in *Rice* reiterated that a prosecutor's explanation for striking a challenged juror need not be particularly "'persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Id.* at 338 (quoting *Purkett*, 514 U.S. at 767-768). "Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 341-42. As in *Rice*, Smith's allegations are insufficient to "supersede the trial court's credibility determination" under § 2254(d)'s deferential standard of review. *Id.* The evidence in the state court record presents no evidence that raises an inference of a discriminatory motive.

To warrant habeas relief, a petitioner must show that the state court's decision was objectively unreasonable, not merely incorrect. The Alabama Court of Criminal Appeals was persuaded that the prosecutor's justification for striking Ramos was nondiscriminatory. *Smith II*, 838 So. 2d at 436. Because this court cannot conclude that the state court's decision was unreasonable in its application of the law or that its factual findings were incorrect by clear and convincing evidence, the writ cannot be granted on this claim. *See Lockyer*, 538 U.S at 75-76 ("[A] federal habeas court may not issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.").

> **B.** **Whether this Court is Barred from Reviewing Smith's Allegation that the State's Administration of the Antipsychotic Drug Haldol During the Trial and Penalty Phase Violated Smith's Rights under the Fifth and Sixth Amendments**

Under the Due Process Clause of the Fourteenth Amendment, a defendant awaiting trial has "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (discussing how the liberty interest in avoiding unwanted medication applies to convicted prisoners); *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) (providing that state pretrial detainees have a liberty interest under the Fourteenth Amendment in avoiding forced administration of antipsychotic medication). The Supreme Court has recognized that a significant liberty interest is implicated when a capital trial defendant is involuntarily medicated to the point that he or she is impaired in assisting counsel. *See Sell v. United States*, 539 U.S. 166, 179, 181 (2003). In light of that significant interest, if a state entity wishes to involuntarily administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges, the government must show that "the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." *Id.* at 179. The rights involved in involuntary medication are critical. Once it has been established that a defendant was involuntarily medicated during a criminal trial without the proper due process considerations, because of the "substantial probability of trial prejudice," prejudice is presumed. *Riggins*, 504 U.S. at 137-38.

In his third argument for reversal, Smith alleges that his constitutional rights under *Harper* and *Riggins* were violated because he was inappropriately medicated with the anti-

psychotic drug Haldol (Haloperidol) during his capital murder trial.[11] (Doc. # 1-1 at ¶¶ 96-102). According to Smith's counsel, the medication caused him to appear at trial as emotionless and unremorseful for his crimes, a demeanor that the prosecution commented upon during the guilt phase closing argument. (Docs. # 1 at ¶¶ 90-91; 1-1 at ¶¶ 91-92). For these reasons, Smith argues that the administration of Haldol violated his due process rights. (Doc. # 1-1 at ¶¶ 100-07). Smith further alleges that the inappropriate administration of Haldol compromised his Sixth Amendment right to counsel during his penalty phase and sentencing proceedings. (*Id.* at ¶¶ 96-99).

The State counters that Smith's *Harper/Riggins* claim is precluded from federal habeas review because the Alabama state courts held that the claim was procedurally defaulted. (Doc. # 28 at 23-25). For the reasons explained below, the court concludes that this claim is due to be denied because the Alabama Court of Criminal Appeals denied it on an adequate and independent state ground.

Smith's medical records apparently were not retained by the jail where he was housed during trial. *Smith III*, 112 So. 3d at 1139. Therefore, there is no conclusive evidence of whether the State actually administered Haldol to Smith during his trial. (*See* State Court Record, Vol. 34, Tab R-74 at 10). More importantly, Smith has offered no evidence that he objected before or during his capital murder trial to any drug being administered to him involuntarily or otherwise given to him against his will. (*See id.*).

---

[11] To be clear, Smith himself has never testified (orally or by affidavit) that he was administered Haldol, but there is record evidence that the medication was administered to him at the jail facility in which he was housed before his trial. (State Court Record, Vol. 34, Tab R-74 at 10 ("Dr. Morton testified that Willie Smith was on Haldol when he came to prison from the county jail.")). Nevertheless, the trial court found it was more probable than not that Haldol was administered to Smith during the course of the trial. (*Id.* at 20 ("The Defendant did not testify that he was taking this medication, but this Court is of the opinion that the Petitioner has shown that it is more likely than not that Smith was taking Haldol at the time of his trial.")).

At the Rule 32 hearing, Dr. William Morton, Jr., an expert in the field of psychopharmacology, testified for Smith and opined that, based on his review of Smith's Holman State Prison records, Smith showed symptoms of side effects from a reaction to Haldol and there was a high likelihood that Smith had been administered the drug while in jail custody during trial. (*See* State Court Record, Vol. 30, at 184-86 (describing symptoms that could have resulted from Haldol administration)). *See also Smith III*, 112 So. 3d at 1139 ("In the 'Progress Notes' from Holman Correctional Facility, the following entry states: 'He [Smith] had apparently been given some Haldol in the County Jail, but there is no record of this in the file.'"). Dr. Morton's testimony was uncontroverted, and the Rule 32 court credited it. (State Court Record, Vol. 34, Tab R-74 at 10 (finding that the "evidence presented by the petitioner would appear to indicate that Willie Smith was [] taking Haldol at the time of trial"); 20 (stating that the "[c]ourt is of the opinion that the Petitioner has shown that it is more likely than not that Smith was taking Haldol at the time of his trial.").

### 1. Exhaustion and procedural bar

Smith's constitutional claims related to administration of Haldol (hereinafter "medication claims") are exhausted for purposes of federal habeas review because he previously presented them to the state courts, both in his Rule 32 proceedings and on collateral appeal. But, while Smith's claims may have been exhausted, the state trial court denied the claims as procedurally barred under Alabama Rule of Criminal Procedure 32.2(a)(3) and (a)(5) because Smith had not raised the claims at trial or on direct appeal. (State Court Record, Vol. 34, Tab R-74 at 10). The Alabama Court of Criminal Appeals affirmed that conclusion. *Smith III*, 112 So. 3d at 1136-38.

When a state prisoner defaults a claim in state court by violating an independent and adequate state procedural rule, "federal habeas review of the claims is barred unless the prisoner

can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. This court must therefore consider whether Smith's claims are barred from federal habeas review because the Alabama courts "clearly and expressly" refused to review the medication claims' merits because of an independent and adequate state procedural rule. *Id*. at 735-36, 750; *Harris v. Reed*, 489 U.S. 255, 260–65 (1989).

The court first turns to whether an "independent" and "adequate" state rule precludes Smith's medication claims. To determine if a state procedural rule is independent, firmly established, and regularly followed, the Eleventh Circuit Court of Appeals has applied a three-part test. First, the last reasoned state court decision in the case must have "clearly and expressly" relied on a state procedural rule to resolve the federal claim. *Card v. Dugger,* 911 F.2d 1494, 1516 (11th Cir. 1990). Second, the state court decision must have rested solidly on a state law ground that is not "intertwined with an interpretation of federal law." *Id.* Finally, the state court's refusal to hear the claim must be based on a procedural rule that is "faithfully and regularly applied." *Id.* at 1516-17.

Although the state trial court heard and discussed the issue of medication allegedly administered during Smith's capital trial, it expressly concluded that the medication claims were barred by Rule 32(a)(3) and (a)(5), except for the ineffective assistance claim related to Haldol administration. (State Court Record, Vol. 34, Tab R-74 at 10 ("To the extent the argument does not relate to an ineffective assistance of counsel claim[,] then it is precluded because it could have been raised at trial or on appeal but was not."); 12 (recognizing that the due process claim was "procedurally barred")). The Court of Criminal Appeals affirmed the trial court's application of those state procedural bars. *Smith III*, 112 So. 3d at 1136-38. Accordingly, the court finds that

the state court clearly and expressly relied on Alabama's procedural rules in refusing to review these claims. Moreover, the procedural bars of Alabama Rule of Criminal Procedure 32.2(a)(3) and (a)(5) were not intertwined with a question of federal law, and, thus, were independent state rules for the purposes of habeas review.

A state procedural rule is adequate if it was "firmly established and regularly followed" at the time of the alleged procedural default. *Ford v. Georgia,* 498 U.S. 411, 424 (1991). In this case, the court does not write on a blank slate regarding the adequacy of Alabama's Rule 32 procedural bars to habeas review of constitutional claims. The Eleventh Circuit has recognized repeatedly that Rule 32.2(a)(3) and (a)(5) are "independent and adequate" state law rules that may bar claims from federal habeas review. *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) ("The district court correctly determined that the claims ... are procedurally defaulted under Rules 32.2(a)(3) and (5) because they were not raised either at trial or on appeal."); *Holladay v. Haley*, 209 F.3d 1243, 1254 & n. 9 (11th Cir. 2000) (recognizing that claims dismissed under Rule 32.2(a)(5) are procedurally barred in federal court), *see also James v. Culliver*, 2014 WL 4926178, at *10 (N.D. Ala. Sept. 30, 2014) (explaining that Rule 32(a) provides independent state procedural rules for deciding a claim). Therefore, binding precedent establishes that Rule 32.2(a)(3) and (a)(5) are independent and adequate state law grounds for adjudicating the Fifth and Sixth Amendment medication claims which bar federal habeas review.

### 2. Cause and prejudice for the default

Smith acknowledges that his Fifth and Sixth Amendment claims were not raised at trial or on direct appeal. (Doc. # 39 at 50). Nevertheless, he argues that there was sufficient "cause" for the default and that actual prejudice would result if this court does not review his claims. (*Id.* at 51, 54-55).

To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The Supreme Court has provided examples of objective impediments.  A showing that "the factual or legal basis for a claim was not reasonably available to counsel … or that some interference by officials[ ] made compliance impracticable" can be cause for a procedural default. *Id.* (internal citations and quotation marks omitted). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a mere possibility of prejudice; he must show that the errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id*. at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) .[12]

Smith presents two claimed objective impediments as cause for his failure to comply with the state's procedural rules. (Doc. # 39 at 51-53). First, he asserts that the factual basis for this claim was not reasonably available to his trial and appellate counsel because "of the State's inadequate record-keeping, or outright deception" about Mr. Smith's medical treatment during trial. (*Id.* at 52). Second, if evidence that Smith was administered Haldol existed, Smith contends that his counsel was constitutionally ineffective for failing to discover and present it. (*Id.* at 52-54). The court addresses these arguments, in turn.

The record does not support Smith's first contention that the evidence of his Haldol administration was not discovered because it was hidden or misplaced. Smith's trial counsel testified during the Rule 32 hearing that Smith did not inform her that he had received medication at the jail. (State Court Record, Vol. 29, Tab R-63 at 61-62). Smith relies on the trial

---

[12] Alternatively, though not at issue here, a habeas court may excuse a procedural default without a showing of cause in extraordinary cases where a "constitutional violation has probably resulted in the conviction of one who is actually innocent," *Murray*, 477 U.S. at 496, or where "review of a state prisoner's claim is necessary to correct a fundamental miscarriage of justice," *Coleman*, 501 U.S. at 748 (internal quotation marks omitted).

court's observation that defense counsel could not have discovered the Haldol administration as evidence that the State concealed or destroyed the jail records. (*See* Doc. # 39 at 52 (citing State Court Record, Vol. 34, Tab R-74 at 11). But, the trial court's findings do not support a cause for failing to raise the Haldol administration issue at trial. The trial court never stated why the jail's medical records were unavailable at the time of the Rule 32 hearing. (*See id.* at 10-12). Indeed, the trial court observed that it was "not clear that the Defendant actually took Haldol." (*Id.* at 11). Simply put, Smith has not demonstrated that the State inappropriately failed to preserve medical records or that it hid facts from his counsel.

Smith's second ground for cause was addressed by the Rule 32 court. The Rule 32 trial court found that Smith's attorneys were not ineffective for failing to investigate "non-obvious psychological problems that [were] not brought to their attention by their client." (*Id.* at 20-21). The Rule 32 court found that Smith exhibited no behavior at trial that would have prompted counsel to investigate whether he was given Haldol, given that Smith's lack of communication and expressions could have reasonably been attributed to his personality and mental capacity rather than to medication. (*Id.* at 11, 21). Based upon the testimony of the witnesses and Smith's counsel during the Rule 32 hearing, the trial court found that Smith's attorneys were unaware he was being given Haldol and that they could not have discovered that fact through reasonable diligence. (*Id.* at 11). For these reasons, along with the reasons discussed below in the analysis of Smith's ineffective-assistance claim concerning counsel's allegedly inadequate investigation, Smith has not shown cause for failing to present the medication claims to the trial court or the Court of Criminal Appeals during his direct criminal proceedings.

Smith points to several cases which have concluded that an involuntary administration of medication violated a defendant's rights where the medication was involuntarily supplied or

where the provision of the medication could not be medically justified. Neither situation applies here, however. Smith's jail medical records are unavailable, and, thus, the record contains no confirmation that (1) Smith was administered Haldol during his criminal trial or (2) he objected to it being administered to him. And, even assuming the administration of the drug to Smith, he has not presented any evidence showing that the drug was medically unnecessary. In sum, Smith cannot show cause to excuse his failure to satisfy Alabama's procedural rules. Accordingly, because the Alabama Court of Criminal Appeals expressly relied on Rule 32(a)(3) and (a)(5) to decide Smith's constitutional medication claims, this court is barred from considering the merits of those claims.

### C. Whether Application of the Death Penalty to Smith Violates the Eighth Amendment to the United States Constitution and is Contrary to and an Unreasonable Application of Established United States Court Precedent

Smith argues that he is intellectually disabled[13] and, as such, application of the death penalty to him would violate his Eighth Amendment rights. (Doc. # 1-1 at 8-19). The Supreme Court has held that imposing the death penalty on intellectually disabled individuals is "excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (citing *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)).

The State makes no argument that Smith has failed to exhaust his *Atkins* claim. (*See* Doc. # 17 at ¶¶ 22-26). Nevertheless, for purposes of his petition, Smith's *Atkins* claim is deemed exhausted for purposes of federal habeas review, as he presented it in Rule 32 proceedings and on appeal to the Alabama Court of Criminal Appeals. In his petition, Smith argues that the state

---

[13] Following the guidance of the Eleventh Circuit, the court uses the terms "intellectually disabled" and "intellectual disability" in this opinion as both law and medicine have moved away from the terms "mentally retarded" and "mental retardation." *See Kilgore v. Sec'y, Florida Dep't of Corr.*, 805 F.3d 1301, 1303 n. 1 (11th Cir. 2015). However, the court uses the terms "mentally retarded" and "mental retardation" in this opinion as necessary to accurately reflect statements made by the parties, their experts, and prior opinions.

court failed to apply the proper legal test in determining that he did not prove that he was intellectually disabled.  (Doc. # 1-1 at ¶ 112).  He further argues that he exhibits subaverage intellectual functioning.  (Doc. # 1-1 at ¶ 111).  He specifically contends that he has a Full Scale Intelligence Quotient (IQ) of 64 as measured by the Stanford-Binet test.  (*Id.* at ¶ 115).  Smith's expert, Dr. Salekin, testified at the state post-conviction hearing that he had an IQ of 64 as measured by the Stanford-Binet test, and the State's expert, Dr. King, stated that he had no reason to question or doubt the numerical results of Dr. Salekin's IQ test. (10-11, 20-21). (*Id.* at ¶¶ 115-16 (*see* State Court Record, Vol. 29, Tab R-63 at 156; State Court Record, Vol. 30, Tab R-63 at 273-74)).  According to Smith, neither the Circuit Court nor the State identified a specific error in Dr. Salekin's test results.  (*Id.* at ¶ 116).

Smith contends that other neuropsychological testing confirms that he has deficits in his executive functioning.  (*Id.* at ¶ 118).  He submits that the executive system is involved in carrying out goal-oriented behavior and includes skills such as planning, sequencing, self-monitoring, and mental flexibility – skills which are required to successfully carry out everyday activities.  (*Id.* (citing State Court Record, Vol. 30, Tab R-63 at 130-32)).  He alleges that he has various deficits in this system that affect his aptitude with respect to these skills.  For example, Smith contends that his "Expressive Language Domain" is in the severely impaired range, and tests of his memory show only a second percentile score on the "Logical Memory I test."  (*Id.* at ¶ 119 (citing State Court Record, Vol. 30. Tab R-63 at 125, 127)).  He also alleges that his score on the "Rey-O" test indicates that he had a moderate impairment in his ability to recognize visual information, which he contends would impact his ability to function in both school and work environments.  (*Id.* at ¶ 120 (citing State Court Record, Vol. 30, Tab R-63 at 132-33).  Smith further asserts that that his score on the "Trails B" test, which measures mental flexibility,

indicates that he has a "mild impairment" in mental flexibility as compared to the general population, and that this impairment would prevent him from seeing multiple approaches to solving problems.  (*Id.* at ¶ 121 (citing State Court Record, Vol. 30, Tab R-63 at 128-29)).  Smith argues that these tests provide further evidence that he meets the definition of being intellectually disabled established by *Atkins v. Virginia*.  (*Id.* at ¶ 122).

Smith further argues that, while the IQ test performed by Dr. King rendered an IQ score over 70, IQ test results are typically reported in a "band" of plus or minus five points.  (*Id.* at ¶ 117).  Accordingly, while he received a full scale IQ score of 72 from Dr. King's test, he submits the range of likely scores based on that result extends as low as 67.  (*Id.*).  He also alleges that the "Flynn Effect" must be taken into account in assessing an individual's IQ score.  The "Flynn Effect" is a theory that contends that IQ scores have been increasing over time and, as such, IQ scores must be recalibrated in order to reflect this increase.  (*Id.* at ¶ 123).  Smith provided evidence, through Dr. Salekin's testimony, that "although there is no national consensus regarding the application of the Flynn Effect to IQ scores, individuals in the mental retardation and forensics field agree that it should be used."  (*Id.* at ¶ 124 (citing State Court Record, Vol. 29, Tab R-63 at 160, 170)).  The Flynn Effect purports to recalibrate an individual IQ score by lowering the score by 0.3 points per year (measured by the year the test was last calibrated) in order to account for the general rise in IQ scores.  (*Id.* ¶ 127).  Accordingly, if the Flynn Effect were applied to Smith's IQ score of 72 that he received on the IQ test that Dr. King administered, then the normed test result would be a 69. (*Id.*).

Smith notes that application of the Flynn Effect has found some favor in the Eleventh Circuit.  One district court, after a hearing on the merits of the issue of a defendant's mental retardation, concluded that the Flynn Effect was relevant in determining whether an IQ score was

less than 70. *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1281 (N.D. Ala. 2009). The Eleventh Circuit affirmed the court's decision, reasoning that "[t]he question is not whether the district court's application of the Flynn effect to lower [the petitioner's] IQ scores was mandatory, but whether the district court's application of it in this case was clearly erroneous. We cannot say it was." *Thomas v. Allen*, 607 F.3d 749, 757 (11th Cir. 2010). Smith contends that, in light of the Flynn Effect, and when the IQ result "band" of plus or minus five points is taken into account, the IQ test administered by Dr. King results in a score below 70. (*Id.* at ¶ 128). Of course, it has also been observed that "the Flynn effect 'is not accepted in the general community' and is only seen in capital punishment litigation." *Ledford v. Warden, Georgia Diagnostic & Classification Prison*, 818 F.3d 600, 627 (11th Cir. 2016) (noting district court findings). Smith argues that he satisfied his burden of proof to establish that he exhibits subaverage intellectual functioning. (*Id.*).

Smith next argues that he exhibits limitations in adaptive skill areas, and those limitations manifested before the age of 18. Dr. Salekin evaluated his adaptive behavior using the Scales of Independent Behavior – Revised (SIB-R) to measure what skills Smith reflected at age 17. (*Id.* at ¶ 130). Dr. Salekin conducted this test by interviewing Smith's brother. (*Id.* at ¶ 131). Smith notes that the test revealed that his "overall functional independence" at age 17 was on the level of an average individual at age 11 years, 3 months. (*Id.*). Further, the test results suggested that at age 17 his motor skills were equivalent to a child of age 8 years, 5 months; his social interaction and communications skills were on the level of age 11 years; his personal living skills were on the level of age 12 years, 8 months; and his community living skills were on the level of age 13 years, 3 months. (*Id.*). Smith contends that all of these results demonstrate that he lacks functioning in certain key skill areas. Smith then argues that even the State's expert, Dr. King,

found that he had "some difficulties with community use, health and safety, self-direction, social skills, and leisure skill." (*Id.* at ¶ 133 (citing State Court Record, Vol. 30, Tab R-63 at 277)). Smith contends that the Circuit Court found that "Smith showed deficits in adaptive functioning based upon test results," but nonetheless found that he and had not sufficiently demonstrated that he met the adaptive functioning prong of Alabama's *Atkins* test. (*Id.* at ¶ 134). On review, the Alabama Court of Criminal Appeals did not find any error in that finding. (*Id.*). Smith contends that this determination by both Alabama courts was unreasonable, and is due to be set aside on habeas review.

### 1.       The Circuit Court's Rule 32 Order

Smith raised his *Atkins* claim in his August 1, 2003 Rule 32 petition. Indeed, by the trial court's estimation, "[a] majority of the testimony taken at the evidentiary hearing related to the issue." (State Court Record, Vol. 34, Tab R-74 Order at 2). The court noted that the testimony of the experts conflicted as it related to whether Smith has "significantly sub-average intellectual functioning." (*Id.* at 3). Dr. Salekin testified that Smith had an overall IQ of 64. Dr. Salekin also testified that the Flynn Effect could lower the Defendant's IQ test score by more than two points; however, the court did not find Dr. Salekin's evidence regarding the Flynn Effect convincing enough to warrant a reduction in the IQ tests before the court. (*Id.*). Instead, the court noted that even Dr. Salekin agreed that there is no national consensus regarding whether the Flynn Effect should be applied to IQ scores, and accordingly determined not to apply the Flynn Effect to the IQ scores before it. (*Id.*). *See Ledford*, 818 F. 3d at 627 (noting that "[t]he district court was 'not impressed' by Ledford's evidence concerning the Flynn effect. The district court found Dr. Zimmerman (Ledford's expert) and Dr. King (the State's expert) both agreed that the Flynn effect was not used in clinical practice to reduce IQ scores, and neither had

seen the Flynn effect applied to IQ scores outside the context of capital litigation."). By contrast, here, Dr. King testified that Defendant had a verbal IQ of 75 and a performance IQ level of 74, which resulted in a full scale IQ of 72. (*Id.*). The court found both Dr. Salekin and Dr. King to be credible with an appropriate background to testify regarding IQ tests. (*Id.* at 3-4). However, the court credited Dr. King's overall IQ calculation as "probably more accurate than that determined by Dr. Salekin." (*Id.* at p. 4). The court based this determination in part on the fact that Dr. King's test resulted in a verbal IQ calculation of 75, which is the exact score verbal IQ score that Smith had received on a prior IQ test.[14] (*Id.*).

Having concluded that Smith had failed to satisfy his burden of demonstrating that his IQ was 70 or below, the Circuit Court then assessed Smith's adaptive function. (*Id.*). The court concluded that, "[a]lthough the Petitioner showed deficits in adaptive functioning based upon test results, the Petitioner did not show many, if any, actual examples of how his low IQ affected his adaptive functioning in everyday life before or after the incident in question." (*Id.*). The court described Dr. Salekin's testimony on the adaptive functioning issue as follows:

> As it relates to the adaptive functioning issue, Dr. Salekin testified that she administered the SIB-R test which includes interviewing a third person about the abilities of the person in question. According to Dr. Salekin, the SIB-R is one of many scales of adaptive behavior that tries "to evaluate a person's ability to function on a day-to-day basis." Dr. Salekin testified that the results "show deficits in adaptive behavior for Willie Smith." According to Dr. Salekin, she used this test because a self-administered test such as ABAS, which was administered by Dr. King, is not usually recommended to determine mental retardation since individuals often "overestimate their abilities." Therefore, they use tests from individuals who know the person in question.
>
> One of the "draw backs" to the SIB-R test is the individual's ability to remember past events, and Dr. Salekin agreed that the tests administered to the Petitioner's brother involved questions about behavior approximately 30 years prior to the

---

[14] Alan D. Blotcky, Ph.D. testified in front of the jury at the sentencing phase of trial, but did not testify at the ensuing Rule 32 hearing. (*See* State Court Record, Vol. 34, Tab R-69 at 12-13). Dr. Blotcky testified that Defendant "tested to have a verbal I.Q. of 75" and "was borderline between mild retardation and low average intelligence." (*Id.*).

test.  Ideally one would want to administer the SIB-R test at the time in question rather than many years later because that is how the "test was normed."  On the SIB-R, Smith's "personal living skills indicated an age equivalency of 12 years, 8 months.

Dr. Salekin also administered the "Woodcock Johnson III test to determine current achievement levels, which relates directly to school function."  The "norm" or average on this test is a score of 100.  The Defendant scored an 89 in ability to speak to others which is less than one standard deviation from the "norm" of 100.  He scored an 84 in "oral expression" which also includes communicating orally with others and is "slightly more than one standard deviation below the mean."  Smith had a "pretty good" score of 93 in listening comprehension, an 88 in "broad reading", a 92 in "broad math", and a 97 in broad written language."  The Defendant also scored a 101 in calculation, 101 in math fluency, and 107 in spelling.  These three scores were above the "mean" or above the national average score.  Therefore, in math fluency the Defendant's grade equivalent was 12.9 and in spelling his grade equivalency was 13.9.  According to Dr. Salekin these grades were "inconsistent… with a diagnosis that Mr. Smith would be mildly mentally retarded."  According to Dr. Salekin, the Defendant's 8.8 grade level in math, 8.5 grade level in broad written language, his 11th grade level in calculation, his 9.8 grade level in written skills, his 10.5 grade level in academic skills, his 12.9 grade level in math fluency, his 13.9 grade level in spelling, and his 8.4 grade level in oral comprehension are all inconsistent with a diagnosis of mental or mild mental retardation.  Over an objection by counsel [of] the Petitioner, Dr. Salekin testified that she does not believe Smith has mental retardation.  She reached this conclusion after doing "a full Atkins evaluation."

(*Id.* at 4-5) (internal citations omitted).

Smith also offered the testimony of Dr. Daniel Marson, a clinical neuropsychologist employed at the University of Alabama at Birmingham.  In addition to giving IQ tests, Dr. Marson conducts "specific tests of discreet cognitive abilities."  (*Id.* at 5).  The Circuit Court assessed his testimony as follows:

Dr. Marson believes that Smith came "into this world with a learning disability, both for verbal and visual information.  What he does learn, he is able to, however, carry over and hold on to."  Dr. Marson was hired more to do a neuropsychological evaluation rather than an intellectual functioning test.  In the "attention" domain of this test the Defendant was "very mildly impaired" in the area of "special span" which means that he would have difficulty scanning his environment and may not notice new stimuli in his surroundings.  The Defendant's exhibits #11 and #12 conflicted with regard to the percentile under WMS III working memory as to whether the Defendant was in the mildly

impaired range or in the low average range.  As it relates the "expressive language" domain, the Defendant's three test scores range from low average to high average; therefore, there was no deficit in that area.  Although there was no deficiency as it relates to the Defendant's racial group, there was one deficiency as it relates to the overall population.  In the "memory" domain, the Defendant tested as moderately impaired in two categories which referred primarily to the Defendant's ability or lack thereof in short term retention of verbal or visual information.  The Defendant also tested as moderately or severely impaired on four visual tests relating to his ability to reproduce a complex drawing after short or long period of time.  Dr. Marson appeared to summarize Smith's ability to remember items as having difficulties in immediately retaining information, but once he learned information he was generally good at retaining the information for long periods of time.  In the remaining sixteen "memory" tests, it appears the Defendant was mildly impaired in one category and was in the low average or high average range for the remaining tests.  Dr. Marson also conducted five tests in the category he listed as "executive function."  In general, these tests relate to an individual's ability to plan, time matters, and organize life situations so as to properly function in society.  As described to this Court, this general category appears to be of greater importance as it relates to the adaptive functioning aspect of <u>Atkins</u>.  The Defendant was listed by Dr. Marson as moderately impaired in a category involving raw processing speed, mildly impaired or borderline range on a second test[], low average on a third test, and low average as it relates to the general population, but average as it relates to Smith's racial group on the final test.

In general, this Court would summarize Dr. Marson's testimony as indicating that the Defendant's deficits would cause him some difficulty in following instructions and retaining information so as to cause some short comings as it relates to school or work activities.  Yet, Dr. Marson did not indicate that the Defendant's short comings would cause him to be unable to succeed in school, work, o[r] society in general, but it might require additional effort or instruction for Smith to perform on par with his peers.  Dr. Marson did not express an opinion as to whether the Defendant was mildly mentally retarded.

(*Id.* at 5-6) (internal citations omitted).

Having reviewed Smith's evidence regarding his adaptive functioning, the Circuit Court then assessed the State's evidence with regard to the issue.  (*Id.* at 6).  Dr. King performed a WRAT-4 test which "gives an indication of an individual's ability to read, write, and do arithmetic."  (*Id.*).  The average score for this test is 100.  (*Id.*).  Smith scored an 85 on reading, 93 on spelling, and an 84 on math computation.  (*Id.*).  These test scores equate to grade levels as

follows: reading equated to an 8.6 grade level, spelling to an 11.5 grade level, and math to a 6.3 grade level.  (*Id.*).  Dr. King performed other tests on Smith as well.  On one test, the Minnesota Multiphasic Personality Inventory (MMPI-2) test, the test profile was invalid because it demonstrated that Smith either "purposefully attempted to look like he was having a mental illness on this particular instrument or he randomly sorted items."  (*Id.*).  Dr. King also testified that he interviewed Smith, and Smith did not have any difficulties in communication or understanding questions or administration of the tests.  (*Id.*).

Dr. King also testified, over Smith's objection, that in his opinion Smith "is not mentally retarded and he likely functions somewhere in the high borderline to low average range of intellectual ability."  (*Id.* at p. 7).  The court recognized that one test that Dr. King performed, the Adaptive Behavior Assessment System, Second Edition (ABAS-2), resulted in a finding that Smith "has some difficulties with community use, health and safety, self-direction, social skills, and leisure skill areas."  (*Id.*).  The Rule 32 court did not credit this finding, however, because it "may not be fully applicable because it sometimes refers to activities that would be limited to someone not in prison."[15]  (*Id.*).  The court also found it instructive that:

> [a]ll tests require the respondent to have "constant contact with the particular target person on practically a daily basis", but that is not possible for the other instruments since the Defendant has been away from others while in prison for so many years.  According to Dr. King, tests such as that run by Dr. Salekin cannot be used because "there aren't any norms for that" and because under the circumstances it would be a violation of the test's protocol.

(*Id.*) (internal citations omitted).

In addition to the testimony from the Rule 32 evidentiary hearing, the court found certain portions of the trial transcript relevant.  (*Id.*).  As the court noted:

---

[15] Dr. King's testimony indicated that he chose to use the ABAS-2 because it is the only test that allows the individual in question to answer the questions himself.  (State Court Record, Vol. 34, Tab R-74 at 7).

> [i]n particular, the Petitioner's father did not help take care of him and his mother frequently worked; therefore, after age 8 or 9 Willie Smith and siblings "practically raised themselves." According to the Defendant's mother, it appears that Smith took care of the other children while she was gone. The Defendant dropped out of school in the 10th grade so that he could work and help provide for his family. According to Mrs. Smith, the Defendant provided well for her. He kept a job at Birmingham Stove and Range for 2 years then got another job at Coca-Cola Company, but he was "relieved" from his job at Coca-Cola when he "got on dope" and missed some work. As noted in <u>Ferguson v. State</u>, supra, the Defendant's ability to work and support his family, even at a young age, weighs against the Petitioner in his argument that he is mentally retarded. Furthermore, Dr. Blotcky testified that he found "no diminished capacity" when he met with the Defendant."

(*Id.*) (internal citations omitted). The court also determined that other evidence from Smith's trial relevant to the adaptive function inquiry as well. (*Id.*). Specifically, the Rule 32 court found one of Smith's pre-trial conversations illuminating:

> Mr. Smith stated as follows in a pre-trial conversation that he did not know was being recorded:
>
>> "I thought somebody saw me back there, I waited for a day. I said if nobody find that car today that mean ain't too much looking for her. So what I do, I'll go round there and burn that bitch up, get my fingerprints off it. So that's what I did. I burned that bitch slap off, I burned that bitch so bad….
>
> In the same statement the Defendant also acknowledged his understanding that he may be caught if he failed to kill the victim, in part because she was a police officer's sister, when he stated as follows: "She didn't know [he would kill her], she just said here you can take the car. I was acting like this here. I was thinking don't shoot, don't do it. Her brother a police. No if I let you go you going to fuck me up…. She said, No I'm not. I promise. (mimicking a female voice). I said you a liar, boom, [t]hen shot her in the head with that gun." In this Court's opinion, the Defendant's intentional killing of the victim, based in part upon his realization that the victim's relationship to a police officer would make his capture more likely, and his apparently well thought-out attempt to cover up the crime, weighs against the Petitioner in relation to the adaptive functioning requirement. This conclusion is supported by the opinion in <u>Ferguson v. State</u>, supra, indicating that extensive involvement in crime and post-crime planning are factors to consider.

(*Id.* at 8) (internal citations omitted).

Taking all of the testimony into account, the Rule 32 court summarized the evidence that it found relevant and drew its conclusions. It noted that Dr. Salekin's SIB-R test, when conducted by way of interview with Smith's brother, placed him at an overall skill level of 12 years and 8 months, but when conducted by way of interview with Smith's mother, placed him at a skill level of 15 years and 3 months. (*Id.*). Dr. Salekin testified that large difference between the two tests was significant, and the court found that such a difference "detracts from the significance placed on the test results." (*Id.*). The Rule 32 court further noted the high likelihood of inaccuracy in Smith's SIB-R test which was based on answers from his younger brother. (*Id.*). At best (for Smith), his "younger brother was in his middle teens when the events that he was questioned about occurred, and he was trying to remember Smith's skill level approximately 30 years later." (*Id.*). The court reasoned that this, too, diminished the credibility of the SIB-R score that Dr. Salekin presented. (*Id.*).

The Rule 32 court also noted that, while the Woodcock-Johnson Achievement Test that Dr. Salekin administered included below average scores, it also demonstrated that Smith did not have significantly substandard scores in the categories of speech, communication, listening comprehension, reading, math, and written skills. (*Id.* at p. 9). Further, Dr. Salekin testified that adaptive functioning tests would be affected by an individual's use of drugs or alcohol. (*Id.*). Because the record indicated that Smith used alcohol and drugs on a regular basis, the court reasoned that some deficits in his adaptive functioning, even at age 17, could be attributed to his drug use. (*Id.*). The court concluded that:

> [a]lthough evidence is clear that Defendant has below average intelligence which has, in some ways, probably affected his life style, the Petitioner has failed to meet the burden of proving that he is mentally retarded so as to preclude imposition of the death penalty.

(*Id.*).  The Rule 32 court further reasoned that, while it was not bound to follow an expert's opinion as to whether or not an individual meets the *Atkins* standard, "the lack of any testimony that Willie Smith is mildly mentally retarded is a strong contributing factor in the Court's decision as it relates to this issue."  (*Id.*).

The Rule 32 court concluded its analysis as follows:

> Based on the testimony presented at the Rule 32 hearing, relevant portions of the trial transcript, and other matters outlined herein, this Court finds that the Petitioner has failed to establish that he is mentally retarded so as to preclude him from receiving a death sentence in this case.  Two experts stated that in their opinion Willie Smith was not mentally retarded, and the other experts who testified did not refute those opinions.  The record indicates that Willie Smith properly functioned in society prior to his arrest for the offense in question.  Although testimony was presented regarding possible deficiencies in the Defendant's adaptive functioning based upon test results, there was no testimony regarding deficiencies in the Defendant's actual ability in areas such as "communication, self care, home living, social interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety."  Ferguson v. State, 2008 WL 902901, *14 (Ala. Crim. App. 2008).  In numerous test[] categories the Defendant tested in the average range or above average, and those test scores were inconsistent with a finding that the Defendant was mentally retarded.

(*Id.*).

## 2.     The Court of Criminal Appeals' Decision

Smith appealed the Circuit Court's denial of his Rule 32 motion.  On May 25, 2012, the Court of Criminal Appeals of Alabama affirmed the circuit court's ruling.  *Smith III*, 112 So. 3d 1108.  The Court of Criminal Appeals, after examining each argument Smith raised on appeal, held that the Rule 32 court did not err in finding that Smith is not mentally retarded under the standards set forth in *Atkins*.  *Id.* at 1134.  The appellate court noted both Smith's standard of proof (*i.e.*, in order to prove that he was entitled to relief, he was required to demonstrate his intellectual disability by a preponderance of the evidence) as well as its own standard of review

(*i.e.*, the Court of Criminal Appeals reviewed the Circuit Court's findings for abuse of discretion). *Id.* at 1125.

After outlining Smith's arguments and the Alabama law related to *Atkins*, the Court of Criminal Appeals determined that "[a]s the circuit court found and as the evidence at the hearing established, Smith did not prove by a preponderance of the evidence that he was mentally retarded." *Id.* at 1130. "The greater weight of the evidence indicated that, although he suffered with some mental deficiencies, they did not rise to the level at which an impartial mind would conclude from the evidence that he was mentally retarded." *Id.* The court found that the Circuit Court did not err in its determination not to apply the Flynn Effect to lower Smith's IQ scores. *Id.* at 1131. The court then held that the Circuit Court did not err when it refrained from adopting a margin of error when examining Smith's IQ score. *Id.* at 1131. The appellate court reasoned that Alabama courts have specifically "refrained from adopting a margin of error as it would apply to IQ scores, because doing so would expand the definition of mentally retarded established by the Alabama Supreme Court in *Ex parte Perkins*." *Id.* (citing *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002)). The court also affirmed the Circuit Court's determination that Smith had not sufficiently demonstrated a lack of adaptive behavior as required by *Atkins*. *Id.* at 1132. The appellate court noted that, even where there are shortfalls in adaptive behavior, those "shortcomings are not evaluated in a vacuum" and "other relevant evidence may weigh against an overall finding of deficiency in this area. *Id.* at 1133. Finally, the court found that the Circuit Court did not err in relying upon the clinical opinions of Dr. Salekin and Dr. King that he was

not mentally retarded.[16]  *Id.*  The court reasoned that "testimony from a clinical psychologist is admissible in evaluating mental retardation in capital cases."  *Id.* at 1334.

### 3.    Analysis of Smith's *Atkins* Claim

As the Supreme Court has noted, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded."  *Atkins*, 536 U.S. at 317.  This is the issue Smith asked the state courts to decide.  He now asks this court to review the state courts' unfavorable determination.  In *Atkins*, the Court expressly left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."  *Id.* (quotation marks omitted and alterations adopted).

Alabama courts first applied *Atkins* in *Ex parte Perkins*.  There, the Alabama Supreme referenced *Atkins*'s guidance and stated:

> [T]his court can determine, based on the facts presented at Perkins's trial, that Perkins, even under the broadest definition of mental retardation, is not mentally retarded.  Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior.  Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).

*Ex parte Perkins*, 851 So. 2d at 456.  In the absence of further guidance from the Alabama Legislature, Alabama appellate courts have adopted *Perkins*'s reasoning:

> [t]he Alabama Legislature has not yet established a method for determining whether a capital defendant is mentally retarded and, thus, ineligible for a sentence of death. "However, the Alabama Supreme Court, in *Ex parte Perkins,* 851 So.2d 453 (Ala.2002), adopted the most liberal definition of mental retardation as defined by those states that have legislation barring the execution of a mentally retarded individual." *Smith v. State,* [Ms. CR–97–1258, Jan. 16, 2009]

---

[16] In evaluating Petitioner's *Atkins* claim, the Court of Criminal Appeals also affirmed the Circuit Court on two grounds not before this court.  *Smith III*, 112 So. 3d at 1134-36 (finding that the circuit court did not err by (1) considering Dr. King's testimony, or (2) selectively relying on certain evidence).

—— So.3d ——, —— (Ala.Crim.App.2009) (opinion on return to fourth remand); *see also Smith v. State,* [Ms. 1060427, May 25, 2007] —— So.3d ——, —— (Ala.2007) ("Until the legislature defines mental retardation for purposes of applying *Atkins,* this Court is obligated to continue to operate under the criteria set forth in *Ex parte Perkins.*"). Pursuant to *Ex parte Perkins,* "to be considered mentally retarded, [a capital defendant] must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior." *Ex parte Perkins,* 851 So.2d at 456; *see also Atkins,* 536 U.S. at 321 n. 5. Further, "these [two deficits] must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)." *Ex parte Perkins,* 851 So.2d at 456…. "Therefore, in order for an offender to be considered mentally retarded in the *Atkins* context, the offender must currently exhibit subaverage intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18." [….]

"In the context of an *Atkins* claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded." *Smith v. State,* [Ms. 1060427, May 25, 2007] —— So.3d at ——; *see Smith v. State,* [Ms. CR–97–1258, Jan. 16, 2009] —— So.3d at ——. "'The question of [whether a capital defendant is mentally retarded] is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony of that issue.'" *Smith v. State,* [Ms. CR–97–1258, Jan. 16, 2009] —— So.3d at —— (quoting *Atkins v. Commonwealth,* 266 Va. 73, 581 S.E.2d 514, 515 (2003)). As the Alabama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, "which [have] the opportunity to personally observe the witnesses and assess their credibility." *Smith v. State,* [Ms. 1060427, May 25, 2007] —— So.3d at —— (quoting *Smith v. State,* [Ms. CR–97–1258, Sept. 29, 2006] ——So.3d ——, —— (Ala.Crim.App.2006) (Shaw, J., dissenting) (opinion on return to third remand)).

*Byrd v. State*, 78 So. 3d 445, 450–51 (Ala. Crim. App. 2009).

Accordingly, Smith was required to establish each of three prongs: (1) he currently exhibits subaverage intellectual functioning (demonstrated by an IQ of 70 or below), (2) he currently exhibits deficits in adaptive behavior, and (3) these problems manifested themselves before the age of 18. Importantly, in presenting his claims to the Rule 32 court, Smith bore the burden of proving that he is intellectually disabled by a preponderance of evidence. As mentioned above, federal courts reviewing habeas petitions pursuant to 28 U.S.C. § 2254 may grant relief only when the state court's adjudication "resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d). Importantly, "a state court's factual determination is entitled to a presumption of correctness." *Debruce v. Comm'r, Alabama Dep't of Corr.*, 758 F.3d 1263, 1266 (11th Cir. 2014) (citing 28 U.S.C. § 2254(e)(1)).  After careful review, the court concludes that the state courts' determination that Smith failed to satisfy the burden of proving that he is intellectually disabled was not unreasonable.  Nor did the state court act unreasonably in its analysis of the three *Perkins* prongs, or unreasonably apply Alabama law in coming to its conclusion.

### a.    The Significantly Subaverage Intellectual Functioning Prong

Smith argues that he exhibits significant subaverage intellectual functioning because (1) his IQ (as reflected by Dr. Salekin's test) is 64, (2) his IQ score based on Dr. King's testing would be below 70 if the state courts had accounted for the Flynn Effect and a five point "band" reflecting the margin of error in the test, and (3) neuropsychological testing demonstrates that he shows a deficit in executive function.  The court addresses each of these arguments, in turn.

### i.    Dr. Salekin's IQ score

The evidence before the court highlights a division in the experts' opinions.  On the one hand, Smith's expert presented evidence that his IQ was below the line set in *Perkins* (an IQ of 70 or below).  On the other, the State's expert presented evidence that his IQ was above Alabama's standard.  Here, it is worth noting (again) that in the state court Smith had the burden of proving by a preponderance of the evidence that he is intellectually disabled.  *Byrd*, 78 So. 3d at 450.  Of course, this burden, coupled with "the mere existence of a division in expert opinion," does not necessarily preclude Smith from proving that he is intellectually disabled.  *See Tharpe*

*v. Warden*, 834 F.3d 1323, 1346 (11th Cir. 2016) (determining that the district court's conclusion that Tharpe failed to prove he was intellectually disabled was not unreasonable).  But it is an important factor in the analysis.

The court cannot say that the state court's resolution of the conflicting expert testimony was unreasonable.  Indeed, this court can imagine a scenario where two equally credible and persuasive experts testify regarding a defendant's IQ in Alabama: one testifying that a defendant's IQ was above 70, and the other that it was below 70.  In such a scenario, a state court could reasonably evaluate the conflicting proof and conclude that the defendant was not intellectually disabled, because he failed to show his intellectual disability by a preponderance of evidence.  Of course, this is not the case here.  While Smith correctly notes that the Circuit Court found both experts "to be credible with an appropriate background to testify regarding Intelligence Quotient tests," the court found a way to differentiate the two scores presented at the Rule 32 hearing.  (*See* State Court Record, Vol. 34, Tab-74 at 4).  As the state court noted, during the penalty phase of his trial, Smith's expert testified that he had a verbal IQ of 75.  (*Id.*).  Because this was the exact same verbal IQ score that Dr. King presented, the circuit court reasoned that "Dr. King's overall IQ calculation … was probably more accurate than that determined by Dr. Salekin."  (*Id.*).  This determination was reasonable in light of the legal and proof standards that were applicable in the state court.  As such, the Court of Criminal Appeals' determination -- which it made after quoting the Circuit Court's reasoning -- that "the greater weight of the evidence" indicated that Smith's mental deficiencies "did not rise to the level at which an impartial mind would conclude from the evidence that he was mentally retarded" (*Smith III*, 112 So. 3d at 1130) was not unreasonable.  *See Ledford v. Warden, Georgia Diagnostic & Classification Prison*, 818 F.3d 600, 635 (11th Cir. 2016) (considering the fact that

one expert's opinion was corroborated by another expert's opinion with regard to a defendant's IQ when assessing the expert's credibility).

Contrary to Smith's suggestion, the reasoning of *Tarver v. Thomas*, 2012 WL 4461710 (S.D. Ala. Sept. 24, 2012), does not change this conclusion. In *Tarver*, the court held that the state Circuit Court's decision to disregard Tarver's IQ score of 61 in favor of other scores was unreasonable. *Id.* at *7. There, however, the state Circuit Court "refused to consider Tarver's score of 61" and "disregarded it without explanation." *Id.* Here, the Circuit Court clearly detailed why it credited Dr. King's overall calculation as "probably more accurate. (State Court Record, Vol. 34, Tab-74 at 4). That determination, and the Court of Criminal Appeals' affirmance, was clearly reasonable.

### ii.       The Flynn Effect and Margin of Error

As discussed above, Smith presented evidence related to the Flynn Effect and an alleged standard measurement error to the Circuit Court and the Court of Criminal Appeals as bases for lowering or "norming" Dr. King's IQ score. The state courts rejected Smith's argument to employ these concepts to lower the IQ score presented by Dr. King. After careful review, the court concludes that the state courts' determinations of this issue were not unreasonable.

Smith contends that "[t]he Eleventh Circuit has held that, to fairly assess IQ scores in capital cases, IQ scores must be adjusted to account for the Flynn Effect." (Doc. # 39 at 45 (citing *Thomas v. Allen*, 607 F.3d 749 (11th Cir. 2010)). That, however, is an absolute misstatement of the law. In *Thomas v. Allen*, all but one of the petitioner's claims under 28 U.S.C. § 2254 were dismissed; the sole claim that survived the motion for summary judgment was the petitioner's claim that he was mentally retarded. *See Thomas v. Allen,* 614 F. Supp. 2d 1257, 1259 (N.D. Ala. 2009), aff'd, 607 F.3d 749 (11th Cir. 2010). Upon joint motion of the

parties, that claim was litigated on the merits in the federal district court, rather than being remanded to the state court system. *Id.* In finding that the petitioner was mentally retarded, the district court accounted for the Flynn Effect in its analysis. *Id.* at 1276-81. On appeal, the Eleventh Circuit held that the district court's application of the Flynn Effect was not clearly erroneous. *Thomas*, 607 F.3d at 757. As the Eleventh Circuit reasoned:

> [b]ecause there is no uniform consensus regarding the application of the Flynn effect in determining a capital offender's intellectual functioning, and there is no Alabama precedent specifically discounting a court's application of the Flynn effect, we cannot say that the district court clearly erred in applying it.

*Id.*

However, *Thomas* does not stand for the premise that courts in the Eleventh Circuit *must* account for the Flynn Effect when performing their analysis. In fact, Alabama law is clear that Alabama courts are not *required* to consider the Flynn Effect when determining whether a criminal defendant is intellectually disabled. *Albarran v. State*, 96 So. 3d 131 at 199-200 (Ala. Crim. App. 2011) (stating that, even though an expert testified regarding the Flynn Effect, "the circuit court could have reasonably rejected the 'Flynn effect' and determined that Albarran's IQ was 71). Similarly, the Eleventh Circuit has held that "a district court is not required to apply a Flynn effect reduction to an individual's IQ score in a death penalty case." *Ledford*, 818 F.3d at 640.

While the state courts are certainly *permitted* to consider the Flynn Effect, the Circuit Court's decision not to do so (and the Court of Criminal Appeals' affirmance of that decision) was not unreasonable. The Circuit Court did not find the evidence of the Flynn Effect convincing enough to warrant a reduction of Smith's IQ test results, and found Dr. Salekin's testimony that there was no national consensus regarding the Flynn Effect instructive. (State Court Record, Vol. 34, Tab-74 at 3). In both *Thomas* and *Ledford* our Circuit has noted that

there is no uniform consensus regarding the application of the Flynn Effect.  *See Thomas*, 607 F.3d at 757; *Ledford*, 818 F.3d at 636.   Accordingly, and taking into account the authority permitting the court to reject the Flynn Effect, the Circuit Court's determination not to take it into account given the lack of consensus was not unreasonable.  Similarly, the Court of Criminal Appeals' affirmance of the Circuit Court's determination was not unreasonable.

Finally, the state courts' determination not to account for so-called "standard measurement error" was not unreasonable.  The Circuit Court noted that Dr. King introduced evidence of standard measurement error during the Rule 32 hearing.  (*See* O. p. 7).  However, the Court of Criminal Appeals found that the Circuit Court did not err by not applying the standard measurement error.  The court noted that "this Court has refrained from adopting a margin of error as it would apply to IQ scores, because doing so would expand the definition of mentally retarded established by the Alabama Supreme Court in *Ex parte Perkins*."  *Smith III*, 112 So. 3d at 1132.  Indeed, at the time the state courts made their determinations, the following reasoning controlled in Alabama:

> Smith urges this Court to adopt a 'margin of error' when examining a defendant's IQ score and then to apply that margin of error to conclude that because Smith's IQ was 72 he is mentally retarded. The Alabama Supreme Court in *Perkins* did not adopt any 'margin of error' when examining a defendant's IQ score. If this Court were to adopt a 'margin of error' it would, in essence, be expanding the definition of mentally retarded adopted by the Alabama Supreme Court in *Perkins*. This Court is bound by the decisions of the Alabama Supreme Court. See § 12–3–16, Ala.Code 1975.

*Smith v. State*, 71 So. 3d 12, 20-21 (Ala. Crim. App. 2008) *overruled by Lane v. State*, 2016 WL 1728753 (Ala. Crim. App. Apr. 29, 2016).  At the time the state courts made their respective rulings, Alabama state law did not allow consideration of "margin of error" when examining a defendant's IQ score.  This principle did not run afoul of clearly established principles found in

*Atkins*, and the state courts' determination not to account for standard measurement error was not unreasonable.

The Supreme Court's decision in *Hall v. Florida* does not alter this analysis.  134 S. Ct. 1986 (2014).  In *Hall*, a 2014 decision, the Court held that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits."  *Id.* at 2001.  If Alabama's rule could be construed as a "strict IQ cutoff at 70," it may run afoul of *Hall*.  *See id.* at 1996; *Lane v. State*, 2016 WL 1728753 (Ala. Crim. App. Apr. 29, 2016).  However, this does not entitle Smith to 2254 relief.  As the Eleventh Circuit has stated, "*Hall*'s holding was not clearly established by *Atkins*," and *Hall* "changed course by requiring the states to recognize a margin of error of five points above or below an IQ score of 70 in assessing intellectual disability."  *Kilgore v. Sec'y, Florida Dep't of Corr.*, 805 F.3d 1301, 1311 (11th Cir. 2015).  At the time *Hall* was decided (2014), the Alabama state courts had already rendered their decisions – in 2009 and 2012, respectively.  Accordingly, at the time of their decisions, the Alabama courts were tasked with applying *Atkins*, not *Hall*, to Smith's case.  *Id.* at 1312.  "Nothing in *Atkins* suggested that a bright-line IQ cutoff of 70 ran afoul of the prohibition on executing the intellectually disabled," and as such, the state court did not unreasonably apply *Atkins* when it referenced a bright-line IQ cutoff of 70.  *Id.*  This holding is supported by our Circuit's determination that nothing "convinces us that *Hall* can be applied retroactively."  *Id.* at 1315.  Accordingly, the state courts' decision not to apply standard measurement error -- which was made well before *Hall* was decided -- was not unreasonable.

### iii.   Smith's Neuropsychological Testing

Smith argues that certain neuropsychological testing provides further support that he exhibits subaverage intellectual functioning.  (Doc. # 39 at 50).  He specifically directs the court to his scores on tests measuring (1) his "Expressive Language Domain," (2) logical memory, (3) ability to encode visual information, (4) and mental flexibility, and argues that they all demonstrate that he satisfies the first prong of the *Perkins* test.  (*Id.* at pp. 50-52).  After careful review, the court concludes the state court's holding on this matter was not contrary to federal law or unreasonable.

Both state courts addressed, and dismissed, this additional neuropsychological testing in the context of the "adaptive behavior" prong of the *Perkins* test, rather than the "subaverage intellectual functioning" prong.  This was not error.  In Alabama, a court need not look beyond an IQ score when assessing the subaverage intellectual functioning prong.  *See Peraita v. State*, 897 So. 2d 1161, 1207 (Ala. Crim. App. 2003) (equating "subaverage intellectual functioning" with "an IQ score of 70 or below).  And, before *Hall*, states were permitted to present IQ test score "cutoffs," which, if not met, prevented the defendant from presenting additional evidence of intellectual disability.  *Kilgore*, 805 F.3d at 1308, 1311.  Accordingly, the state court's determination that Smith failed to prove his subaverage intellectual functioning, which was based on the IQ scores presented to the Circuit Court, was not unreasonable.[17]

### b.   The Adaptive Behavior Prongs

Smith consolidates his analysis of the final two prongs of the *Perkins* analysis into a single claim for relief.  (*See* Doc. # 39 at 52).  The court will do likewise in its discussion.  As mentioned above, Smith alleges that the state court unreasonably weighed the evidence and

---

[17]   To the extent that Smith's neuropsychological testing can be considered in assessing the adaptive behavior prong of Perkins, it is addressed below.

determined that he had failed to meet his burden of proving that he satisfied the adaptive behavior prong of the *Perkins* test. (Doc. # 39 at 54). He specifically contends that the Court of Criminal Appeals disregarded certain test results that he presented and instead relied on collateral evidence from the record and the opinions of expert witnesses. (*Id.*). He also asserts that the tests he presented showed that he had significant adaptive functioning deficits before he reached 18. (*Id.* at 56).

In Alabama, "to be diagnosed as mentally retarded, an offender must have significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Ferguson v. State*, 13 So. 3d 418, 434–35 (Ala. Crim. App. 2008). Here, again, the state court did not unreasonably err in concluding that Smith failed to meet his burden of proving that he was intellectually disabled.

The Circuit Court assessed the SIB-R scores on which Defendant relies in his Petition, but found them less credible than other evidence before the court. (State Court Record, Vol. 34, Tab-74 at 8). Specifically, the court noted the difference between the SIB-R test results when the test was given to Smith's mother as opposed to his younger brother. (*Id.*). The court also noted that the SIB-R test required Smith's younger brother to recall events and assess Smith's skill level from approximately 30 years earlier, and the court found this technique problematic. (*Id.*). As such, the Circuit Court looked to record evidence that demonstrated that Smith was able to work and support his family as well as engage in a well thought-out attempt to cover up his crime. (*Id.* at 7-8). After weighing all of the evidence before it, including the experts' opinion testimony, the Circuit Court concluded that Smith failed to meet his burden of proving that he is intellectually disabled. (*Id.* at 9). The Court of Criminal Appeals affirmed that determination,

and found that "[a]lthough there was some evidence of deficiencies in Smith's adaptive behavior, these deficiencies were not significant in relation to all his testing concerning this prong of the *Atkins* test." The state courts' factual findings and conclusions were not unreasonable.

Smith also claims that the state courts disregarded his test results in favor of other considerations, but that argument is off the mark. Both the Circuit Court and the Court of Criminal Appeals considered the test results Smith presented. The Circuit Court found that even after considering the test results before the court, "[p]etitioner did not show many, if any, actual examples of how his low IQ affected his adaptive functioning in everyday life before or after the incident in question." (*Id.* at 4). The Court of Criminal Appeals correctly noted that "although it is true that as a threshold matter the psychological evaluator must determine that the defendant was deficient in at least two areas of adaptive behavior, these shortcomings are not evaluated in a vacuum." *Smith III*, 112 So. 3d at 1133. Indeed, Alabama courts routinely look to factors besides test scores to evaluate whether a defendant has met his burden of proving deficiencies in his adaptive behavior. *See Ex parte Perkins*, 851 So. 2d at 456 (finding it instructive that Perkins maintained interpersonal relationships and had a job for a short period when analyzing his "adaptive behavior"); *Lewis v. State*, 889 So. 2d 623, 698 (Ala. Crim. App. 2003) ("the nature and circumstances surrounding the crimes in this case – including Lewis's articulate and detailed statement to the police – suggest goal-directed behavior, thus indicating that Lewis does not suffer from deficits in adaptive behavior."). The state courts' consideration of the record was neither impermissible nor unreasonable. *Tharpe v. Warden* is instructive. 834 F.3d at 1346. In *Tharpe*, the Eleventh Circuit noted that the mental-health experts who examined the petitioner were divided with regard to the extent of the deficiencies in his adaptive behavior. *Id.* After examining the content and basis of the experts' opinions, the court held that "there is insufficient

evidence presented here to establish that [the state court's] conclusion… was unreasonable." *Id.*
Here, the state courts did not err in viewing the entire record in making a determination
regarding Smith's adaptive behavior.  Smith has not shown that the deficiencies in his adaptive
functioning were so significant "that no fairminded jurist could reasonably conclude" that he had
failed to prove that his impaired behavior qualified him as intellectually disabled for purposes of
Alabama's death penalty law. *Id.* 1347.

That the state courts considered the experts' opinions as to whether Smith was
intellectually disabled does not change this conclusion.  The Court of Criminal Appeals correctly
noted that testimony from a clinical psychologist is admissible in evaluating mental retardation
in capital cases.  *Smith III*, 112 So. 3d at 1134.  Indeed, the court properly noted that it is
common for Alabama courts to consider expert opinion regarding whether a defendant is
mentally retarded.  *Id.* (citing *Ex parte Perkins*, 651 So.2d at 456; *Ray v. State*, 80 So. 3d 965,
981 (Ala. Crim. App. 2011); *Borden v. State*, 60 So. 3d 935, 938 (Ala. Crim. App. 2004)).
Given the number of cases in which courts have considered an expert's opinion regarding
whether a defendant is intellectually disabled, the court finds that the state courts' consideration
of the experts' opinion was not unreasonable.

Having found that the state courts did not unreasonably find that Smith failed to prove the
second *Perkins* prong, it follows that the state courts did not unreasonably find that Smith failed
to meet the third *Perkins* prong as well.  The second *Perkins* prong requires that Smith
demonstrate that he currently exhibits deficits in adaptive behavior.  The third prong requires he
prove that those problems manifested themselves before the age of 18.  The state court
reasonably determined that Smith failed to prove deficits in adaptive behavior.  In the absence of
proof that Smith currently exhibits (or has exhibited in the past) deficits in adaptive behavior, the

state court did not unreasonably determine that Smith failed to establish that those deficits manifested before the age of 18.

### c.     Smith's Final Contention

As a separate argument, Smith contends that "the Court of Criminal Appeals' decision was contrary to, and an unreasonable application of the *Perkins* test adopted pursuant to *Atkins*." (Doc. # 39 at 54).  In support of his argument, Smith alleges (again) that the Court of Criminal Appeals unreasonably (1) relied on subjective expert opinions as to whether he was intellectually disabled, (2) disregarded the IQ score that Dr. Salekin presented, (3) disregarded the Flynn Effect, and (4) failed to acknowledge test results showing that he had significant adaptive functioning deficits at the age of 17.  This court has already determined, the state courts' determinations on these matters were not unreasonable.  Accordingly, Smith's above-listed contentions do not support his argument that the Court of Criminal Appeals involved an unreasonable application of the *Perkins* test.

To the extent Smith's section 2254 petition seeks relief based on *Atkins*, it is due to be denied.

### D.     Whether Mr. Smith was Denied Effective Assistance of Counsel in Violation of Supreme Court Precedent in *Strickland v. Washington*

Smith alleges in his habeas petition that he was denied effective assistance of counsel in numerous respects. The court addresses the general constitutional standard that applies to Smith's ineffective assistance claims and then discusses each of Smith's allegations.[18]

---

[18] Because the Alabama Court of Criminal Appeals held that Smith failed to establish counsel's ineffective performance with respect to all of his ineffective assistance claims, the court limits its review of the claims under 28 U.S.C. § 2254 to the first prong of the *Strickland* test.

### 1.      General Ineffective Assistance Standard

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-

pronged standard for judging the Sixth Amendment effectiveness of attorneys who represent

criminal defendants at trial or on direct appeal.[19]

> A convicted defendant's claim that counsel's assistance was so defective as to
> require reversal of a conviction or death sentence has two components. First, the
> defendant must show that counsel's performance was deficient. This requires
> showing that counsel made errors so serious that counsel was not functioning as
> the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the
> defendant must show that the deficient performance prejudiced the defense. This
> requires showing that counsel's errors were so serious as to deprive the defendant
> of a fair trial, a trial whose result is reliable. Unless a defendant makes both
> showings, it cannot be said that the conviction or death sentence resulted from a
> breakdown in the adversary process that renders the result unreliable.

*Id.* at 687; *see also Williams v. Taylor*, 529 U.S. 362, 390 (2000). The two parts of the *Strickland*

standard are conjunctive; accordingly, a petitioner bears the burden of proving *both* deficient

performance *and* prejudice in order to prevail on an ineffective assistance claim. *Williams v.*

*Allen*, 598 F.3d 778, 789 (11th Cir. 2010). Thus, a court is not required to address both aspects of

the *Strickland* standard when a habeas petitioner makes an insufficient showing on one of the

prongs. *See, e.g.*, *Holladay*, 209 F.3d at 1248 ("Because both parts of the test must be satisfied in

order to show a violation of the Sixth Amendment, the court need not address the performance

prong if the defendant cannot meet the prejudice prong, or vice versa.") (internal citation

omitted). Here, the court need only address the performance prong of *Strickland*.

### a.      The Performance Prong

To establish that counsel's performance was deficient, a petitioner "must show that

counsel's representation fell below an objective standard of reasonableness," which is defined in

terms of "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 687-88;

---

[19]  Smith has not argued in this § 2254 petition that he received ineffective assistance from the attorneys
who represented him during his post-conviction proceedings.

*see also Williams*, 529 U.S. at 390-91; *Darden v. Wainwright*, 477 U.S. 168, 184 (1986). The *Strickland* Court instructed lower federal courts to be "highly deferential" when assessing counsel's performance:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations and internal quotation marks omitted). *See also, e.g.*, *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) (stating that, "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate") (internal quotation marks omitted). To overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance, a petitioner "must establish that no competent counsel would have taken the action that [petitioner's] counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*).

The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir.

1998) (noting that *Strickland* performance review is a "deferential review of all the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence-which is also constitutionally protected-and would restrict the wide latitude counsel have in making tactical decisions."

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler* and *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers*, 13 F.3d at 386. In short, an attorney's performance will be deemed deficient only if it is objectively unreasonable (*i.e.*, falls below the wide range of competence demanded of attorneys in criminal cases), such that no competent attorney would have taken the action that petitioner's counsel did take.[20] *See, e.g.*, *Chandler*, 218 F.3d at 1315; *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990).

While decisions by counsel are "virtually unchallengeable" if made "after thorough investigation" of the applicable law and facts, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments

---

[20] At times, Smith's § 2254 petition appears to suggest that the minimum standard of performance for trial counsel was established by the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). (*See, e.g.*, Doc. # 1-1 at ¶ 145 (citing ABA Guideline 11.8.6(B)(1)); ¶ 147 (citing ABA Guideline 11.8.6(D)); ¶ 154 (citing ABA Guidelines 11.4.1(D)(2)(c), 11.8.6(B)(1), and 11.8.6(D))). That is wrong. The Eleventh Circuit has held that the ABA Guidelines do not establish the minimum standard in all cases that counsel must meet to comply with prevailing professional norms. *Butts v. GDCP Warden*, No. 15-15691, slip op. at 9 (11th Cir. Mar. 9, 2016). As the *Butts* opinion explained:

> Counsel must perform reasonably under "prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2065. Those norms, Butts insists, are established by the recommendations of the ABA and the Southern Center for Human Rights. They aren't. Butts argues that the Supreme Court's decision in <u>Wiggins v. Smith</u>, 539 U.S. 510, 123 S. Ct. 2527 (2003), establishes that trial counsel performed deficiently by failing to follow those recommendations. It doesn't.

*Id.*

support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. At the same time, defense counsel does not have an "absolute duty to investigate particular facts or a certain line of defense, although in some circumstances, a complete failure to investigate may constitute deficient performance of counsel." *DeYoung v. Schofield*, 609 F.3d 1260, 1284 (11th Cir. 2010) (internal quotation marks omitted). And, the court must accord substantial deference to counsel's decision to forego a particular investigation. *Strickland*, 466 U.S. at 691. To render effective assistance at the penalty phase of a capital trial, defense counsel must "reasonably investigate[] possible mitigating factors and [make] a reasonable effort to present mitigating evidence to the sentencing court." *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006). A part of effective defense advocacy is formulating "a strategy that [is] reasonable at the time and [balances] limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107. In short, counsel "is not required to pursue every path until it bears fruit or until all hope withers." *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) (internal quotation marks omitted).

### b.   Deference to State Court's Adjudication of Ineffective Assistance Claims

The Supreme Court has established an especially high burden that § 2254 petitioners must meet to succeed on ineffective assistance claims decided in the respondent's favor by the state courts.   This is so for two reasons. First, § 2254(d) requires a federal court to grant deference to a state court's adjudication of an ineffective assistance claim. Second, the *Strickland* standard requires all courts to defer to the assumption that counsel provided adequate assistance to a defendant. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were

reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

In addition, under AEDPA, "a state court's factual findings are presumed correct, and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1309 (11th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)). "Therefore, where factual findings underlie the state court's legal ruling, our already deferential review under AEDPA becomes [again] doubly so." *Id.* (internal quotation marks, brackets, and citation omitted).

### 2. Analysis of Smith's Ineffective Assistance Claim Regarding Counsel's Failure to Raise an Issue Regarding Administration of Haldol at Trial

Smith first claims that his trial counsel provided ineffective assistance to him because they failed to investigate his mental state and discover that jail personnel administered Haldol to him before trial. (Doc. # 1-1 at ¶¶ 139-40). According to Smith, counsel's failure to discover that he had been administered Haldol prejudiced him because, owing to that failure, counsel could not rebut the prosecution's claim that he had shown a lack of remorse during the trial by informing the jury of his medication. (*Id.* at ¶ 141). The State responds that the Alabama Court of Criminal Appeals' adjudication of this ineffective assistance claim was not contrary to *Strickland* nor was it an unreasonable application of *Strickland*. (Doc. # 28 at 39).

Smith contends that the Court of Criminal Appeals improperly relied on his failure to inform trial counsel that he had received Haldol because counsel should have conducted a reasonable investigation into his use of medication. (Doc. # 39 at 61-62). According to Smith, there is a reasonable probability that the jury "would have given [him] a life sentence instead of the death penalty" if it had been informed of the Haldol administration. (*Id.* at 63-64).

Frankly, the court is uncertain whether Smith seeks to raise an ineffective assistance claim relating solely to trial counsel's inadequate investigation of his medication, or whether he also intends to present an ineffective assistance claim regarding trial counsel's failure to present information about his medication to the jury during rebuttal argument. In the interest of a comprehensive review, the court will discuss both claims.

On collateral review, the Alabama Court of Criminal Appeals affirmed the trial court's denial of these claims. *Smith III*, 112 So. 3d at 1138-40, 1144-46. The trial court made the following findings of fact and conclusions of law in its Rule 32 Order:

> The Petitioner [Smith] asserts that being under the influence of Haldol prevented him from showing any emotion during the trial or from assisting his counsel during the penalty phase. The Petitioner asserts that the State improperly took advantage of this situation by pointing out his lack of remorse and pointing out that he appeared to be an emotionless killer. Attorneys for the Petitioner called Dr. William Alexander Morton, Jr., an expert in the field of psychopharmacology. Dr. Morton testified about how Haldol reduces brain activity and makes an individual slow down and not respond to outside stimuli. Dr. Morton testified that Willie Smith was on Haldol when he came to prison from the county jail. Although Dr. Morton was unable to testify conclusively that the Defendant was on Haldol at the time of his trial, and Petitioner Smith did not testify regarding any medications he may have taken prior to trial, evidence presented by the Petitioner would appear to indicate that Willie Smith was [ ] taking Haldol at the time his case proceeded to trial. If the Defendant was taking Haldol at the time of his trial, the next question which must be addressed [is] whether his counsel was ineffective in representing the Defendant as it relates to his use of Haldol. The Petitioner claims that his trial counsel should have objected to the prosecutor's comments regarding Mr. Smith's lack of remorse, and argues that such an objection would have been even more necessary had defense counsel known the Defendant was taking Haldol. Yet, the record is clear that the Defendant did not tell his attorney that he was taking any medication, and neither of the two doctors who examined the Defendant prior to trial recognized any problems which could be directly attributed to such medication. Nor was anything else brought to counsel's attention which would have caused either attorney to realize that the Defendant may have been taking some medication which could affect his demeanor. Based upon these findings, this Court cannot find that either of the Petitioner's trial attorneys were deficient or that their performance was below the standard called for in the first prong of [*Strickland*].

In a similar argument Smith goes on to argue that his trial counsel was ineffective in failing to investigate Smith's psychiatric condition. As the Court previously indicated, this argument as it relates to the Defendant's use of Haldol is not supported by the evidence because the Court finds defense counsel could not have reasonably known that the Defendant may have been taking medication that affected his demeanor. As the Petitioner's brief and case law cited therein indicates, an attorney (or even a mental health expert) could reasonably assume that an individual's lack of emotion and lack of communication could be based upon the personality of the individual and could be amplified due to a lower intelligence quotient of the individual. Therefore, Smith's trial counsel could not be expected to do additional investigation to determine whether the Defendant was taking some type of medication. This is especially true in light of the fact that neither of the mental health experts who saw the Defendant at the time of trial felt that this was an issue. Attorney Amy Peake also testified that she did not recall the Defendant telling her that he was given medication that affected him in any way; therefore, her actions, or lack thereof, were reasonable. . . .

Contrary to the Petitioner's assertions, this Court is also of the opinion that the Respondent is correct in asserting that defense counsel cannot be regarded as ineffective for failing to reveal Smith's use of Haldol and how the drug may have affected him. As previously noted in this Order, the argument that the Defendant was given Haldol is disputed. The Defendant did not testify that he was taking this medication, but this Court is of the opinion that the Petitioner has shown that it is more likely than not that Smith was taking Haldol at the time of his trial. Even though he may have been taking Haldol, it appears clear that Smith [never] told his attorneys that he was being medicated or that the medication may have caused Smith to act emotionless. The Respondent correctly cites <u>Funchess v. Wainwright</u>, 772 F.2d 683, 689 (11th Cir. 1984) for the proposition that defense counsel should not be regarded as ineffective for failing to know about non-obvious psychological problems that are not brought to their attention by their client. Without addressing the prejudice prong of <u>Strickland v. Washington</u>, it is clear that Petitioner has not shown that his counsel was ineffective for failing to notify the court and the jury of the possible effect of medication which counsel was never informed the Defendant was taking. As previously noted, the fact that two doctors who interviewed the Defendant prior to trial also did not see this as a problem weighs heavily against the argument that trial counsel was ineffective for not bringing this to the attention of the jury or judge.

(State Court Record, Vol. 34, Tab R-74 at 10-11, 20-21).

The Alabama Court of Criminal Appeals affirmed the trial court's decisions on both of Smith's ineffective-assistance claims. It held that Smith's attorneys did not provide deficient assistance by failing to investigate "the State's administration of Haldol to him during trial"

because (a) Smith provided "no evidence to establish that his counsel knew or should have known that he was taking Haldol, if he was in fact administered the drug," (b) Smith's counsel testified that he never complained about being administered Haldol to her, and (c) "nothing in the record suggests that any Haldol was involuntarily or unknowingly administered to Smith." *Smith III*, 112 So. 3d at 1138-39. According to the Court of Criminal Appeals, "[w]hile there was testimony that Smith's demeanor was consistent with that of someone who had taken Haldol, there was also testimony that Smith's affect may have been caused by other reasons." *Id.* at 1140. Thus, it concluded that the trial court's finding of no deficient assistance was not clearly erroneous. *Id.*

With regard to Smith's claim that counsel should have informed the judge and jury of the Haldol administration during the penalty phase once the prosecution had commented on his lack of visible remorse, the Court of Criminal Appeals highlighted the lack of evidence that Smith had informed his attorneys of the drugs he was administered, the lack of "any indication that his counsel should have reasonably believed that to be the case," and prior precedent that permitted the prosecution to "comment on a capital defendant's lack of remorse." *Id.* at 1144-45. Accordingly, the Court of Criminal Appeals affirmed the trial court's conclusion that Smith failed to show counsel's ineffectiveness as to that claim. *Id.* at 1145.

Smith does not dispute the state court's factual findings but claims that the Court of Criminal Appeals unreasonably applied *Strickland*. (Doc. # 39 at 61). The court is not convinced. Smith never informed his trial counsel that he had been administered Haldol. (State Court Record, Vol. 34, Tab R-74 at 11). Two doctors who examined Smith before the penalty phase did not recognize any symptoms of Haldol use. (*Id.*). And, counsel reasonably could have

attributed his lack of emotion during the trial to other factors. (*Id.*). There is nothing in the record to suggest the state appellate court misapplied *Strickland*.

As the Eleventh Circuit has made clear, counsels' investigation into mitigating evidence can be found reasonable even where they fail to discover evidence of a defendant's psychiatric condition. For example, in *Holladay*, trial counsel failed to discover evidence that the defendant was treated in the psychiatric ward of a mental hospital. 209 F.3d at 1251. Nor did counsel in *Holladay* discover the defendant's friends who recalled "his unpredictable behavior." *Id.* Nevertheless, the Eleventh Circuit affirmed the denial of an ineffective assistance claim premised on trial counsel's investigation because "the report of the lunacy commission that [petitioner] was sane and competent combined with counsel's impression of [petitioner] as cooperative, articulate, and affable did not put [trial counsel] on notice that there were or might be psychiatric records that she needed to find." *Id.* at 1252. The *Holladay* court also noted that the petitioner in that case provided no proof that he had informed counsel of his prior psychiatric treatment. *Id.* Here, Smith's ineffective assistance claim concerning counsel's allegedly insufficient investigation into his medication is analogous to the claim decided against the petitioner in *Holladay*. These claims are analogous because Smith never informed counsel that he had been administered Haldol, and the medical experts who examined Smith discovered no signs that he had received anti-psychotic medication.[21]

---

[21] This court agrees with the state trial court that *Funchess* provides strong authority for denying Smith's claims that counsel was ineffective for failing to investigate the administration of Haldol and for failing to bring it to the attention of the jury and trial judge. In *Funchess*, a pre-AEDPA habeas action by a state prisoner, the petitioner claimed that trial counsel rendered ineffective assistance by failing to investigate and present evidence that the petitioner had suffered from "extreme mental and emotional disturbance." 772 F.2d at 689. The Eleventh Circuit held that the petitioner failed to demonstrate counsel's deficient performance in investigating that mitigating circumstance because the petitioner never informed his counsel about his past psychological problems, a psychological examination conducted before trial found that the petitioner was competent to stand trial and criminally responsible at the time of the murders, the examination noted no history of psychological problems, and counsel perceived that the petitioner competently assisted him in trial preparation. *Id.* at 689-90. As in *Funchess*, the examinations Smith received did not reveal symptoms of Haldol administration, and therefore there was an

Dr. Morton's testimony during the Rule 32 hearing does not alter this conclusion. According to Smith, Dr. Morton, a psychopharmacologist, testified that (a) "it would have only taken [him] between 10 and 15 minutes to perform an evaluation to determine that Mr. Smith was suffering from the effects of Haldol," and (b) "he could have spoken on the phone with trial counsel and taught them how to determine whether their client was on Haldol." (Doc. # 1-1 at ¶ 140). Dr. Morton's testimony does not provide significantly probative evidence that counsel rendered deficient performance because it relies on the benefits of hindsight. *Strickland* instructs courts not to be the Monday morning quarterbacks. That is, courts must *not* evaluate counsel's performance through a rear-view mirror and rely on the benefits of hindsight to determine which experts or witnesses competent counsel would have discovered. *See Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (*en banc*) (citing *Strickland*, 466 U.S. at 689). In *Waters*, the court explained why testimony regarding what an expert *could have* provided to counsel *if* counsel had investigated the right issue is of questionable value in this context.

> It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or, if they were called, had they been asked the right questions. This case is no exception. But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance. This case is no exception in that respect, either. That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. As we have noted before, "[i]n retrospect, one may always identify shortcomings," *Cape v. Francis,* 741 F.2d 1287, 1302 (11th Cir.1984), *cert. denied,* 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985), but perfection is not the standard of effective assistance.

---

insufficient basis for investigating any possible medication use. (*See* State Court Record, Vol. 34, Tab R-74 at 11 ("[N]either of the mental health experts who saw the Defendant at the time of trial felt that [medication] was an issue."). Given that *Funchess* examined a petitioner's *Strickland* claim under a less deferential standard than that provided in § 2254(d), and the *Funchess* opinion strongly weighs against Smith's claim here, this court cannot say that the Alabama Court of Criminal Appeals ruled contrary to *Strickland* or unreasonably applied *Strickland*.

*Waters*, 46 F.3d at 1513-14. To accept Dr. Morton's testimony as proof that the Court of Criminal Appeals unreasonably applied *Strickland*, the court would have to engage in hindsight analysis of what Smith's counsel could have done better if the evaluations conducted before the penalty phase had been more fruitful. But such an argument provides no basis for determining that the Court of Criminal Appeals' application of *Strickland* was unreasonable or contrary to prior precedent. Thus, the court finds that the Alabama Court of Criminal Appeals' adjudication of the ineffective assistance claim regarding counsel's supposedly insufficient investigation into Smith's medication was neither contrary to the Supreme Court's opinion in *Strickland* nor an unreasonable application of *Strickland*.

Similarly, the court is unconvinced by Smith's argument that the state courts' denial of his ineffective assistance claim regarding counsel's failure to present rebuttal argument based on the administration of Haldol merits relief under § 2254(d). As explained above, the state trial court found that counsel could not be faulted for failing to bring this issue to the jury's or the trial court's attention because Smith never mentioned the medication to counsel and the doctors who examined Smith did not perceive a problem related to the use of Haldol. (State Court Record, Vol. 34, Tab R-74 at 21). The Court of Criminal Appeals' holding that Smith failed to show deficient assistance by trial counsel because they had no reasonable indication that he was suffering from effects of Haldol use is a reasonable application of *Strickland*. *Smith III*, 112 So. 3d at 1144-45. As the *Williams* court explained, trial counsel is not obligated to investigate every avenue "until all hope withers." *Williams*, 185 F.3d at 1237.

For these reasons, Smith's ineffective assistance claims related to trial counsel's investigation of his medication and failure to present information about his Haldol use to the court are due to be denied.

### 3. Analysis of Petitioner's Ineffective Assistance Claim Regarding Trial Counsel's Investigation of His Intelligence and His Psychiatric Condition

Smith's second ineffective assistance claim concerns counsel's investigation of his intelligence and psychiatric condition. (Doc. # 1-1 at ¶¶ 143-48). According to Smith, trial counsel failed to present evidence of his low intellectual capacity to the jury, which would have "provided strong evidence of mitigation." (*Id.* at ¶ 145). Smith contends that counsel failed to order a full intelligence test or a test to determine his adaptive skills. (*Id.* at ¶ 148). In addition, Smith argues that counsel "spent minimal time with the psychology experts in preparation for trial." (*Id.*). These shortcomings in counsel's performance caused prejudice to Smith because the jury did not hear "crucial evidence" regarding his low intellectual capacity, and that evidence "likely would have had an effect on his ultimate sentence." (*Id.*).

The State responds that the Alabama Court of Criminal Appeals referred to Smith's mental condition and low intelligence as "nonstatutory mitigating circumstances." (Doc. # 28 at 39 (citing *Smith III*, 112 So. 3d at 1141)). According to the State, the Alabama Court of Criminal Appeals also concluded that, based on fee declarations that showed counsel met with a psychologist and a psychiatric social worker before Smith's trial, counsel investigated Smith's mental condition. (*Id.* at 39-40).

Smith replies that his counsel's fee declarations "do not show that counsel's investigation was reasonable." (Doc. # 39 at 65). Smith contends that the attorney responsible for his penalty phase proceedings, Amy Peake, did not recall meeting with the two doctors who examined Smith before his trial. (*Id.*). Although he concedes that his other trial counsel, L. Dan Turberville, met the psychologist and social worker, he argues that Turberville presented no mitigating evidence

on his behalf because that attorney was occupied with personal problems.[22] (*Id.*). Finally, Smith contends that the Court of Criminal Appeals failed to consider whether the jury heard the mitigating evidence. (*See id.* at 65-66).

On collateral review, the Alabama Court of Criminal Appeals affirmed the trial court's denial of this ineffective assistance claim. *Smith III*, 112 So. 3d at 1141-42. It noted that the trial court made no findings on the issue of whether counsel failed to present evidence of Smith's low intelligence as mitigation evidence. *Id.* at 1141. But, it found that Smith's argument on appeal that the trial court failed to adequately address the issue was "not preserved for review" because he did not object to the trial court's order denying the state habeas petition on that ground. *Id.* at 1141 n. 19. The trial court's findings of fact and conclusions of law related to this issue state:

> The Petitioner then alleges that Defendant's trial counsel failed to properly interview, prepare and question Dr. Blotcky regarding reasonably available mitigation evidence. (p. 63, Rule 32 Petition). Although the Petitioner alleges that Dr. Blotcky was not sufficiently qualified, the record reflects that he had a "Ph.D. in Clinical Psychology from Vanderbilt University. Did an internship in Clinical Psychology at the University of Texas Health and Science Center, and [had] been in private practice for seven years." Although another expert may have provided more information in mitigation for the Defendant, this Court cannot say that defense counsel was ineffective in hiring Dr. Blotcky as opposed to hiring another expert. The Petition further asserts that another expert could have given mitigation testimony showing that Smith was "under the influence of extreme mental and emotional disturbance at the time of the crime," that his "ability to appreciate the criminality of his conduct was impaired, and that his "ability to conform his conduct to the law was substantially impaired." (p. 64, Rule 32 Petition). Yet, no such testimony was presented at the evidentiary hearing. Therefore, there is insufficient proof of the Defendant's mental condition at the time of the offense to establish that his trial counsel was ineffective in not hiring a different expert.
>
> Assuming that the Petitioner is correct in asserting that trial counsel waited until a week before trial to hire Blotcky, such a delay does not automatically result in a conclusion that counsel was ineffective in hiring him. The petitioner must also show how a delay in hiring the expert prejudiced Smith, but no such showing has been made.

---

[22]  As explained in more detail below, Turberville participated in Smith's penalty phase proceedings by presenting a final argument on Smith's behalf and by conducting some investigatory work for mitigating evidence.

(State Court Record, Vol. 34, Tab R-74 at 18). The state trial court's order that imposed the death penalty discussed at length the evidence submitted by counsel during the penalty phase and sentencing phase regarding Smith's intelligence and psychiatric condition:

> Defendant Smith was examined by C.J. Rosencrans, [Ph.D.], Clinical Professor of Psychiatry and certified Forensic Examiner. Dr. Rosencrans' findings were orally communicated by the undersigned to counsel on May 1, 1992, written findings consisting of cover letter and four typed pages were given to counsel on May 4, 1992.
>
> Dr. Rosencrans stated in his findings that "the defendant is fully capable of assisting his attorney in his own defense and of cooperatively interacting with the court at this time[."] Also, Dr. Rosencrans stated, "It is my opinion that defendant was not mentally ill nor suffering from any other discernible psychiatric nor psychologic disturbance at the time of the offense[."] Dr. Rosencrans' findings were not disclosed to the jury nor did he testify.
>
> Alan D. Blotcky, [Ph.D.] was retained by the defense at State expense to evaluate the defendant. Dr. Blotcky testified in front of the jury at second stage, stating that defendant tested to have a verbal I.Q. of 75, was borderline between mild retardation and low average intelligence, that defendant's personality tests indicated the defendant was distressed and depressed, had a paranoid view of the world, was a good candidate for rehabilitation, knew right from wrong, was not suffering from any psychosis; further, that defendant reported previous cocaine abuse that would impair his judgment, reported a pill overdose in effort to commit suicide, had suffered at the hands of an abusive father who mistreated defendant and defendant's mother.

(*Id.*, Vol. 34, Tab R-69 at 12-13). At the sentencing phase, the trial court did not find that Smith had committed the murder "under the influence of extreme mental or emotional disturbance." (*Id.* at 16). But, the trial court did find that the effects of his father's abuse and his verbal I.Q. in "the borderline range between mild retardation and low average intelligence" were mitigating factors under Alabama Code § 13A-5-52. (*Id.* at 18-19).

The Alabama Court of Criminal Appeals held that Smith's counsel were not "ineffective during the penalty phase by only using Dr. Blotcky's findings as to this matter" because debatable trial tactics normally do not rise to the level of ineffective assistance. *Smith III*, 112 So.

3d at 1142. "Significantly, the existence of alternative or additional mitigation theories generally does not establish ineffective assistance of counsel." *Id.* (quoting *Daniel v. State*, 86 So. 3d 405, 407 (Ala. Crim. App. 2011)). The Court of Criminal Appeals acknowledged the sentencing court's finding that Smith's low intelligence and mild retardation were mitigating circumstances. *Id.* at 1141. Most significantly, that court determined that "Smith's counsel clearly investigated Smith's mental condition as evidenced by counsel's fee-declaration sheets, which were introduced by Smith at the evidentiary hearing. They indicate that counsel conferred with a psychologist on a number of occasions and also spoke with a psychiatric social worker." *Id.*

The Alabama Court of Criminal Appeals also denied Smith's claim that his counsel were ineffective due to their failure to direct the experts to "perform what Smith says are the correct tests." *Id.* at 1143-44. "Smith has failed to show that their testing was incorrect or misleading. Although these experts did not reach the results Smith may have desired, their testing has not been shown to have been faulty or inadequate. . . . Although newer tests become available periodically, as occurred concerning one of the tests in this case, there is no indication that any such testing would have yielded different results." *Id.*

Smith complains that the Alabama Court of Criminal Appeals' adjudication of this claim was "manifestly unreasonable." (Doc. # 39 at 64). The court disagrees. This claim does not come close to meeting the high threshold for granting Smith relief under § 2254(d). Smith's current argument mainly consists of second-guessing the tests that medical experts performed on him before the penalty phase and contending that he should have been given more tests. (*See* Doc. # 39 at 64). It must be acknowledged, though, that Dr. Blotcky conducted a verbal IQ test and personality tests before the penalty phase of the trial. (State Court Record, Vol. 34, Tab R-69 at 12 (discussing Dr. Blotcky's testimony at trial)). Moreover, Smith's counsel talked to a

psychologist on April 14, 1992, April 18, 1992, April 20, 1992, April 29, 1992, and May 3, 1992.[23] (*Id.*, Vol. 26, Tab R-62 at 1591). Smith's attorney also talked to a psychiatric social worker for an hour on April 24, 1992. (*Id.*). Dr. Blotcky testified before the jury during the penalty phase that Smith suffered from "mild retardation," "low average intelligence," depression, and paranoia. (*Id.*, Vol. 34, Tab R-69 at 12-13). Indeed, the state trial court recognized that Smith's low intelligence and his "troubled adolescence occasioned in large part by an abusive father" were mitigating factors weighing against the imposition of the death penalty. (*Id.* at 19). In short, Smith's § 2254 petition provides no ground for this court to disturb the Court of Criminal Appeals' holding that trial counsel conducted a competent investigation of Smith's intelligence and psychiatric condition.[24]

Smith contends in his reply brief that the Court of Criminal Appeals erred by relying on the trial court's findings alone without addressing that the jury had to consider the mitigating evidence. (Doc. # 39 at 66). Smith relies on *Lockett v. Ohio*, 438 U.S. 586 (1978), to support this assertion. But, Smith's argument is not supported by the record in that he ignores the sentencing court's finding that Dr. Blotcky presented evidence of Smith's low verbal IQ, depression, and paranoia to the jury during the penalty phase. (*See* State Court Record, Vol. 34, Tab R-69 at 12-

---

[23] To be sure, Turberville's fee declaration did not specify how long his conferences with the psychologist were before trial. (*See* State Court Record, Vol. 26, Tab R-62 at 1591). But, at the same time, the fee declarations do not support Smith's factual claim that "his attorneys spent minimal time with the psychology experts in preparation for trial." (Doc. # 1-1 at ¶ 148).

[24] In many respects, Smith's claim that counsel selected the wrong psychiatric and intelligence tests is analogous to a claim that counsel selected the wrong experts. In *Hinton v. Alabama*, 134 S. Ct. 1081 (2014), the Supreme Court rejected the proposition that a compelling ineffective-assistance claim can be premised on a mere failure to choose the right experts. In that opinion, the Supreme Court asserted that "[t]he selection of an expert witness is a paradigmatic example of the type of strategic choice that, when made after thorough investigation of the law and facts, is virtually unchallengeable." *Hinton*, 134 S. Ct. at 1089 (internal quotation marks and brackets omitted). The Supreme Court cautioned in *Hinton* that it did not intend to "launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired." *Id.* Similarly, the court concludes that *Strickland* does not obligate federal courts to examine the relative merits of the medical tests actually performed on a capital defendant at counsel's direction and the medical tests that might have been performed, absent evidence that all competent attorneys would have ordered a particular test as part of a particular mitigation investigation.

13 (describing the testimony presented during the penalty phase)). This is not a case where defense counsel presented no mitigating evidence concerning the petitioner's intellectual or mental condition during the penalty phase or sentencing phase. And, "[i]t is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 (11th Cir. 2002). Even in a case with stakes as high as those in capital litigation, defense counsel is not required to present every piece of mitigation evidence to a sentencer, as stacking defenses often weakens the strength of an argument. *See Chandler*, 218 F.3d at 1319 ("Counsel is not required to present every nonfrivolous defense; nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy.").

For these reasons, Smith's ineffective assistance claim based on counsel's investigation into his intellectual and psychological condition is due to be denied.

### 4.     Analysis of Petitioner's Ineffective Assistance Claim Regarding Reliance on Inexperienced Trial Counsel for Penalty Phase Argument

Smith's characterization of the record is that the senior member of his counsel team, Turberville, "effectively handed off the penalty phase to [Amy] Peake, who was involved in her very first case after becoming admitted to the State of Alabama Bar." (Doc. # 1-1 at ¶ 150). He claims that Turberville conducted no investigation of mitigating factors and did not question any of the witnesses who testified during the penalty phase. (*Id.*). Smith contends that Peake failed to direct experts to conduct sufficiently comprehensive tests that would have determined his level of mental intelligence. (*Id.* at ¶ 152). According to Smith, "Turberville's mere presence at the penalty phase was *not* sufficient in protecting Mr. Smith's rights because none of the appropriate investigation had been done by Ms. Peake." (*Id.* at ¶ 156) (emphasis in original). He complains

that the trial court incorrectly found that Tuberville presented the closing argument, as Turberville only presented a brief statement following Peake's closing argument. (*Id.*). Additionally, Smith argues that counsel failed to investigate "all aspects of his background" for mitigating evidence. (*Id.* at ¶ 154).

The State responds that the mitigating evidence Smith believes should have been presented would not have established a statutory mitigating circumstance. (Doc. # 28 at 42). Nor would the additional evidence have changed the aggravating circumstance found by the trial court. (*Id.*). The State argues that Smith has failed to show prejudice from counsel's allegedly deficient assistance because "there is no reasonable probability" that the additional mitigating evidence presented at the post-conviction hearing "would have altered the balance of aggravating and mitigating circumstances in this case and changed the outcome of the sentencing proceedings." (*Id.* at 43).

The Alabama Court of Criminal Appeals affirmed the trial court's denial of this ineffective assistance claim.  *See Smith III*, 112 So. 3d at 1142-44. It held that Turberville, Smith's lead counsel, had the amount of prior experience required under Alabama law for capital defense and that only one attorney on Smith's defense team was required under Alabama law to have that level of experience. *Id.* at 1144. The trial court's findings of fact and conclusions of law on this issue state:

> It appears that Smith is correct in asserting that Attorney Amy Peake handled all of the questioning of witnesses during the penalty phase and that this was Peake's first time to appear in a criminal trial. Yet, the State of Alabama is likewise correct in noting that "the appellate courts of Alabama have held that only one attorney representing a capital defendant is required to meet the five-year prior experience requirement. <u>See</u>, e.g., <u>Hodges v. State</u>, 856 So.2d 875 (Ala.Crim.App. 2001). There is no dispute that Smith's lead defense attorney, L. Dan [Turberville], exceeded the statutory requirements for appointed representation." (p. 27, State's Post-Hearing Memorandum addressing Smith's Second Amended Rule 32 Petition). Contrary to the Petitioner's argument on pages 52 and 53 of his

> Petition, there is insufficient evidence to show that Mr. [Turberville] excluded himself from the proceedings so as to treat the matter as if [Turberville] was not present to assist Ms. Peake. In fact, Mr. [Turberville] gave the closing argument of the defense after evidence was presented in the penalty phase. Since Smith did have an attorney who met the minimal five year requirement, in order to prevail regarding a claim of ineffective assistance of counsel at the penalty phase the Petitioner is required to meet the elements outlined in <u>Strickland v. Washington</u>, supra.

(State Court Record, Vol. 34, Tab R-74 at 16).

According to the Alabama Court of Criminal Appeals, Peake took several steps to investigate Smith's background prior to trial:

> [Peake] testified that she attempted to obtain Smith's school records. She was following up on information from Smith that he had attended special-education classes; however his records were no longer available. She therefore contacted an assistant principal, who remembered Smith and who testified for him at the penalty phase. Cocounsel stated that her duties were to conduct investigation for sentencing. She also testified that she was instructed "to a limited extent" by the lead counsel as to with whom to speak and what to investigate. (R. 60.) She stated that she spoke with Smith's family members, as well as with members of the community in which he had lived. She testified that she was certain that she had spoken with Dr. Blotcky before the penalty phase, although she could not recall this. . . . She stated that lead counsel "was not very helpful." (R. 62.) She testified that she introduced testimony concerning Smith's upbringing and his severe drug abuse. Lead counsel, however, retained the services of Dr. Blotcky.

*Smith III*, 112 So. 3d at 1143. According to Peake's fee declaration, she visited Smith once for an hour before trial, interviewed witnesses for 9.25 hours before trial, and met with a psychologist for 1.5 hours before trial. (State Court Record, Vol. 26, Tab R-62 at 1589).

Smith's § 2254 ineffective assistance claim fails to demonstrate that the Court of Criminal Appeals unreasonably applied *Strickland*. As the Court of Criminal Appeals held, the question of whether Smith's defense team included an attorney with sufficient criminal-trial experience is a question of state law, not a question of constitutional law. *See Smith III*, 112 So. 3d at 1144 (citing Alabama case law that only requires one attorney on a defense team to have five years' experience in order to comply with Alabama Code § 13A-5-54). While counsel is

granted a stronger presumption of effective advocacy by courts as they become more experienced, *see Chandler*, 218 F.3d at 1316, *Strickland* simply does not require a minimum threshold of experience for an attorney to provide effective assistance to a defendant.

Further, Smith incorrectly suggests in his petition that Turberville did not work on the penalty phase of the trial. Turberville's fee declaration states that he met with a psychologist and a psychiatric social worker before trial and called a family court to obtain evidence. (State Court Record, Vol. 26, Tab R-62 at 1591). While Turberville did not examine the defense witnesses during the penalty phase, he was at counsel's table and nothing in the record suggests he failed to supervise the defense.  He presented the defense's final argument during the penalty phase. (*See generally id.*, Vol. 9, Tab R-23 at 1537-44; Vol. 10, Tab R-23 at 1545-46). Contrary to Smith's characterization in the § 2254 petition, Turberville presented a substantial closing argument to the jury during the penalty phase, along with Peake's closing argument. (*Cf.* Doc. # 1-1 at ¶ 156). If Smith's claim is that the Alabama state courts incorrectly determined that Turberville acted as counsel during the penalty phase of his criminal trial, he has not demonstrated by clear and convincing evidence that the Alabama state courts made an incorrect determination of fact.  *Cf.* 28 U.S.C. § 2254(e)(1). And, to the extent that this claim contests Peake's pretrial investigation into mitigating factors, Smith has failed to show that the Alabama Court of Criminal Appeals unreasonably applied *Strickland* or ruled contrary to *Strickland*. As explained above, Smith's counsel investigated his intellectual and psychological condition before trial and presented evidence from a psychologist during the penalty phase. (*See, e.g.*, State Court Record, Vol. 9, Tab R-21 at 1492-1507). Smith's counsel also interviewed family members and witnesses with knowledge of his school record. *See Smith III*, 112 So. 3d at 1143. During the penalty phase,

Smith's counsel presented testimony from Smith's mother, his godmother, and his fiancée, along with Dr. Blotcky's testimony. (*See* State Court Record, Vol. 9, Tab R-21 at 1464-91).

For these reasons, Smith's ineffective assistance claim premised on Peake's relative lack of experience and Turberville's alleged non-involvement in the penalty phase of the trial presents no ground for relief under § 2254(d) or § 2254(e).

### 5.   Analysis of Smith's Ineffective Assistance Claim Based on Counsel's Presentation of *Batson* Motion

Finally, Smith claims that trial counsel and appellate counsel rendered ineffective assistance by "failing to properly support Mr. Smith's Batson claim" with "citations of historical discriminatory strikes in Jefferson County." (Doc. # 1-1 at ¶ 157 & n. 7). Smith contends that Turberville was familiar with cases where Alabama courts had concluded that the Jefferson County District Attorney's Office committed *Batson* violations because Turberville had acted as defense counsel in those cases.  (*Id.* at ¶¶ 158-59). But, Smith asserts that appropriate citations were not presented to the Alabama Court of Criminal Appeals because that court commented on the lack of citations to support the argument that the prosecutor had a history of discriminatory peremptory strikes. (*Id.* at ¶ 160).

The State responds by arguing that Smith has not demonstrated a decision contrary to *Strickland* or an unreasonable application of *Strickland* with respect to this ineffective assistance claim. (Doc. # 28 at 43-45). In reply, Smith asserts that counsel's failure to provide specific examples of prior *Batson* violations by the district attorney's office "allowed the Alabama Court of Criminal Appeals to dismiss this allegation as 'vague' and led the trial court to conclude that Mr. Smith had not presented a prima facie case." (Doc. # 39 at 68). Smith reiterates that Turberville was familiar with a "pattern of local jury discrimination" but failed to provide

sufficient support of that pattern to the trial court and the Court of Criminal Appeals.  (*Id.* at 69-70).

The trial court denied this ineffective assistance claim in the Rule 32 petition. With regard to trial counsel's performance, the trial court ruled as follows:

> This Court is of the opinion that this argument is without merit for several reasons. First, at the Rule 32 evidentiary hearing the Petitioner did not specify how Mr. Turberville's 'extensive knowledge' of prior discrimination by the Jefferson County District Attorney's Office would have, if sufficiently conveyed to the court, successfully resulted in his Batson Motion being granted. Furthermore, it appears that "fourteen of [the State's] fifteen strikes [were] to eliminate prospective jurors of the female gender." The State's decision to strike each of these fourteen prospective female jurors was sufficiently addressed on remand by the trial court. The Court of Criminal Appeals of Alabama held that "[a]ll of the reasons given by the prosecutor for his strikes of these potential jurors were sufficiently facially gender neutral." Smith v. State, 838 So.2d 413, 436 (Ala.Crim.App. 2002). Based upon the appellate court's standard of review in death penalty cases, if any of the reasons given for striking said jurors violated Batson, then the court would have been obligated to find plain error and address that issue. Yet, the appellate court did not find any error or any improper motive in the prosecutor's strikes. Since the appellate court held that fourteen of the fifteen strikes were proper, the only issue which would need to be addressed was the State's decision to strike the one remaining male juror. Based upon this court's summary of the State's strikes, although not entirely clear, it appears that the only remaining strike by the prosecution was a white male. (RT. 448-455). Therefore, any claim of a Batson violation would be without merit. Even if this conclusion regarding the fifteenth juror struck by the State being a white male is incorrect, the Petitioner has failed to sufficiently carry his burden at the evidentiary hearing as it relates to this issue.

(State Court Record, Vol. 34, Tab R-69 at 19-20). The trial court also denied Smith's ineffective assistance claim regarding appellate counsel's presentation of the *Batson* issues in Smith's direct appeal, based in part on its finding that appellate counsel had not provided ineffective assistance:

> Smith then asserts that his "appellate counsel improperly presented the issue of discriminatory strikes of jurors to the Alabama Supreme Court" and the Court of Criminal Appeals of Alabama. As it relates to the submission of this issue to the Court of Criminal Appeals, the record is clear that the issue was presented and a remand was required by the appellate courts. After a hearing on remand, the Alabama Court of Criminal Appeals affirmed Smith's conviction and held that "the reasons given by the prosecutor for his strikes of these potential jurors were

> sufficiently facially gender neutral." <u>Smith v. State</u>, 838 So.2d 413, 436 (Ala.Crim.App. 2002). As this Court noted in paragraph 20 of this Order, this issue is without merit as it relates to the gender of the potential jurors and the race of the potential jurors. . . . Furthermore, the Petitioner has failed to show that Smith's appellate attorney was deficient or that Smith was prejudiced in any way by appellate counsel's actions.

(*Id.* at 24).

The Alabama Court of Criminal Appeals affirmed the trial court's denial of this ineffective assistance claim in the Rule 32 petition. *Smith III*, 112 So. 3d at 1147-48. According to the Court of Criminal Appeals, "[t]he record affirms that trial counsel effectively argued this ground to the trial court, and this Court's remand indicates that appellate counsel effectively argued discrimination by the prosecutor. Therefore, Smith has failed to prove ineffectiveness on this ground." *Id.*

Smith's contention that his trial and appellate counsel failed to present appropriate authority in support of the *Batson* claims falls far short of showing that his trial or appellate counsel rendered deficient assistance, much less that the Court of Criminal Appeals unreasonably adjudicated these claims. Smith cites no authority whatsoever -- and the court has not found any -- to support the proposition that reasonable jurists would find counsel's assertion of the *Batson* claims ineffective because counsel failed to cite certain authority.  An attorney might provide ineffective assistance under *Strickland* if he or she is ignorant "of a point of law that is fundamental to [the defendant's] case" and fails to "perform basic research on that point." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014). The record demonstrates, though, that counsel understood and referenced the fundamental law concerning the constitutional prohibition of discriminatory peremptory strikes. Indeed, at the trial in 1992, Smith's trial counsel raised a challenge to the prosecution's use of strikes against females two years before the Supreme Court held that peremptory strikes on the basis of gender violate the Fourteenth Amendment's Equal

Protection Clause in *J.E.B. v. Alabama*. Notably, Smith does not argue that trial or appellate counsel performed an ineffective investigation of law supporting the *Batson* claims, nor has he provided evidence that counsel failed to investigate precedent supporting the claims. *See Eady v. Morgan*, 515 F.3d 587, 599 (6th Cir. 2008) (stating that a habeas petitioner bears the burden of proving that counsel conducted an ineffective investigation of law because courts presume that attorneys provided competent representation). Unlike a claim that trial or appellate counsel rendered ineffective assistance by failing to present an issue for judicial review, a claim that counsel rendered ineffective assistance by failing to provide certain citations to authority has no support in Supreme Court case law interpreting *Strickland*. Accordingly, the court concludes that the Alabama Court of Criminal Appeals reasonably applied *Strickland* in denying these ineffective assistance claims. As a practical matter, the state courts understood and applied the correct legal framework in addressing the challenged use of jury strikes.  And, as a more academic matter, counsel are duty bound to be effective trial and appellate advocates, not law review editors.

### E.   Whether the Failure of a Juror to Reveal that He had Prior Knowledge of the Case Violated Smith's Constitutional Rights to Due Process, a Fair Trial, and a Reliable Sentencing Determination

Smith argues that one juror's failure to reveal his prior knowledge of the case violated Smith's constitutional rights to due process, a fair trial, and a reliable sentencing. (Doc. # 1-1 at ¶¶ 163-74). After Smith's trial, a juror wrote a letter to the trial court. (State Court Record, Vol. 2, at 241-43). In the letter, the juror wrote in part:

> One juror who lived in [Center Point], and was a vocal proponent of sentencing the defendant to death, even made a comparison of the jury selection process by mentioning the fact that he had previous knowledge of the case (which he supposedly told you about) and thus disclosed it to you. Therefore those who were sympathetic to life should have disclosed their problem with the death penalty.

(*Id.* at 242). Smith contends that this passage reveals that a juror failed to respond to voir dire questions about his prior knowledge of the case[25] and that Smith was consequently denied a trial by a panel of impartial, indifferent jurors, as required under *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). (Doc. # 39 at 71).

In denying relief on this claim on direct appeal, the Alabama Court of Criminal Appeals concluded that Smith "was not deprived of a fair trial because a juror might have had knowledge of the case." *Smith II*, 838 So. 2d at 439. The Court of Criminal Appeals highlighted the lack of evidence that any juror actually communicated his or her prior knowledge to the jury:

> Although the appellant argues that the fact that a juror was, according to another juror's letter, not forthcoming or honest in his answers during voir dire, there is no real evidence of that fact in the record. As previously stated, the letter was not an affidavit; the author of the letter did not testify concerning this possible hearsay statement, nor did the juror from [Center Point] testify.

*Id.* at 437-38. Smith maintains that the state court's finding contravened established Supreme Court precedent in *Irvin* and was an unreasonable determination of the facts. (*See* Doc. # 39 at 73).

The court concludes that the Alabama Court of Criminal Appeals reasonably applied established Supreme Court law on this issue and did not issue a decision contrary to clearly established law. As the State points out, *Irvin* involved a case of pervasive pretrial publicity in the community and not just a single juror. (*See* Doc. # 28 at 48-49). The Supreme Court's precedent makes clear that "[q]ualified jurors need not … be totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975) (holding that juror exposure to information about a prior conviction or to news accounts of the crime did not presumptively

---

[25] Of course, the very language of the passage itself tends to undercut Smith's argument. The note indicates that the Center Point juror claimed he had disclosed the "previous knowledge" to the court. (*Id.*).

deprive a defendant of due process when there was no evidence of prejudgment or hostility towards the defendant in the community or courtroom).

In *Irvin* and its progeny, the Supreme Court has held that jurors' exposure to pretrial publicity or even knowledge about a defendant's prior convictions does not presumptively deprive a defendant of due process. Instead, only those instances of publicity or prior knowledge that can be shown to be pervasive and inflammatory warrant reversal of a defendant's conviction. *See e.g.*, *Irvin*, 366 U.S. at 727 (granting habeas relief where pervasive pretrial publicity about confession resulted in 90 percent of the venire members expressing an opinion about the defendant's guilt); *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963) (holding that a denial of venue change violated due process after confession was broadcast to substantial percentage of community); *Estes v. Texas*, 381 U.S. 532, 550-52 (1965) (holding that pretrial television coverage and disruptive recording during trial violated defendant's due process rights); *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) (inherent prejudicial publicity and disruptive influences in courtroom deprived defendant of due process). In contrast, Smith has only presented evidence that a single juror may have had prior knowledge of the case and referred to his prior knowledge during jury deliberations. (State Court Record, Vol. 2, at 242). Smith neither obtained nor presented evidence that the juror shared his outside knowledge with the jury. Indeed, if the submitted letter is taken at face value as a complete and accurate portrayal of the jury's penalty-phase deliberations (and this is the only "evidence" in the record on this issue), the juror claimed to have told the court of this knowledge and did not disclose his extrinsic knowledge to the jury. That is, he told the other jurors that he had disclosed his information to the trial court and was arguing that other jurors should have "disclosed their problem with the death penalty" to the trial court before the trial began. (*See id.*). And, again, in any event, we are

not informed of exactly what this previous knowledge was.  Due to the stark differences between Smith's claim and the claim presented in *Irvin*, Smith's claim for habeas relief on this ground is due to be denied.

Smith further argues that the Court of Criminal Appeals' denial of this claim was unreasonable because the court unreasonably applied the legal principle that "a jury's verdict is not subject to impeachment by the testimony of jurors as to matters which transpired during the deliberations." *Smith II*, 838 So. 2d at 438 (citing *Fox v. State*, 269 So. 2d 917, 920 (Ala. Crim. App. 1972)). This application was incorrect, Smith argues, because federal courts have "held that statements indicating juror misconduct fall outside of the rule cited by the appellate court governing impeachment of verdicts." (Doc. # 39 at 73). But Smith's argument misses the point. The record contains no evidence that the juror from Center Point committed misconduct by disclosing extrinsic information to the jury, much less extrinsic evidence. For example, in *United States v. Martinez*, 14 F.3d 543, 550 (11th Cir. 1994) a juror informed the other jurors that the defendant faced 160 years of imprisonment if convicted, jurors watched television news accounts about the trial, jurors used a dictionary during deliberations, and a juror became aware of media accounts that she was participating in the trial. In contrast, the letter that Smith relies upon provided no specific extrinsic information shared by the juror from Center Point to the jury. (*See* State Court Record, Vol. 2, at 242). Whereas the *Martinez* court could presume prejudice against the defendant based on the introduction of extrinsic evidence during jury deliberations, *see* 14 F.3d at 550-51, the Alabama Court of Criminal Appeals was not obligated to presume prejudice against Smith based upon an unsworn statement that a juror had disclosed some type of knowledge of the case to the jury during penalty phase deliberations.

For these reasons, the Alabama Court of Criminal Appeals' denial of this claim was neither contrary to clearly established federal law or an unreasonable application of clearly established federal law. Nor did the Court of Criminal Appeals make an unreasonable finding of fact. Accordingly, this claim in Smith's habeas petition is due to be denied.

**F.      Whether Smith's Post-Arrest Statement to Police Informant Latonya Roshell was Obtained in Violation of his Sixth Amendment Right to Counsel**

Smith next alleges that, while he was awaiting trial, a State's witness solicited an incriminating statement from him outside of the presence of counsel, in contravention of Supreme Court precedent in *Maine v. Moulton*, 474 U.S. 159 (1985) and *United States v. Henry*, 447 U.S. 264 (1980). (Doc. # 1-1 at ¶ 175). While Smith was detained at the Jefferson County Jail, he asked Latonya Roshell (a police informant and later one of the State's witnesses) to assist him in making a three-way telephone call to family members. (State Court Record, Vol. 7, at 1139-41). While Roshell was listening to the call, Smith said that he suspected that Roshell was a police informant. (*Id.* at 1142). Smith then allegedly told Roshell "that he knew he did [the crime] and I [Roshell] knew he did it[,] but he wasn't going to go to court and tell the judge that he did it." (*Id.*). Roshell testified that she did not respond to the statement. (*Id.*) Roshell later reported Smith's statements to police and testified about them at trial. (*Id.* at 1142-43).

On return to remand, the Alabama Court of Criminal Appeals held that the admission of Roshell's testimony about the phone call did not violate Smith's right to counsel. *Smith II*, 838 So. 2d at 463.  It concluded that the Hoover Police Department did not solicit her assistance with regard to Johnson's murder. *Id.* Additionally, it determined that there was no "deception or custodial interrogation initiated by law-enforcement officers." *Id.*

Under *Massiah v. United States*, 377 U.S. 201, 206 (1964), the Sixth Amendment is violated when a government agent deliberately elicits incriminating statements from a defendant

who is represented by counsel. The Supreme Court has established three requirements for finding a Sixth Amendment violation based on deliberately eliciting an incriminating statement through an informant: (1) an informant was acting as a "government agent"; (2) the informant engaged in a "deliberate elicitation" of incriminating information from the defendant; and (3) the right to counsel had attached at the time of the conversation between the defendant and the informant. *Moulton*, 474 U.S. at 170-71; *Henry*, 447 U.S. at 269-70. The Court has in turn identified three important factors to consider in determining whether an informant deliberately elicited incriminating information from a defendant: (1) whether the informant "was acting under instructions as a paid informant"; (2) whether the defendant was unaware of the informant's role; and (3) whether the defendant "was in custody and under indictment at the time he was engaged in conversation." *See Henry*, 447 U.S. at 270. To establish a violation of the right to counsel, "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986); *Moulton*, 474 U.S. at 177 n. 13 (asserting that the Sixth Amendment right to counsel is violated when an informant engages the defendant "in active conversation … [that] was certain to elicit" incriminating statements).

Smith contends that for two reasons the Court of Criminal Appeals unreasonably applied *Moulton* and *Henry* to the facts of his case: first, he faults the state court for relying upon the fact that Smith "initiated the telephone call during which he . . . admitted that he had committed the murder," *Smith II*, 838 So. 2d at 461, and contends that the identity of the caller is irrelevant under *Moulton* and *Henry*; second, he claims the state court relied on its determination that Roshell was a passive listener because "she said nothing in response to [Smith's] . . . confession," *id.* at 462. (*See* Doc. # 39 at 76). This court reviews each of these contentions in

turn.

### 1. Government Agent

Smith's first challenge to this holding by the Alabama Court of Criminal Appeals fundamentally misconceives the basis of the Court of Criminal Appeals' holding. Smith correctly points out that "the identity of the party who instigated the meeting at which the Government obtained incriminating statements [is] not decisive or even important," *Moulton*, 474 U.S. at 175. But, Smith cites a portion of the Court of Criminal Appeals' opinion that discusses a Fourth Amendment claim by Smith, rather than the Sixth Amendment claim at issue in this habeas petition:

> Similarly, in the present case, the appellant suffered no violation of his right to privacy as he initiated the telephone call during which he threatened the person who had revealed his actions and again admitted that he had committed the murder.

*Smith II*, 838 So. 2d at 461. Although it is true that the Court of Criminal Appeals referenced Roshell's initiation of the call at issue, the Court of Criminal Appeals centered its Sixth Amendment analysis on *Henry*, finding that the police did not purposely recruit Roshell to obtain incriminating statements from Smith after he was represented by counsel. *Smith II*, 838 So. 2d at 463.

Smith argues that Roshell acted under instructions from police by recording incriminating statements in a conversation that occurred before his arrest. (Doc. # 39 at 75 (citing State Court Record, Vol. 7, at 1133-35)). However, Smith has not claimed that Roshell received instructions from police to elicit additional evidence from Smith once he had been arrested. Nor has Smith advanced any evidence in his petition to demonstrate that Roshell received such instructions from police. Thus, this court cannot find that the Court of Criminal Appeals' determination here was an objectively unreasonable application of *Moulton* or *Henry*. *Harrington*, 562 U.S. at 100.

### 2. Deliberate Elicitation

Smith further alleges that the length and the breadth of Roshell and Smith's phone conversation demonstrates deliberate elicitation under *Henry*. (Doc. # 39 at 76). He asserts that the Court of Criminal Appeals' finding that Roshell passively listened to the incriminating statement is unreasonable. The court disagrees.

*Moulton* and *Henry* are instructive on when an informant's actions will be considered deliberate elicitation. In *Moulton*, the Supreme Court held that a codefendant deliberately elicited information from a defendant by feigning memory loss and asking the defendant to remind him of details about crimes, while tape recording the conversation. *Moulton*, 474 U.S. at 166, 176-77. In *Henry*, a paid informant, who shared a cell with the defendant, offered to obtain information from Henry. *Henry*, 447 U.S. at 266. Although agents told the informant not to question Henry about a robbery, the fact that federal agents paid the informant on a contingency-fee basis for useful information and told the informant to "pay attention" to Henry's statements was sufficient forewarning that the informant might engage Henry in conversations that were likely to elicit incriminating information. *Id.* at 270-71.

In contrast, the state court record here shows that Roshell's actions did not come close to approaching deliberate elicitation. Roshell did not prompt Smith to say that "he did it," nor did she say anything in response to Smith's confession. (*See* State Court Record, Vol. 7, at 1142). The Court of Criminal Appeals determined that Roshell was a "passive listener" as Smith voluntarily made incriminating statements. The Supreme Court's precedent from *Kuhlmann* requires that an informant take some action beyond mere listening to establish a Sixth Amendment violation. *Kuhlmann*, 477 U.S. at 459. Here, as in *Kuhlmann,* there is no evidence that Roshell initiated a conversation with Smith that was designed to elicit incriminating

statements or that Roshell asked questions concerning the pending charges. *Id.* at 460. Thus, this court denies Smith's claim that the state court's decision was contrary to or an unreasonable application of established federal law.

> **G.** **Whether the State's Withholding of an Extrajudicial Statement that Smith Made to Police Informant Roshell Violated Smith's Constitutional Rights of Due Process, a Fair Trial, and a Reliable Sentencing Determination**

In this claim, Smith alleges that the prosecution violated his "rights of due process, a fair trial and a reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution" by admitting Roshell's recollection of the phone conversation. (Doc. # 1-2 at ¶ 178). Specifically, Smith contends that the prosecution failed to provide inculpatory statements from Roshell, a police informant, to defense counsel until the morning trial began. (Doc. # 1-1 at ¶¶ 176-77). According to Smith, the State failed to provide this information despite discovery requests that sought such statements as well as assurances by the prosecutor that the State would provide necessary discovery materials for its confidential informant. (Doc. # 1-2 at ¶ 182). In addition, Smith contends that the admission of the statement violated his right against self-incrimination because he sought to suppress the statement and he informed the court of the prejudice he had suffered from the State's failure to disclose it. (*Id.* at ¶ 184). Smith insists that the failure to disclose this inculpatory evidence violated his right to confront witnesses against him during the preliminary hearing because he could have cross-examined Roshell about the statement during that hearing. (*Id.* at ¶ 186). Finally, Smith contends that the failure to disclose this inculpatory evidence in the prosecution's possession placed him at a disadvantage during plea negotiations because he "may have been more inclined to accept the prosecutor's offer of life imprisonment without possibility of parole" if his counsel had been informed of Roshell's testimony by the prosecution. (*Id.* at ¶ 190). Notably, throughout the 15

paragraphs of this argument, Smith does not identify a single Supreme Court precedent which he contends the Alabama Court of Criminal Appeals unreasonably applied or an unreasonable finding of fact.

In Smith's direct appeal brief, his counsel argued that the prosecution failed to turn over evidence of his out-of-court statement to Roshell in a timely fashion, as required under Alabama Rule of Criminal Procedure 16.1.[26] (State Court Record, Vol. 14, Tab R-32 at 11-14). Smith indicated that the late disclosure violated his confrontation rights. (*Id.* at 16). Relying on state law, Smith argued that the late disclosure of this evidence required him to improvise at trial. (*Id.* at 17). Smith also argued in his appeal brief that the failure to disclose this evidence placed him at an extreme disadvantage during plea negotiations because he might have accepted the plea offer if the prosecution had provided the evidence to his counsel. (*Id.* at 18). In closing, Smith argued that he was "entitled to a second trial where his Constitutional rights [were] not undermined by the State's illegal actions." (*Id.*).

On return to remand, the Alabama Court of Criminal Appeals affirmed the trial court's admission of Roshell's testimony "because the appellant's telephone conversation with Roshell was not admitted in violation of the trial court's discovery order or in violation of constitutional or state law." *Smith II*, 838 So. 2d at 442. That court concluded that the prosecutor had not suppressed the statement because (1) the prosecutor had no knowledge of it before he informed defense counsel about it, and (2) Roshell had informed officers in another jurisdiction about the contents of the statement. *Id.* at 440-41.

---

[26] Smith's appellate brief also cited an Eleventh Circuit direct criminal opinion, *United States v. Noe*, 821 F.2d 604 (11th Cir. 1987). (State Court Record, Vol. 14, Tab R-32 at 15). In *Noe*, the Eleventh Circuit reversed a defendant's convictions because the government had violated Federal Rule of Criminal Procedure 16. 821 F.2d at 606-09. This decision did not rely on a rule of federal constitutional law, and the Federal Rules of Criminal Procedure do not apply in Alabama state court.

Again, Smith has not cited any Supreme Court precedent to show that the delayed disclosure clearly violated established federal law or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Further, even if this court liberally construed Smith's claim to present a federal constitutional violation, his claim would nevertheless be ineligible for federal habeas relief because he only presented one federal constitutional basis for this claim (which the court addresses below) to the state appellate court during his direct appeal. (*See* State Court Record, Vol. 14, Tab R-32 at 9-18). Rather, Smith based his direct appeal claim on Alabama Rule of Criminal Procedure 16.1. That rule addresses discovery. The Supreme Court cases that address constitutionally-mandated discovery, such as *Brady v. Maryland*, 373 U.S. 83 (1963), are of no help to Smith here. The evidence at issue was not exculpatory, as *Brady* requires, nor did Smith allege that there was a reasonable probability that the outcome of his case would have been different had the evidence been disclosed at the time he contends it should have. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

As mentioned above, Smith raised a single federal constitutional claim related to this issue on direct appeal. He argued that the delayed discovery violated his Sixth Amendment right to confrontation at the preliminary hearing. But, he did not cite any Supreme Court precedent in support of that argument. (*See* State Court Record, Vol. 14, Tab R-32 at 16). Indeed, it is difficult to conceive of precedent to support the argument that Smith's confrontation rights were violated because he lacked this single piece of information. "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original). Smith's habeas petition

does not indicate that he was deprived of an opportunity to cross-examine Roshell during the preliminary hearing.[27]

The Supreme Court has made plain that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citing 28 U.S.C. § 2241); *see also Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) ("[A] habeas petition grounded on issues of state law provides no basis for habeas relief."). Even though Smith's claim is "couched in terms of … due process" and other federal constitutional violations, it essentially raises issues of state law (violations of Alabama Rule of Criminal Procedure 16) that are not cognizable on federal habeas review. *Branan*, 861 F.2d at 1508. To the extent that Smith presents constitutional issues regarding the admission of his telephone conversation with Roshell -- other than the *Henry* claim and the confrontation claim discussed above -- the claims are due to be denied because Smith failed to fairly present them to the Alabama Court of Criminal Appeals during his direct appeal. (*See* State Court Record, Vol. 14, Tab R-32 at 9-18); *Baldwin v. Reese*, 541 U.S. 27, 32 (2004) ("We consequently hold that ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does

---

[27] Under Alabama law, "the purpose of a preliminary hearing is to determine if there is sufficient probable cause to hold the accused on the alleged offense." *Rowland v. State*, 460 So. 2d 282, 284 (Ala. Crim. App. 1984). Here, the record does not suggest that the trial judge would have had "a significantly different impression of [Roshell's] credibility" during the preliminary hearing if Smith's counsel had access to the statements from the telephone call, which buttressed the incriminating content of other statements Smith made to Roshell. *See Delaware v. Van Arsdall*, 475 U.S. 673, 680-81, 684 (1986) (holding that harmless-error analysis applies to Confrontation Clause claims premised upon an "improper denial of a defendant's opportunity to impeach a witness for bias"). Smith's habeas petition indicates that the admission of Roshell's testimony regarding the telephone call violated his Confrontation Clause rights because the State had not disclosed that information in a timely fashion and it was prejudicial to his defense. (Doc. # 1-2 at ¶¶ 183-84). As an initial matter, this argument incorrectly suggests that the court should conduct a prejudice analysis to determine whether the State's conduct violated Smith's Confrontation Clause rights. Even if the court conducted a prejudice analysis, though, Smith would not be entitled to relief. This is because even more effective cross examination of Roshell during the preliminary hearing would not likely have changed the trial court's determination that there was probable cause here. And, Smith received ample opportunity to cross-examine Roshell during the guilt phase of the trial after his defense counsel had been informed about Roshell's testimony regarding the telephone call. (*See* State Court Record, Vols. 7, at 1144-54; 8 at 1155-62).

not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."). For these reasons, this claim provides no basis for affording Smith relief under 28 U.S.C. § 2254(d).

### H. Whether the District Attorney Employed Improper Arguments to the Jury in Both the Guilt-Innocence and Penalty Phases of Mr. Smith's Trial

Smith alleges that during closing argument, the prosecutor violated Smith's rights to due process, a fair trial, and a reliable sentencing determination by (1) impeding the jury's role in assessing the credibility of a State witness and bolstering that witness' credibility, and (2) indirectly commenting on Smith's choice not to testify as part of remarks regarding his lack of remorse. (Doc. # 1-2 at ¶ 191). The court discusses these allegations, in turn.

#### 1. Comment on a State Witness' Credibility

Smith first argues that the prosecutor improperly told the jury that State witness Michael Wilson's denial of involvement in illegal drug activity during his testimony was immaterial and should not be considered by them in assessing the credibility of his testimony:

> And His Honor told you about lying to you about a material fact.  Was it material whether or not [Michael Wilson] dealt drugs?  Was it material about whether or not this Tech 9 was his?  No, that's not material, it's a smokescreen to take your mind off of what is material. . .
>
> Ms. Sharma Ruth Johnson was not killed by an overdose of drugs. Ms. Sharma Ruth Johnson was not killed by a Tech 9. Ms. Sharma Ruth Johnson was killed by a shotgun. So, is that material whether or not that Tech 9 was his or he dealt drugs?

(State Court Record, Vol. 8, Tab R-13 at 1310). Smith argues that he was prejudiced by the prosecutor's argument suggesting that the jury disregard the discrepancies in Wilson's testimony. Smith further contends that the prosecutor later bolstered Wilson's testimony during closing argument. The State responds by asserting that Smith has not alleged the type of severe and

pervasive conduct to support a claim of constitutional error. (Doc. # 28 at 61, citing *Berger v. United States*, 294 U.S. 78 (1935)).

On direct appeal, the Alabama Court of Appeals reviewed and denied both allegations on the merits. *Smith II*, 838 So. 2d at 455-59.  The claims were reviewed under a plain error standard as Smith had not made a timely objection to the allegedly improper prosecutorial remarks. *Id.* at 455.  The appellate court found no plain error in the prosecutor's comments that these "discrepancies" in Michael Wilson's testimony were immaterial because the prosecutor's comments were supported by the evidence and, under Alabama law, "the credibility of a witness is a legitimate subject of comment during closing arguments." *Id.* at 456 (internal citation omitted). The appellate court similarly held that the prosecutor's bolstering of Wilson's testimony during closing argument did not amount to reversible error.

The challenged remarks to the jury were as follows:

> What was material is what the defendant told Michael Wilson sometime thereafter or early month of November, 'I did some madness and I have to get off this side of town.' That was what was material.

(State Court Record, Vol. 8, Tab R-13 at 1311).  The appellate court held that these remarks were "proper inferences from the evidence in his [closing] statement concerning Michael Wilson's testimony." *Smith II*, 838 So. 2d at 457.

Smith cites *Berger v. United States*, 295 U.S. 78 (1935) and *Darden v. Wainwright*, 477 U.S. 168 (1986) as the "clearly established Federal law" providing the basis for relief for this claim. 28 U.S.C. § 2254(d)(1). Habeas relief is only available as to this claim "if the state court applies a rule that contradicts the governing law set forth" in *Berger* and *Darden* or "if the state court confront[ed] a set of facts that [were] materially indistinguishable from a decision of [the

Supreme] Court and nevertheless arrive[d] at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Brown v. Payton*, 544 U.S. 133, 141 (2005).

First, the facts of Smith's case are not "materially indistinguishable" from *Berger* and *Darden*. Here, Smith alleges the prosecutor bolstered a State witness' credibility. In *Darden*, the Court addressed a prosecutor's closing remarks directed at the defendant. *See Darden*, 477 U.S., at 180, n. 11 (prosecutor's closing argument referred to the defendant as an "'animal,'"; prosecutor also stated, "'I wish I could see [the defendant] with no face, blown away by a shotgun.'" *id.,* at 180, n. 12). And in *Berger*, the Court was confronted with prosecutorial attacks on witnesses while testifying. *Berger,* 295 U.S. at 84 (prosecutor persistently misstated the facts in his cross-examination, pretended that a witness had said something he had not said, assumed prejudicial facts not in evidence, and argued with witnesses.)

Claims such as this one face a substantial hurdle to overcome the deference afforded to a state court's determination that a prosecutor's closing argument was not constitutionally erroneous. This is particularly true given that "*Darden* itself held that a closing argument considerably more inflammatory than the one at issue here did not warrant habeas relief." *Parker v. Matthews*, 132 S. Ct. 2148, 2152-56 (2012) (state court's rejection of *Darden* prosecutorial misconduct claim -- based on prosecutor's remarks that defendant had a motive to exaggerate his emotional disturbance in his meetings with a mental health expert -- precluded federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision."); *Harrington*, 562 U.S. at 101 (internal citation omitted). The Supreme Court made clear in *Darden* that "[i]n order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due

process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). When a habeas petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis ... is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982); *see also Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004) (holding that state courts have "more leeway ... in reaching outcomes in case-by-case determinations" in prosecutorial misconduct claims).  As one circuit court has put it, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645).

Smith has not persuaded the court that the state court's decision is not entitled to the substantial deference that § 2254(d) affords a determination regarding prosecutorial misconduct. The Court of Criminal Appeals found that the prosecutor's comments were proper inferences from the evidence and unlikely to mislead the jury, particularly given the strength of the evidence against Smith. Because there is no basis to set the state court's conclusion as contrary to Supreme Court precedent or an unreasonable factual determination, habeas relief is unavailable for this claim. *Parker*, 132 S. Ct. at 2154–55; *Williams*, 529 U.S. at 407-08.

### 2.  Comment on Lack of Remorse

Smith also asserts that the prosecutor's closing argument unconstitutionally commented on his Fifth Amendment right to remain silent as established in *Griffin v. California*, 380 U.S. 609 (1965). (Doc. # 1-2 at ¶ 199).

During his penalty phase closing arguments, the prosecutor addressed Mr. Smith's failure to show remorse during trial:

> I see no remorsefulness. I see no remorsefulness now,
> probably no remorsefulness then and probably never will be
> any remorsefulness.

(State Court Record, Vol. 9, Tab R. 22 at 1515). Smith also alleges that the following comments

made by the prosecutor were improper:

> And he sits here and does not shed one tear, not even one tear
> for his mother sitting on this stand begging and crying for his
> life. All he can do is close his eyes and that's what he does to
> everything, is close his eyes. And that's what he will continue to
> do to the world is close his eyes.

(*Id.* at 1518).

The Alabama Court of Criminal Appeals denied relief on this claim. *See Smith II*, 838 So.

2d at 459 (holding that the prosecutor's comments were proper in that they were making

"inferences and conclusions from the evidence."). After careful review, this court concludes that

the state court's basis for concluding that the prosecutor's closing argument was not an

unconstitutional comment on Smith's failure to testify at trial was reasonable.

The Fifth Amendment to the United States Constitution "forbids either comment by the

prosecution on the accused's silence or instructions by the court that such silence is evidence of

guilt." *Griffin*, 380 U.S. at 615 (defendant's right against self-incrimination violated when the

prosecutor argued to the jury that the defendant knew the facts, but had "not seen fit to take the

stand and deny or explain."). In the Eleventh Circuit, an indirect comment on silence, as alleged

here, violates the Fifth Amendment only if "the statement was *manifestly intended* to be a

comment on the defendant's failure to testify" or "the statement was of such a character that a

jury would naturally and necessarily take it to be a comment on the failure of the accused to

testify." *Jones v. GDCP Warden*, 753 F.3d 1171, 1194 (11th Cir. 2014) (emphasis in original)

(citing *United States v. Knowles,* 66 F.3d 1146, 1162–63 (11th Cir. 1995) (internal quotation

marks omitted)); s*ee also Isaacs v. Head,* 300 F.3d 1232, 1270 (11th Cir. 2002) ("The defendant bears the burden of establishing the existence of one of the two criteria. The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement... .").

In *Jones*, the Eleventh Circuit held that a comparable comment ("Have you seen any remorse in this case?") was not an unconstitutional comment on the defendant's failure to testify because it did not directly criticize the defendant's refusal to testify to his remorse. *Jones*, 753 F.3d at 1194. "At most," the Eleventh Circuit explained, "the prosecutor drew the jury's attention to the lack of remorse that Jones had expressed to his pen pals and confidants." *Id*. Similarly, Smith's prosecutor drew the jury's attention to Smith's lack of remorse, but in the context of the surrounding argument, it is plausible that the reference was to Smith's conduct during the offense, not his silence at trial. Immediately before the challenged comments, the prosecutor referred to Smith's lack of compassion during the death of the victim. (State Court Record, Vol. 9, Tab R-22 at 1514 ("I ask you to show him no compassion today as he showed Ms. Sharma Ruth Johnson no compassion on October the 27th, 1991.")). Because there was an equally plausible explanation for the prosecutor's comment, the remark was not a manifest comment on the defendant's silence. *United States v. Swindall,* 971 F.2d 1531, 1551–52 (11th Cir.1992) (internal quotation marks omitted) (there is no manifest intention to comment on a defendant's silence "if some other explanation for [the] remark is equally plausible"). The second set of comments about Smith's lack of emotion during his mother's testimony was even more attenuated from any comment on Smith's failure to testify. In context, the prosecutor's comments were based on the defendant's courtroom demeanor.

Smith has provided no basis for this court to conclude that the Alabama Court of Criminal Appeals unreasonably applied *Griffin*. Therefore, his claim that the prosecutor's argument violated his Fifth Amendment privilege against self-incrimination is due to be denied. *See Taylor v. Culliver*, 2012 WL 4479151, at *94 (N.D. Ala. Sept. 26, 2012), *aff'd,* 638 F. App'x 809 (11th Cir. 2015) (references to the appellant's lack of remorse were not comments on the appellant's constitutional right against self-incrimination but rather references to the appellant's behavior after he had murdered the victims).

**I.    Whether the Trial Court's Reference to Inadmissible Evidence to Which Mr. Smith's Jury had Already been Exposed Violated Mr. Smith's Rights of Due Process, a Fair Trial, and a Reliable Sentencing Determination under the United States Constitution**

Smith contends that his constitutional rights were violated by the trial court's reference to a redacted portion of a tape that the court had ruled inadmissible. The trial court had ruled the portions of the tape and the transcription of the tape inadmissible because it contained irrelevant and prejudicial references to unrelated criminal conduct during a conversation between Smith and witness Latonya Roshell. (Doc. # 1-2 at 12-16; see Vol. 8 at 1165-96; 1196-1217). Smith contends that the trial court improperly told the jury about inadmissible portions of the transcript and gave the jury a transcript that contained the inadmissible evidence. (Doc. # 1-2 at ¶ 201). Smith cites Alabama law.  But he does not point to any Supreme Court authority in support of his claim. (Doc. #  1-2 at ¶ 205).

The Alabama Court of Appeals rejected this claim on direct appeal, finding that "there is no likelihood that, given the court's instructions, the jury could have reached an adverse conclusion or guessed what the missing portion contained based on the gap in the tape." *Smith II*, 838 So. 2d at 443 (quotations omitted). The appellate court further explained that "the trial

court's instructions to the jury properly informed them that the omitted portions were not pertinent and dealt with matters unrelated to the present case." *Id*.

As an initial matter, the court notes that Smith is essentially seeking habeas relief based on a violation of state law. Such a claim is not cognizable on federal habeas review under 28 U.S.C. § 2254(a). *Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Phillips*, 455 U.S. at 221 ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution."). In federal habeas corpus proceedings, state courts are the "ultimate expositors of state law." *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Therefore, the only question that this court need resolve is "whether the state court's decision was contrary to clearly established federal law." *Fondren v. Comm'r, Alabama Dep't of Corr.*, 568 F. App'x 680, 685 (11th Cir. 2014); ("Questions of pure state law do not raise issues of constitutional dimension for federal habeas corpus purposes"); *Carrizales v. Wainwright*, 699 F.2d 1053, 1054-55 (11th Cir. 1983). After careful review, the court concludes the state court decision at issue was not "contrary to" a conclusion reached by the Supreme Court on a question of law, nor was it decided differently than a Supreme Court decision addressing a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06. The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). This court must therefore defer to the state court's interpretation of its evidentiary rules.

To the extent that Smith's claim alleges that the state court's purported reference to inadmissible evidence violated his Due Process rights, that argument lacks any merit.  Under such a theory, federal habeas courts do not grant relief, as might a state appellate court, simply because an instruction or reference was incorrect under state law.  *Estelle*, 502 U.S. at 72.  The question, instead, is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  *Estelle*, 502 U.S. at 72 (internal citations omitted).

During the State's case in chief, the trial court admitted into evidence a recording of Smith's conversation with a police informant, Latonya Roshell.  (State Court Record, Vol.8, at 1191).  In conjunction with the tape, the State provided transcripts of the tape to the jurors, so that they could follow along with the testimony as the tape played.  (*Id.* at 1190).  After playing the tape for approximately sixteen minutes, the court *sua sponte* stopped the tape and informed the attorneys outside the presence of the jury that portions of the tape which had not yet been played contained potentially objectionable material.  (*Id.* at 1197).  Upon agreement of the parties, the trial court ruled that those statements which referenced collateral bad acts be redacted from the transcript, and that the portion of the tape that contained inadmissible statements be skipped when the tape was played to the jury.  (*Id.* at 1198-1210).  Before calling the lawyers to discuss the possible redaction outside the presence of the jury, the trial judge stated:

> I have an idea that might save us a little time, let's do that.  I have got a proposal I would like to make to the lawyers, folks.  If you don't mind[,] let us talk a little bit out of your presence.  *If you will leave the paperwork in the chair* and retire to the jury room for a minute.

(*Id.* at 1197-98) (emphasis added).   The court later described to the jury that one of the lawyers would fast-forward through irrelevant portions of the tape, and stated that "[s]ometimes there are materials that don't really pertain to the litigation… so we have taken a few minutes just to make sure everything that comes to your attention is pertinent." (*Id.* at 1230).   No good deed ever goes unpunished.   Smith now argues that the state court erred by making reference to the redacted portions of the transcript, as well as by giving the jurors copies of the full transcript (which they were instructed to leave behind as they retired to the jury room) prior to redacting those transcripts.   (Doc. # 1-2 at ¶¶ 205-207).

Neither of Smith's allegations amounts to a Due Process violation.   While Smith cites Alabama state law for the premise that "mere mention of the inadmissible evidence itself is error," the trial judge's statements did not violate Smith's Due Process rights.   (*Id.* at ¶ 205).   Here, the trial judge never mentioned the inadmissible evidence, and instead only stated that portions of the tape were being skipped because they weren't relevant.   Moreover, even if the trial judge's statements could be construed as mentioning inadmissible evidence, they certainly do not rise to the level of a violation of Smith's Due Process rights.   The judge's brief statements, which make no reference at all to the content of the redacted material, did not "so infect[] the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147.   In light of the record, the evidence against Smith was overwhelming.   The trial judge's explanation regarding the portions of the tape that were redacted does not change that, and did not compromise the trial as a whole.

Similarly, Smith's claim that each member of his jury received an unredacted transcript for approximately sixteen minutes does not support his claim for habeas relief.   Smith points to no record evidence that a juror actually saw any evidence that the court later ruled to be

106

inadmissible.  Moreover, the court ultimately redacted the tape and transcript on its own motion – Smith's counsel stated that he did not plan on objecting to the collateral acts mentioned in the tape until they were about to be played to the jury in open court.  (State Court Record, Vol.8, at 1198-99).  As such, the court on its own initiative actually reduced the risk of jurors seeing potentially prejudicial evidence in their transcripts.  And, indeed, even if a juror had seen the inadmissible evidence (*i.e.*, evidence suggesting that Smith had sold drugs and previously been arrested), that alone would not rise to the level of a Due Process violation in this case.  Again, the weight of the evidence against Smith was overwhelming, and the possibility that a juror *might* have seen certain collateral evidence is simply not enough to support Smith's claim that the state court acted unreasonably when it denied his Due Process claim based on the trial court's determinations related to the transcript.  Accordingly, Smith is not entitled to habeas relief on this claim.

### J.      Whether the Trial Court Improperly Considered Mr. Smith's Court Ordered Pretrial Psychiatric Examination in Sentencing Mr. Smith to Death

Smith argues that the trial court improperly considered a court-ordered pretrial psychiatric examination in sentencing him to death.  His argument has three components: first, Smith did not have an opportunity to confront the examiner, Dr. C.J. Rosecrans, because he never testified at trial (Doc. # 1-2 at 17-18); second, there was no evidence that Smith received *Miranda* warnings before a pretrial competency examination (*id.* at 18-19), and third, the trial court improperly used evidence from that competency evaluation against Smith at sentencing.  (*Id.* at 20).

Smith further alleges that the trial court's use of findings from a pretrial competency evaluation violated the Sixth Amendment's confrontation clause because Dr. Rosecrans did not testify and therefore, Smith never got an opportunity to cross examine him. (*See* State Court

Record, Vol. 12 at 217-21, forensic report of Dr. C.J. Rosecrans.) The trial court first used

findings by Dr. C.J. Rosecrans to support a statutory mitigating factor under Ala. Code § 13A-5-

52. ("Mitigating circumstances shall include any aspect of a defendant's character or record and

any of the circumstances of the offense that the defendant offers as a basis for a sentence of life

imprisonment without parole instead of death.") (*See* State Court Record, Vol. 10, Tab R-27 at

1715-18; 1720; *Smith II*, 838 So. 2d at 444). At Smith's sentencing, the court discussed the

Alabama capital scheme's requirement that the sentencer consider "any aspect of a defendant's

character or record and any of the circumstances of the offense that the defendant offers as a

basis for a sentence of life imprisonment without parole instead of death" as mitigating evidence.

Ala. Code § 13A-5-52.[28] Referring to this provision, the trial court stated from the bench:

> Of course, we go now to 13A-5-52, what's been called in the case law as the
> eighth mitigating circumstance. But, we know this includes the defendant's
> character, record, et cetera. We know from Mr. Mixson's comments in the
> personal social history part of the presentence report that the defendant grew up in
> what the defendant terms as a poor environment… .
>
> The defendant further relates to Dr. Mixson his adolescent problems, after talking
> to him about his childhood problems. No money for drug rehab, states he has a
> two hundred dollar – three hundred dollar a day drug habit. Tells Dr. Rosecrantz
> (sic), if I am not mistaken, that that he was enrolled in the TASK (sic) program at
> one time.

(State Court Record, Vol. 10, Tab R-27 at 1715-18). A short time later, the trial court added,

"Defendant related to Dr. Rosecrantz (sic) his overdose of pills a year or so ago." (*Id.* 1720).

Because Smith did not object to the trial court's discussion of the evaluation, the state

appellate court addressed this allegation for plain error. *Smith II*, 838 So. 2d at 444. The

---

[28] Ala. Code § 13A-5-52 (1975) provides: In addition to the mitigating circumstances specified in Section
13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the
circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole
instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence
of life imprisonment without parole instead of death.

Alabama Court of Criminal Appeals found that "the trial court had orally communicated the findings to defense counsel prior to trial, and that the written findings from the psychiatrist were also given to defense counsel prior to trial." *Id.*. The court further noted that Smith "had an opportunity to review the findings before trial and to call the psychiatrist as a witness, or otherwise to rebut his findings. Furthermore, defense counsel had the appellant evaluated by his own expert, who was called to testify for the appellant at sentencing." *Id.* The Court of Criminal Appeals found that this reference to the competency evaluation worked to Smith's benefit and was not prejudicial to Smith.  Having examined the record, this court agrees with the appellate court's conclusion.

Smith also alleges the trial court should not have considered information from the competency evaluation by Dr. Rosecrans because that there was no evidence that Smith was advised of his *Miranda* rights before the evaluation.  (Doc. # 1-2 at ¶ 214).  He argues that this violated his Fifth Amendment right against self-incrimination, established in decisions such as *Estelle v. Smith*, 451 U.S. 454 (1981) and *Miranda v. Arizona*, 384 U.S. 436 (1966). *Estelle* and *Miranda* protect the privilege against compulsory self-incrimination. In *Estelle*, the Supreme Court held that using a capital defendant's statement made during a court-ordered psychological examination to prove an aggravating factor violated the defendant's right against self-incrimination. However, several factors distinguish Smith's allegation from *Estelle*. First, the trial court did not use Smith's statements made during the competency examination against him, which was the core concern of *Miranda* and *Estelle*.  Instead, the court used Smith's statements as evidence of a mitigating factor.  (*See* State Court Record, Vol. 10, Tab R-27 at 1715-18). Beyond that, at most, the trial court considered the absence of a mental health diagnosis. Additionally, the trial court's use of Dr. Rosecrans's report is distinguishable from *Estelle*

because it did not apply the report to an element of the offense or to an aggravating factor at sentencing. Further, the court did not use the report to justify the capital sentence it imposed.

Even assuming for the sake of argument that Smith did not receive Miranda warnings before his competency hearing (the record is actually silent on the matter), the Supreme Court has ruled that statements obtained in violation of *Miranda* may nevertheless be admissible for other purposes at trial. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("[T]he *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted"); *Harris v. New York,* 401 U.S. 222, 224-26 (1971) (statements obtained without warning a defendant of his right to counsel under *Miranda* may be used to impeach the defendant's testimony at trial). The Supreme Court permits the use of unconstitutionally-obtained evidence at sentencing if it does not "impugn the integrity of the fact-finding process" or permit a sentencing decision to rest upon inherently unreliable evidence. *Stone v. Powell*, 428 U.S. 465, 479 (1976) (quoting *Kaufman v. United States*, 394 U.S. 217, 224 (1969)). *See e.g.*, *United States v. Graham-Wright*, 715 F.3d 598, 601 (6th Cir. 2013) (sentencing court may consider statements defendant made to a psychiatrist during a pretrial competency examination); *United States v. Nichols*, 438 F.3d 437, 441 (4th Cir. 2006) (permitting consideration at sentencing of defendant's statement obtained in violation of *Miranda*).

Finally, Smith challenges the trial court's reference to Dr. Rosecrans's evaluation in the written sentencing order.  (Doc. # 1-2 at ¶ 216).  On direct appeal, the Court of Criminal Appeals rejected this claim, and stated that the trial court's notation in its summary of the facts that Smith had a competency evaluation was inconsequential:

[A]lthough the appellant argues that the trial court improperly considered the

> psychiatrist's finding concerning his competence to stand trial, a review of the record clearly indicates that the information concerning this finding was simply a statement that the psychiatrist found appellant competent to stand trial which was included in the statement of facts portion of the sentencing order. There is no indication that this fact was considered by the trial court in sentencing, rather a review of the record indicates otherwise. Thus, there was no plain error on this ground.

*Id*. at 445. Smith also alleges that the court considered the evaluation as substantive evidence in its order. (Doc. # 1-2 at ¶ 216).   In the written sentencing order, the trial court cited the evaluation as one example of the overall lack of evidence that Smith had an extreme emotional disturbance:

> Dr. Rosencrans (sic) stated in his findings that 'the defendant is fully capable of assisting his attorney in his own defense and of cooperatively interacting with the court at this time.' Also, Dr. Rosecrans stated, 'It is my opinion that defendant was not mentally ill nor suffering from any other discernible psychiatric nor psychologic disturbance at the time of the offense.'

 (Vol. 1, C.R. 159, Order of the Court on Imposition of the Death Penalty at 12).

Because Dr. Rosecrans did not testify at trial, Smith alleges that using the competency evaluation in this instance to reject the statutory mitigating circumstance of "extreme mental or emotional disturbance" abridged his right to confront the evidence against him as established in *Davis v. Alaska*, 415 U.S. 308, 316 (1974). (See Vol. 1, C.R. 163, Order of the Court on Imposition of the Death Penalty at 16, discussing Ala. Code § 13A-5-52).[29]

This court first addresses Smith's argument that he was not confronted with this evidence until he viewed it in the trial court's sentencing order.  (*See* Doc. # 1-2 at ¶¶ 211-12). And, to be

---

[29] Regarding the mitigating circumstance under Ala. Code § 13A-5-52, the trial court found the following:

"2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;

Does not exist. No evidence adduced at trial nor at the second stage in front of the jury nor by way of evidence adduced at third stage, nor the reports of either psychologist, Dr. Rosecrans or Dr. Blotcky suggest that the defendant acted under the influence of a mental or emotional disturbance, much less extreme mental or emotional disturbance." (Vol. 1, C.R. 163, Order of the Court on Imposition of the Death Penalty at 16).

clear, the court interprets Smith's contention as an assertion that the defense was not told that the trial court would *use* Dr. Rosecrans's report, not that Smith did not receive a copy of the report. In fact, Smith was given Dr. Rosecrans's report, and his mental health expert reviewed it in preparation for trial.[30]

As to the substance of Smith's challenge, the Alabama Court of Criminal Appeals found, in a related claim presented in Smith's Rule 32 appeal, that no prejudice existed from the discussion of Dr. Rosecrans's report in the written sentencing order. *See Smith III*, 112 So. 3d at 1150. The appellate court found that no prejudice existed because Smith had not attempted at trial "to prove the mitigating circumstance that the 'capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.'" *Id.*; *see also* (State Court Collateral Appeal Record, Vol. 19 at 88).

This court agrees with the appellate court. The trial court did not rely on Smith's competency evaluation as substantive evidence to reject the § 13A-5-52 mitigating circumstance. The trial court listed the report while concluding that none of the evidence, including that presented by the defendant, pointed towards the existence of that mitigating circumstance. While the confrontation clause bars admission of testimonial evidence and reports that are testimonial in nature (unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant), the reference to Dr. Rosecrans's report was not the type of testimonial evidence that implicates the confrontation clause. And, as the Respondent points out in his brief (Doc. # 28 at 67-68), Smith has not explained how *Davis* applies here beyond its general holding that a defendant has the right under the confrontation

---

[30] The trial court wrote in the sentencing order, "Dr. Rosecrans' findings were orally communicated by the undersigned to counsel on May 1, 1992, written findings consisting of cover letter and four typed pages were given to counsel on May 4, 1992," the day Smith's trial began. (State Court Trial Transcript, Record Vol. 1, C.R. 159; 148).

clause to explore a witness's biases on cross-examination. *Davis v. Alaska*, 415 U.S. 308 (1974). *Compare Crawford v. Washington*, 541 U.S. 36 (2004) (finding that the confrontation clause is violated by the admission of an unavailable witness' out of court statement when defendant did not have a prior opportunity to cross-examine the witness); *Melendez–Diaz v. Massachusetts*, 557 U.S. 305 (2009) (extending *Crawford* to prohibit the prosecution's use of certificates of analysis as proof that substance was cocaine absent the testimony of the analysts who conducted the scientific testing).

Nor has Smith argued that there was any reasonable possibility that the mitigating circumstance would have been found to exist if Smith had been given an opportunity to cross-examine Dr. Rosecrans or if the trial court had not included Dr. Rosecrans's report in its fact-findings. Based on the state court record, Smith's claim does not support a finding that the state court decision was contrary to *Davis v. Alaska*, or that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Smith is not entitled to relief on this claim under § 2254(d). *Everett v. Sec'y, Florida Dep't of Corr.*, 779 F.3d 1212, 1239 (11th Cir. 2015) (quoting *Loggins v. Thomas,* 654 F.3d 1204, 1220 (11th Cir. 2011) (As long as "some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied.")).

**K.     Whether the Trial Court's Instruction to the Jury at Both the Guilt-Innocence and Penalty Phase of Mr. Smith's Trial Denied Mr. Smith's Right to Due process, a Fair Trial, and Reliable Sentencing Determination**

Smith contends that the trial court deprived him of his right to due process by failing to properly instruct the jury in three particular ways. (Doc. # 1-2 at 20-25). First, Smith alleges that the trial court failed to instruct the jury (a second time) that it could not convict Petitioner based

on uncorroborated statements of an accomplice. Second, Smith maintains that the trial court failed to give a supplemental instruction regarding witness Latonya Roshell's testimony in light of the fact that she was a paid informant for the State.   Finally, Smith argues that a jury instruction which suggested that the jurors use their "collective minds," to determine guilt or innocence was flawed. For the reasons discussed below, these allegations are not cognizable in federal habeas corpus proceedings either because they involve only an issue of state law or because they present no unreasonable application of Supreme Court precedent.

### 1.  Instruction on corroboration of accomplice testimony

Smith contends that the trial court's failure to give the jury a second set of instructions on corroboration of accomplice testimony deprived him of due process. Smith acknowledges that the jury was given one set of instructions regarding accomplice testimony, but complains because a second set of instructions on the corroboration of accomplice Angelica Willis's testimony was not given. Without those additional instructions, he argues, the jury may have impermissibly relied solely on Willis's statement in reaching its guilty verdict. (Doc. # 1-2 at ¶ 218).

Smith's claim centers on an Alabama statute which proscribes that a defendant in a felony case may not be convicted solely upon accomplice testimony.[31] In keeping with Alabama law that accomplice testimony be corroborated, the trial court gave an initial set of instructions

---

[31] Ala. Code § 12–21–222 (1975) ("A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.")

before guilt-phase closing arguments in Smith's trial. During this initial charge, the trial court

instructed on corroboration as follows:

> As you know, Angelica Willis is a, I would guess a self-confessed accomplice in the murder component here that we are discussing today of Ms. Johnson, having testified in exchange for an offer of a twenty-five year sentence on a plea of guilty to murder.
>
> Now, the reason I mention this to you, we have a special statute relative to accomplice testimony and it would probably be good for me to go over this with you, maybe paraphrase it. It is entitled accomplice's testimony for a felony conviction. And it says in substance that a conviction of a felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense.   And such corroborative evidence, if it merely shows the commission of the offense or circumstances thereof, is not sufficient.

(State Court Record, Vol. 8, Tab R-12, at 1295-96).  Smith contends that the trial court's failure

to reinstruct the jury on corroboration after closing arguments of counsel, despite having

indicated that it would do so (*see id.* at 1299), led the jury to underestimate the importance of

corroborating Angela Willis' testimony.  (Doc. # 1-2 at ¶ 219).

> The Alabama Court of Criminal Appeals rejected this claim on the merits, holding:
>
> In the present case, the trial court sufficiently charged the jury as to the applicable law; no plain error resulted from his procedural decisions as to when to instruct the jury. Nor is there any indication in the record that this concept would have been given insufficient emphasis by not being repeated at the close of the argument. The decision whether to repeat certain instructions to the jury is a matter generally left to the trial court's discretion.

*Smith II*, 838 So. 2d at 452.  On habeas review, Smith must establish that the state court decision

is contrary to federal law, unreasonably applies clearly established law, or is based on an

unreasonable determination of the facts in light of the evidence presented. Additionally, to obtain

habeas relief for a jury instruction claim, he must show that the instruction was so unfair that it

denied him the due process of law.  *Estelle*, 502 U.S. at 72 ("The only question for us is

"whether the ailing instruction by itself so infected the entire trial that the resulting conviction

violates due process.") (quoting *Cupp,* 414 U.S. at 147); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (a state habeas petitioner's burden is especially heavy to show prejudice based on an incomplete instruction because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law"); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'").

As noted above, Smith's contention that the trial court erred by failing to recharge the jury on how to consider corroboration of accomplice testimony fails because it raises an issue of state law that is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a); *Estelle,* 502 U.S. at 67-68. The Court of Criminal Appeals held that additional instructions on corroboration were unnecessary under Alabama law, and this court is bound by the court of appeal's interpretation of state law. *See Bradshaw,* 546 U.S. at 76 ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Moreover, Smith was not deprived of due process or a fair trial under existing Supreme Court precedent. In *United States v. Beard*, the Eleventh Circuit stated that "a defendant is entitled to a special cautionary instruction on the credibility of an accomplice or a government informer if he requests it and the testimony implicating the accused is elicited solely from the informer or accomplice." 761 F.2d 1477, 1481 (11th Cir. 1985), quoting *United States v. Garcia*, 528 F.2d 580, 587-88 (5th Cir. 1976). In *Beard*, our Circuit found no instructional error because the jury instruction on credibility and bias afforded adequate protection against any prejudice from the government's use of a confidential informant. *Beard* is not clearly established Supreme Court precedent, as required under § 2254(d) to warrant habeas relief. However, even if *Beard*

116

did apply, Angelica Willis's testimony was found to be corroborated, *see Smith II*, 838 So. 2d at 425 (noting that informant's testimony was corroborated by defendant's recorded statements, other witness testimony, and physical evidence), and Smith does not challenge that finding as unreasonable. Smith's claim is thus not cognizable under § 2254(d), and his claim is denied.

Finally, even if the trial court's failure to reinstruct the jury were constitutional error (and, to be clear, it is not), that error would not amount to a denial of due process unless it had a "substantial and injurious effect on the verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637–38 (1993). Given Smith's recorded statements, other witness statements, and the physical evidence, there is no basis to conclude that the jury would have reached a different verdict had it been reinstructed regarding uncorroborated accomplice testimony. The Court of Criminal Appeals concluded that its "review of the entire charge reveals that the jury was properly instructed as to the law concerning the corroboration of accomplice testimony and its importance was not diminished to the jury because the trial court failed to repeat these instructions at the close of the parties' arguments." *Smith II*, 838 So. 2d at 452-53. Accordingly, the state courts' rejection of Smith's instructional error claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court. Habeas relief, therefore, is not warranted on this claim.

### a.  Failure to give supplemental instruction on witness bias

Smith's next contention is similar to his claim about witness Angelica Willis. Smith asserts that the trial court should have specifically instructed the jury to evaluate witness Latonya Roshell's testimony in light of the fact that she was a paid informant for the State. (Doc. # 1-2 at ¶ 220). The trial court instructed the jury on witness bias. (*See* State Court Record, Vol. 9, Tab R-16, at 1417-18 ("[Y]ou can consider anything you observed about a

witness that tends if you think you observed something about a witness that might make he or she color their testimony; the motive of one testifying, any bias exhibited by a witness, just whatever, big area for common sense.")).

The Alabama Court of Criminal Appeals considered this claim on direct appeal and found no error because the "record clearly indicates that the trial court's charge completely addressed the subject of witness credibility and bias, therefore, there was no error in refusing to give the requested instructions." *Smith II*, 838 So. 2d at 453. In his argument to this court, Smith again cites the *Beard* court's holding that "a defendant is entitled to a special cautionary instruction on the credibility of an accomplice or a government informer if he requests it and the testimony implicating the accused is elicited solely from the informer or accomplice." 761 F.2d at 1481 (quoting *Garcia,* 528 F.2d at 587-88). As already noted above, *Beard* is not clearly established Supreme Court precedent.  But even if *Beard* did apply, the record does not establish the two pre-conditions for a cautionary instruction: Smith did not request the jury instruction, nor was Willis's testimony uncorroborated. *See Smith II*, 838 So. 2d at 453 (finding that issue was not raised at trial), 425 (noting that informant's testimony was corroborated by defendant's recorded statements, other witness testimony, and physical evidence). Smith's claim is thus not cognizable under section 2254(d), and habeas relief is not warranted on this claim.

### b.  Reasonable doubt instruction

At Smith's trial, before closing argument from the parties, the trial court gave an initial jury charge. (State Court Record, Vol. 8, Tab R-12, at 1273-1300). In that charge, the court began by reminding the jury that Smith was presumed to be not guilty and that "[t]he burden of proof does not shift to Willie B. Smith here at any point in the litigation." (*Id.* at 1274). In his petition, Smith alleges that the trial court improperly shifted the burden of proof to him by

instructing the jury during its initial charge that the jury begin its consideration with "an abiding conviction that Mr. Willie B. Smith is guilty," thus creating a risk that Smith was convicted on a standard of proof below that required by the Due Process Clause of the United States Constitution. (Doc. # 1-2 at ¶ 223). Smith further alleges that the trial court's instruction that reasonable doubt had to be removed from the jury's "collective minds" before voting to acquit Smith, instead of individually, also lowered the prosecution's burden of proof. (Doc. 1-2 at 26). Smith objects to the portion of the jury instruction below:

> I will say this:  If after a full and fair consideration of all of the evidence in the case, if there should remain in your collective minds an abiding conviction that Willie B. Smith here is guilty of the offense or offenses charged, then you would be convinced by that full measure of proof required in the law, you would be convinced beyond a reasonable doubt or to a moral certainty and you should convict.

> On the other hand if after that same and full and fair consideration of all of the evidence in the case, if there does not remain in your collective minds -- the verdict has to be unanimous, as I will say again in a little bit -- if there does not remain in your collective minds an abiding conviction that he is guilty, then that is another way of saying I'm not convinced by that full measure of proof that the judge is talking about and the man should be acquitted.

(State Court Record, Vol. 8, Tab R-12, at 1277-78).

The Alabama Court of Criminal Appeals denied Smith's claim on the merits, finding that the trial court's reasonable doubt jury instruction was constitutionally acceptable as a whole. *Smith*, 839 So. 2d at 454. The Court of Criminal Appeals relied upon an Alabama Supreme Court decision that upheld a similar jury instruction as proper. *Id.* (citing *Ex parte Brooks,* 695 So.2d 184, 192 (Ala.1997)) (holding that reasonable doubt charge that instructed the jury that it should acquit "if there does not remain in your collective minds here an abiding conviction that [the defendant] is guilty" did not diminish the reasonable standard of proof by shifting the burden of proof from the State).

As one court has explained, in federal habeas proceedings state court jury instructions are to be evaluated as a whole, rather than in isolation:

> In a criminal case, the government must prove each element of a charged offense beyond a reasonable doubt. *See, e.g.*, *In re Winship*, 397 U.S. 358, 361 (1970). … When reviewing the correctness of reasonable-doubt charges, the Supreme Court has phrased the proper constitutional inquiry as "'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard.'" *Harvell v. Nagle*, 58 F.3d 1541, 1542-43 (11th Cir. 1995) (quoting *Victor*, 511 U.S. at 6, 114 S. Ct. at 1243). We consider the instruction as a whole to determine if the instruction misleads the jury as to the government's burden of proof. *See id.; see also Victor v. Nebraska*, 511 U.S. 1 at 5-6 (instructions must be "taken as a whole"); *Cage*, 498 U.S. at 41 (explaining that "[i]n construing the instruction, we consider how reasonable jurors could have understood the charge as a whole").

*Davis v. Allen*, 2016 WL 3014784, at *113 (N.D. Ala. May 26, 2016) (citing *Johnson*, 256 F.3d at 1190-91) (parallel citations omitted).

As previously noted, the part of the charge that Smith challenges was an initial charge which was given before the closing arguments. In the main part of the jury charge, which was given after closing argument, the trial court instructed that the jurors should exercise their independent judgment, but that their verdict had to be unanimous:

> I told you a moment ago that your verdict had to be unanimous, a verdict of all soon to be twelve. That is to say that in order to convict Willie B. Smith of either of the counts in the charge, your verdict has to be unanimous with respect to that count, all twelve must agree. *If one is not so satisfied by that full measure of proof required in the law, then the jury cannot convict.*
>
> Likewise in order to acquit him your verdict must be unanimous. *Your verdicts don't have to pigtrack[32], any permutation of verdicts is possible.*

(State Court Record, Vol. 9, Tab R-16, at 1438-1439, emphasis added).

The trial court's instruction to Smith's jury, when considered in its entirety, could not possibly have led the jury to convict him on a lesser showing of proof than that required by *In re*

---

[32] While the record indicates that the trial judge informed the jury that their verdicts don't have to "pigtrack," the court believes that the phrase that was likely intended was "piggyback." In any event, neither phrase changes this court's analysis.

*Winship,* 397 U.S. 358, 361 (1970). As the Supreme Court held in *Victor v. Nebraska,* "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." 511 U.S. 1, 5 (1994).

In light of the state court record, this court cannot conclude that the Alabama Court of Criminal Appeals' legal conclusion -- that the mention of "unanimously as a collective mind" in the jury charge did not unconstitutionally lower the prosecution's burden of proof -- was an unreasonable application of Supreme Court law. Therefore, habeas relief is not available on this claim.

### L.     Whether the Trial Court Improperly Restricted Mr. Smith's Ability to Confront the Witnesses Against Him

Smith alleges that the trial court improperly impeded his constitutional right to confront three of the State's witnesses. Specifically, Smith asserts that the trial court impeded his trial counsel's cross-examination of (1) witness Michael Wilson, about a prior juvenile adjudication (Doc. # 1-2 at ¶ 226), (2) Smith's codefendant, Angela Willis, about her plea agreement (Doc. # 1-2 at ¶ 230), and (3) police officer Steve Corvin, about his investigation of a potential alternate suspect. (Doc. # 1-2 at ¶ 232). Smith contends that the Alabama courts' rejection of his confrontation claim is contrary to *Davis v. Alaska,* 415 U.S. 308 (1974).   The court addresses Smith's argument in relation to each of these witnesses.

### 1.   State Witness Michael Wilson's Prior Adjudication

In the first subpart of his claim, Smith alleges that his right to confrontation was violated when the trial court refused to allow defense counsel to impeach a prosecution witness, Michael

Wilson, with a prior juvenile adjudication for a drug offense. In considering this claim on direct

appeal, the Alabama Court of Criminal Appeals recounted the following exchange at trial:

| | |
|---|---|
| [Defense counsel]: | You make your living selling dope, don't you? |
| [Wilson]: | Naw. |
| [Prosecutor]: | I object unless he has some basis for – |
| [Defense counsel]: | I do. |
| [The Court]: | He said 'No' did you not? |
| [Wilson]: | Yes. I said 'No, I work.' |
| [Defense counsel]: | You have been to Mt.  Meigs for selling dope, haven't you? |
| [Prosecutor]: | Your Honor, I object to this, Your Honor. |
| [The Court]: | Sustained. Go ahead, next question. |

*Smith II*, 838 So. 2d at 447-48.

Alabama law prohibits using juvenile records for general impeachment. *See* Alabama

Rule of Evidence 609(d) ("[e]vidence of juvenile or youthful offender adjudications is not

admissible under this rule") and Alabama Code § 12-15-72(a)(b) (providing that a juvenile

adjudication is not a conviction and is not admissible against a juvenile in any court). The state

appellate court noted that Smith made no proffer, as required under Alabama precedent, that the

juvenile adjudication would be proof of bias. *Smith II*, 838 So. 2d at 448.  Thus, the Court of

Criminal Appeals distinguished Smith's line of questioning about a juvenile adjudication on

general credibility from the factual basis of the U.S. Supreme Court's decision in *Davis v. Alaska*

addressing "cross-examination directed toward revealing possible bias, prejudices, or ulterior

motives of a witness." *Id*. at 448 (quoting *Davis*, 425 U.S. at 316). In *Davis*, defense counsel was

prevented from cross-examining a trial witness about possible bias related to the witness's

juvenile adjudication for burglary and his probation status at the time of the events. During cross-

examination, Davis's counsel sought to explore whether the witness identified the petitioner out

of fear or concern that the police might believe the witness had committed the burglary for which

the defendant was on trial, thereby jeopardizing the witness's probation. Davis argued that the

witness's fear that he would be blamed may have compromised his identification of the defendant. *Davis,* 415 U.S. at 311, 317. The Supreme Court reversed Davis's conviction, holding that his counsel should have been permitted to ask the witness not only "whether he was biased," but also "why [he] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318.

The line of inquiry in Smith's case, however, is simply not analogous to the one in *Davis*. Smith's cross-examination sought to show that Michael Wilson's juvenile drug offense was relevant to bias because Wilson was under investigation by the police at the time of the offense for drug trafficking. (*See* Doc. # 1-2 at ¶ 228). But Smith did not proffer an explanation at the time of the trial court's ruling that, as Alabama precedent required, the cross-examination would show Wilson's bias, as opposed to general credibility. *Smith II*, 838 So. 2d at 448. Moreover, that evidence was already before the trier of fact.  The Court of Criminal Appeals noted that the testimony about Wilson's criminal drug activities would have been cumulative to other testimony by a police informant stating that Michael Wilson was under investigation for "selling narcotics." *Smith II*, 838 So. 2d at 449; (State Court Record, Vol. 7, at 1111). In light of the other evidence, the Court of Criminal Appeals concluded that the trial court's ruling about Wilson's juvenile drug adjudication was, even if it were found to be error, harmless error. *Id.*  Thus, it concluded, Smith was not precluded at trial from developing the probative value of the evidence of Wilson's potential biases because of his criminal activities.

The state court's finding that the impeachment evidence Smith sought at trial was marginally probative and cumulative was not contrary to *Davis v. Alaska* or any clearly established Supreme Court authority. Trial courts may impose evidentiary limits on cross-examination into the potential bias of a witness without violating the confrontation clause. *See*

*Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986) ("… trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."). The state court here disallowed impeachment with a juvenile conviction that was inadmissible under Alabama law.  Therefore, Smith's claim does not support a finding that the state court decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Accordingly, under § 2254(d), Smith is not entitled to relief on this claim.

### 2.   State Witness Angelica Willis's Plea Agreement

In the second subpart of his confrontation claim, Smith argues that the trial court unconstitutionally restricted his counsel's cross-examination of witness Angelica Willis about her plea agreement with the State. (State Court Record, Vol. 6, at 945). Willis was originally charged with capital murder in Smith's case and entered into an agreement to testify against Smith at trial.  Willis testified that she agreed to plead guilty to murder and receive a 25-year sentence. *Smith II*, 838 So. 2d at 459. At Smith's trial, defense counsel cross-examined Willis about her attorney, "who negotiated an excellent deal for you." *Id.* The prosecution objected, and the court sustained the objection. *Id.*

After his conviction, Smith argued on direct appeal that the trial court's ruling curtailed his opportunity to explore Willis' plea agreement on cross-examination. The Alabama Court of Criminal Appeals held, to the contrary, that Smith had been permitted to explore Willis' plea agreement and her potential bias at trial. *Smith II*, 838 So. 2d at 459 ("[d]efense counsel was allowed to cross-examine the witness extensively about the agreement and made the jury fully

aware of the possible influences that the plea agreement could have had on [Willis's] testimony." (internal quotations omitted)).

The Confrontation Clause is violated when a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." *Van Arsdall,* 475 U.S. at 680. However, the Supreme Court has noted, a defendant's right to cross-examine adverse witnesses is not unlimited. *Id*. at 679 ("The Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.") (quoting *Fensterer*, 474 U.S. at 20).

Smith's jury was repeatedly informed, during direct and cross-examination, that Willis was testifying in exchange for a plea offer from the prosecution. *Smith II*, 838 So. 2d at 459. In an exchange during the cross-examination of Willis, defense counsel emphasized Willis' plea deal:

> "Q. And you have pleaded not guilty all the way up to a couple of days ago when you decided that they are trying Willie Smith and I may be next and the government is offering you a deal, isn't that right?
>
> "A. I took the offer that was given to me because it was in my best interest.
>
> "Q. That's right, that's exactly right."

*Id*. The trial court also instructed the jury about Willis' plea deal as follows:

> As you know, Angelica Willis is a, I would guess a self-confessed accomplice in the murder component here that we are discussing today of Ms. Johnson having testified in exchange for an offer of a 20–25 year sentence on a plea of guilty of murder.

*Smith II*, 838 So. 2d at 450.

The Confrontation Clause guarantees a defendant a legitimate opportunity to apprise a jury of a witness' biases through cross-examination. Smith's counsel was given ample

opportunity to elicit testimony about Willis' motivations to testify. The jury was made aware of Willis' plea deal, through both examinations and the trial court's instructions. The Confrontation Clause requires no more under these facts. The Eleventh Circuit has consistently held that "[a]s long as sufficient information is elicited from the witness from which the jury can adequately assess possible motive or bias, the Sixth Amendment is satisfied." *De Lisi v. Crosby,* 402 F.3d 1274, 1301 (2005), *citing United States v. Lankford,* 955 F.2d 1545, 1549 at n. 10 (11th Cir. 1992) (internal citations and quotation marks omitted). The Court of Criminal Appeals' decision does not contravene clearly established Supreme Court precedent or reach an unreasonable determination based on the facts. 28 U.S.C. § 2254(d); *Williams,* 529 U.S. at 405–06. Accordingly, Smith is not entitled to habeas relief on this claim.

### 3.   Cross-examination of Officer Steve Corvin

Smith's third contention alleges that the trial court limited his ability to cross-examine Officer Steve Corvin about other individuals who owned a jacket similar to the one that Mr. Smith reportedly wore on the night of the crime. (State Court Record, Vol. 6, at 861). The trial court sustained the prosecution's objection to this line of questioning on hearsay grounds. (*Id.*). The trial court's ruling was upheld on direct appeal. *Smith II*, 838 So. 2d at 463. The Court of Criminal Appeals concluded that the trial court committed no error in sustaining the hearsay objection as "[d]efense counsel clearly was attempting to introduce the third party's statement for the truth of the matter asserted; specifically, that her boyfriend owned the same jacket and that he looked like the appellant." *Smith II*, 838 So. 2d at 464.

As noted previously, the Confrontation Clause does not entitle defendants to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer,* 474 U.S. at 20. In *Crawford v. Washington*, the Court explained that "it is wholly

consistent with the Framers' design to afford the States flexibility in their development of hearsay law." 541 U.S. at 68. The Court has also noted that "trial judges retain wide latitude [under the Confrontation Clause] ... to impose reasonable limits on such cross-examination." *Van Arsdall,* 475 U.S. at 679. Smith has not identified how the Court of Criminal Appeals' decision upholding the exclusion of hearsay evidence is contrary to or an unreasonable interpretation of established federal law. Upon careful review, this court concludes it did not.  Habeas relief is precluded on this claim.

> **M.   Whether the Trial Judge Improperly Referred to Smith's Choice not to Testify in Violation of Smith's Right Against Self-Incrimination as Protected Under the Fifth and Fourteenth Amendments to the United States Constitution**

Smith alleges that the trial court improperly referred to his failure to testify at trial, thereby violating his Fifth Amendment right against self-incrimination.  (Doc. # 1-2 at ¶ 233.) This claim was raised on direct appeal, and the Alabama Court of Criminal Appeals considered it on the merits but rejected it. *Smith II*, 838 So. 2d at 467. Habeas relief is only available if the state court decision was contrary to or an unreasonable application of clearly established law. Here, the state court's decision was neither an unreasonable application of nor contrary to *Griffin*, 380 U.S. at 615 (holding that the Fifth Amendment forbids either comment by the prosecution or jury instructions about an accused's silence as evidence of guilt at trial). *Griffin* prohibited certain comments on silence because the jury may infer guilt from comments on a defendant's failure to testify and thus relieve the prosecution of a portion of its burden of proof.

Smith challenges a portion of the trial court's sentencing order in which the trial court summarized the proceedings:

Second stage proceedings were conducted beginning May 7, 1992, no additional

127

> evidence adduced by state; defense witnesses consisted of mother, neighbor,
> friend and psychologist Allen D. Blotcky. Defendant did not testify nor had
> defendant testified at guilt stage.

(State Court Record, Vol. 1, Tab R-1, at 148). The Alabama Court of Criminal Appeals concluded that this reference was a factual recitation of what evidence was presented at trial, not an adverse comment on Smith's failure to testify. *Smith II*, 838 So. 2d at 459. The court agrees. Smith has presented no argument or evidence to the contradict this conclusion. Moreover, here, the sentencing order was *post-verdict* and did not influence the jury's consideration of the evidence at trial or sentencing. The trial court's statement that Smith did not testify was neither used nor viewed in any adverse manner; it was simply stated as matter of record. The Supreme Court has not prohibited all references to a defendant's silence at trial: it has prohibited only uninvited and adverse ones. *See, e.g.*, *United States v. Robinson*, 485 U.S. 25, 31-32 (1988) (declining to expand *Griffin* to preclude a prosecutor's reference to defendant's opportunity to testify in response to claim that the Government had not allowed defendant to explain his side of the story); *Lockett v. Ohio*, 438 U.S. 586, 595 (1978) (prosecutor's references in closing remarks to State's evidence as "unrefuted" and "uncontradicted" did not violate defendant's Fifth and Fourteenth Amendment rights when defendant first focused the jury's attention on her silence). No Supreme Court decision required the state appellate court to reach a different conclusion here. For these reasons, this claim does not warrant habeas relief.

### N.  Whether the Trial Court Erred in Refusing to Grant Smith's Request to Strike for Cause Venire Member Florence Noe

Smith alleges that the trial court erred in denying his request to challenge venire member Florence Noe for cause. (Doc. # 1-2 at ¶ 234). He contends that she was aware of some of the facts of the case, lived near the crime scene, knew that her daughter used an

automatic teller machine near the crime scene, and had a firm belief in the death penalty. (Doc. # 1-2 at ¶ 235). Smith raised this allegation on direct appeal, and the Alabama Court of Criminal Appeals reviewed it on the merits. *Smith II*, 838 So. 2d at 473-75. The Court of Criminal Appeals held that the venire member "indicated that she would base her verdict on the evidence presented and attempt to be a fair juror." *Smith II*, 838 So. 2d at 475. The court also stated that "there was no indication of bias toward [Smith] by this potential juror; therefore, no error resulted in the trial court's denial of the challenge for cause." *Id.*

The record reveals that Noe was questioned by the court and defense counsel regarding her feelings toward the death penalty.  (State Court Record, Vol. 4, at 383).  She testified that she was aware of the case because she lived four blocks away from where the victim was abducted. (*Id.*).  She also stated that she had particular concerns with the case because one of her daughters used the same ATM where the kidnapping occurred.  (*Id.* at 384).  However, she stated that she had not formulated any opinion regarding the defendant's guilt or innocence.  (*Id.*).  She further testified that she could be fair to the man charged in the event, and that her verdict would be based on in-court evidence and would not be affected by her concern for her daughter's safety. (*Id* at 384-85).

When Noe was asked about her views on the death penalty, the following exchange occurred:

> Q.    But you do believe very, strongly in the death very penalty? You believe very, very strongly in the death penalty?
>
> A.    I believe in the death penalty. I wouldn't say strongly. In certain cases I do.

(*Id.* at 389).

Smith alleges that the trial court erred in refusing to grant his request to strike Ms. Noe for cause.  As an initial matter, the court notes that his claim sounds solely in state law.  (*See*

Doc. # 1-2 at ¶¶ 234-238).  Indeed, he cites Alabama law for the premise that "[a] challenge for cause must be sustained upon a showing of 'probable prejudice.'"  (*Id.* at ¶ 236, citing *Dixon v. Hardey*, 591 So. 2d 3 (Ala. 1992).  After citing other Alabama state law, he contends that Ms. Noe exhibited "probable prejudice," and that the trial court "committed reversible error" in denying defense counsel's challenge for cause.  (*Id.* at ¶ 238).

As mentioned above, the Supreme Court has made plain that "in conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *McGuire*, 423 at 67-68, citing 28 U.S.C. § 2241; *see also Brannan*, 861 F.2d at 1508 (11th Cir. 1988) ("[A] habeas petition grounded on issues of state law provides no basis for habeas relief.").  Here, Smith has not alleged any violation of federal law. Whether a trial court "committed reversible error" in its "probable prejudice" finding is a question for state court on appellate review.  There is no basis for federal habeas relief as to such a claim.  Accordingly, habeas relief is not available for this claim.

Further, Smith cannot claim that Noe's inclusion on the jury violated his Due Process rights (and to be clear, he has not made that claim), because such a claim would be off the mark. A juror must be struck for cause when his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  "The judgment as to 'whether a venireman is biased ... is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference even on direct review; the respect paid such findings in a habeas proceeding certainly should be no less.'" *Uttecht v. Brown*, 551 U.S. 1, 7, (2007) (citing *Witt*, 469 U.S. at 428).  There is nothing in the record to indicate that the state court erred at all, much less acted unreasonably in refusing to strike Ms. Noe for

cause.  Ms. Noe testified that she had not pre-formed any opinion regarding Defendant's guilt or innocence, she would act fairly as a juror, and her verdict would be based on the evidence presented in the courtroom.  (State Court Record, Vol. 4, at 383-85).  She further stated that she believed that the death penalty was appropriate "in certain cases," but did not say that she "strongly" believed in the death penalty.  (*Id.* at 389).  There is absolutely nothing in the record that indicates Ms. Noe's views would have prevented (or substantially impaired) her ability to perform as a juror.  For this reason, too, habeas relief is not available on this claim.

### O.  Whether the Atmosphere at Trial Violated Smith's Rights of Due Process, a Fair Trial, and a Reliable Sentencing Determination

Smith next alleges that the aggregated conduct of private spectators at his capital trial created a sufficiently prejudicial atmosphere at trial to deny his rights to due process, to a fair trial, and to a reliable sentencing determination. (Doc. # 1-2 at ¶ 239).  Smith contends that: the victim's family and friends' presence in the courtroom, including the victim's brother, a Birmingham police officer in uniform, was unduly inflammatory and created prejudice; the victim's family, along with the jury, was given a transcript of police informant Latonya Roshell's testimony, which, according to Smith, gave the jury the impression that the victim's family's rights were superior to the defendant's rights; and the trial court interrupted the reading of the jury instructions at sentencing because a spectator was crying.  (*Id.* at ¶ 241). This claim was considered and denied on the merits by the Alabama Court of Criminal Appeals on Smith's Rule 32 appeal. *Smith II*, 838 So. 2d at 469-72. This court is therefore bound by that determination unless Smith can show that the state court's decision was contrary to or an unreasonable application of clearly established federal law.  He cannot.

Smith argues that he is entitled to relief because the state court failed to consider the totality of the evidence purportedly constituting a prejudicial atmosphere at trial and instead

examined each instance of prejudice in isolation. (Doc. # 39 at 93). As an initial matter, the record suggests that in its opinion the Alabama Court of Criminal Appeals did indeed consider the totality of the evidence supporting Smith's claim. The fact that the appellate court also discussed the allegations individually does not mean that the court did not consider the collective impact of spectator conduct on Smith's trial. However, even assuming, *arguendo,* that the Alabama court failed to consider the totality of the circumstances, this court concludes that it cannot review this claim under § 2254(d)(1) because there was no clearly established federal law to support his claim that was sufficiently related to the facts of Smith's case, even if the allegations were reviewed in their totality.   In other words, the Alabama Court of Criminal Appeals' decision did not contravene clearly established federal law because no Supreme Court precedent has established that private spectator conduct has denied a defendant's fair-trial rights. *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'").

In *Carey v. Musladin*, members of a victim's family sat in the spectator gallery during the trial wearing buttons displaying the victim's picture. *Id.* at 72.  Musladin objected to the display at trial and challenged the spectators' conduct in state court, relying on *Estelle v. Williams*, 425 U.S. 501 (1976) and *Holbrook v. Flynn,* 475 U.S. 560 (1986), as establishing Supreme Court precedent regarding inherent prejudice that the state court failed to apply to Musladin's case.  *Id.* at 75. (Smith also relies on *Estelle* and *Flynn*). The Supreme Court in *Musladin* distinguished both *Williams* and *Flynn* because those cases addressed the constitutionality of government-sponsored practices – in *Williams,* compelling the defendant to stand trial in prison clothes, and

in *Flynn,* seating state troopers immediately behind the defendant. In those cases, the Court discussed whether some state actions were so inherently prejudicial that they had to be justified by an "essential state interest." *Flynn,* 475 U.S. at 568-569. In contrast, Smith's case (like Musladin's) involved no state action. The Court wrote in *Musladin* that it had "never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial;" thus, the state court's finding could not be challenged in federal habeas corpus for failing to apply clearly established precedent. *Musladin*, 549 U.S. at 76.

Finally, Smith argues that he suffered actual prejudice from the atmosphere at his trial, as evinced by a letter from a juror stating that the juror felt a prejudicial bias towards the death penalty during the trial. (Doc. # 39 at 95). But such a letter is not determinative, in any event, because the Supreme Court's test for inherent prejudice is "not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Holbrook,* 475 U.S. at 570 (quoting *Estelle,* 425 U.S. at 505).

The case Smith primarily relies upon, *Woods v. Dugger*, 923 F.2d 1454, 1457 (11th Cir. 1991), is not Supreme Court precedent. Moreover, *Woods* discusses a display by state actors -- uniformed correctional officers whose presence showed solidarity with the victim, a correctional officer -- not private ones.  And, *Musladin* considered whether private spectator conduct was inherently or "potentially prejudicial," rather than a question of actual prejudice. *See Musladin*, 549 U.S. at 77. This court finds a recent federal circuit court decision in which a habeas petitioner challenged private spectator conduct instructive. Like Smith, the petitioner in *Turner v. McEwen*, 819 F.3d 1171 (9th Cir. 2016), relied on a "more general principle that a jury may rely only on evidence presented at trial in reaching its verdict." 819 F.3d at 1177-78.  The Ninth

Circuit held that "[i]f 'state-sponsored' actions within a courtroom such as those at issue in *Williams* and *Flynn* were too dissimilar to establish law applicable to conduct by private actors in the courtroom, as the Court held in *Musladin,* then cases regarding actions outside the courtroom, such as *Turner v. Louisiana,* cannot suffice to constitute clearly established law applicable to this situation, either." *Id*. at 1178. As the Eleventh Circuit has noted, "[s]tate courts are not obligated to widen or enlarge legal rules set forth by the U.S. Supreme Court to contexts in which it has never decided." *Walker v. Hadi*, 611 F.3d 720, 723 (11th Cir. 2010) (quoting *Hawkins v. Alabama,* 318 F.3d 1302, 1307 n. 3 (11th Cir. 2003)). Smith is not entitled to habeas relief on this claim because it is not cognizable in federal habeas corpus proceedings.

### P.       Whether Alabama's System of Judicial Sentencing in Capital Cases Violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution

Smith alleges that Alabama's sentencing scheme is unconstitutional under the Sixth and Fourteenth Amendment because the judge, rather than the jury, is tasked with deciding the facts that enhance a sentence from life without parole to death. (Doc. # 1-2 at ¶ 246). Smith argues that the Alabama courts' rejection of this claim was an unreasonable application of clearly established federal law as determined by the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002).

*Apprendi* proscribes that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. *Ring* extended the rule in *Apprendi*, and held that capital defendants were entitled to a jury determination of any fact, including aggravating factors, that made them eligible for the death penalty. 536 U.S. at 598. Smith

argues that the Alabama sentencing scheme violated *Ring* in three respects: first, Alabama's sentencing structure under Ala. Code § 13A-5-45(e)-(f) violates *Ring* because the statute permits a trial judge to find facts that expose a capital defendant to greater punishment; second, Alabama law unconstitutionally allows a trial judge to increase a capital defendant's sentence from life imprisonment to death based on facts that the jury does not find beyond a reasonable doubt; and third, Alabama sentencing juries do not specifically find aggravating factors but only make sentencing recommendations. (Doc. 1-2 at 37). Respondent counters that habeas relief cannot be granted because the state court's determination was neither an unreasonable determination of, nor contrary to, Supreme Court precedent.

Smith's claim was raised and adjudicated on the merits by the Alabama Court of Criminal Appeals on state post-conviction review and is therefore exhausted for federal review. *See Smith III*, 112 So. 3d at 1150-52. The Court of Criminal Appeals found that neither *Ring* nor *Apprendi* were violated because the jury convicted Smith of kidnapping and robbery at the guilt phase and based its penalty phase finding of aggravating circumstances -- that the capital offense was committed during the course of a kidnapping and a robbery -- on the guilt phase evidence. Thus, the Court of Criminal Appeals concluded that Smith's jury made the fact findings that rendered Smith eligible for the death penalty. *Id*. at 1152.

After Smith filed his petition, the United States Supreme Court decided *Hurst v. Florida*, 136 S. Ct. 616 (2016). In *Hurst*, the Court found that Florida's capital sentencing scheme violated the Sixth Amendment because Florida's sentencing scheme entrusted the "judge alone to find the existence of an aggravating circumstance." *Id.* at 624. Following the *Hurst* decision,

Smith filed a Notice of Supplemental Authority (Doc. # 40), which attached a copy of the decision and argued that *Hurst* supports his argument that Alabama's capital sentencing scheme violates the Sixth Amendment. Following this filing, the parties each filed briefs addressing the applicability of *Hurst* to Alabama's sentencing scheme. (Docs. # 43, 44).

The State contends that *Hurst* is a decision based on *Ring*, which has no retroactive application. *See Schriro v. Summerlin*, 542 U.S. 348 (2004). As such, it argues that because the Supreme Court did not make the *Hurst* rule retroactive, it has no effect on cases such as Smith's that had become final at the time it was announced. (Doc. # 43 at 5). However, this court may consider a Supreme Court decision postdating the state judgment under review if it "made no new law" and is "illustrative of the proper application of [previously established] standards." *Wiggins v. Smith*, 539 U.S. 510, 522 (2003). The court concludes that this description aptly describes the *Hurst* decision. In *Hurst*, the *C*ourt characterized its holding as one which "applied" *Ring* to Florida's sentencing scheme. *Hurst*, 136 S. Ct. at 621-22 ("In light of *Ring*, we hold that Hurst's sentence violates the Sixth Amendment."). *Hurst* did not articulate a new rule of law; rather, it applied *Ring*'s analysis to Florida's sentencing scheme. Because this is so, for purposes of this court's review, the court must consider whether the state court unreasonably applied *Ring* here.[33]

However, while Smith's argument must be considered, it is not a successful one. This is because it is foreclosed by Eleventh Circuit precedent. *See Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172 (11th Cir. 2013). In *Lee*, the petitioner argued that Alabama's capital sentencing scheme violated *Ring*. *Id.* at 1197. The court disagreed, and found that:

---

[33] To be clear, *Ring* does not apply retroactively. *Schriro*, 542 U.S. at 354. However, *Ring* was decided on June 24, 2002, while Smith's case was still pending before the Alabama courts on direct review, meaning that it is applicable to his case. *Id.* at 351 (holding that *Ring* "applies to all criminal cases still pending on direct review.").

> The holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury…. *Ring* goes no further, and Lee points to no Supreme Court precedent that has extended *Ring*'s holding to forbid the aggravating circumstance being implicit in the jury's verdict or to require that the jury weigh the aggravating and mitigating circumstances.

*Id.* at 1198.  On March 24, 2014, the Supreme Court denied certiorari review of the Eleventh Circuit's decision. *Lee v. Thomas*, 134 S. Ct. 1542 (2014). This court is bound by our Circuit's precedent, which has established that a state court's application of Alabama's capital sentencing scheme "is not contrary to or an unreasonable application of *Ring*." *Lee*, 726 F.3d at 1198.

And, *Hurst* does nothing to dispel this conclusion.  Before *Hurst* was decided, Florida law required that, while the trial judge was required to give the jury's recommendation "great weight," *Tedder v. State*, 322 So. 2d 908, 910 (Fla. 1975), the judge's sentencing order "must reflect the trial judge's independent judgment about the existence of aggravating and mitigating factors."  *Blackwelder v. State*, 851 So. 2d 650, 653 (Fla. 2003) (*per curiam*).  A jury in Florida did not make specific factual findings with regard to the existence of mitigating or aggravating circumstances. *Hurst*, 136 S. Ct. at 622. Therefore, under pre-*Hurst* law in Florida, the maximum punishment a defendant "could have received without any judge-made findings was life in prison without parole." *Id.* It follows inexorably that, under the Florida scheme, a judge's determination to impose a death sentence, based on her own findings of aggravating circumstances, would violate the Sixth Amendment.  *Id.*

Alabama's capital sentencing scheme is different. Indeed, as explained below, it is different enough to be distinguishable from the Florida scheme struck down in *Hurst*. Thus, even if the court were to consider *Hurst* and distinguish it from this Circuit's pronouncement in *Lee* (and to be sure, it need not), the state court's rejection of Smith's Alabama sentencing scheme claim would still not be contrary to or an unreasonable application of federal law.

To be clear, *Hurst* did not hold that judicial sentencing in capital cases is unconstitutional. Instead, the Supreme Court held Florida's capital sentencing scheme unconstitutional because it "conditioned a capital defendant's eligibility for the death penalty on findings made by the trial court and not on findings made by the jury." *Ex parte State*, 2016 WL 3364689, at *5 (Ala. Crim. App. June 17, 2016). By contrast, under Alabama's capital sentencing scheme, "a capital defendant in Alabama is not eligible for the death penalty unless at least one of the aggravating circumstances of § 13A-5-49 exists." *Id.* at *7. If the jury determines that the State has failed to prove the existence of an aggravating circumstance beyond a reasonable doubt, it is required to return a verdict assessing the penalty of life imprisonment without parole, and that finding and verdict are binding on the trial court. *Id.* As such, Alabama's capital sentencing scheme "forecloses the trial court from imposing a death sentence unless *the jury* has unanimously found beyond a reasonable doubt the existence of at least one § 13A-5-49 aggravating circumstance." *Ex parte McGriff*, 908 So. 2d 1024, 1037 (Ala. 2004).

*Ring* held that a capital defendant is "entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. In Alabama, one such fact is the finding of an aggravating circumstance, which makes a defendant eligible for the death penalty. *Hurst* found fault with Florida's scheme specifically because Florida trial judges were tasked with independently finding the existence of aggravating circumstances. *Hurst*, 136 S. Ct. at 622. However, consistent with *Ring*, Alabama juries must find an aggravating circumstance beyond a reasonable doubt before a defendant is eligible to receive the death penalty. Alabama's capital sentencing scheme does not run afoul of *Ring*, and

the state court's decision was not contrary to or an unreasonable application of the Sixth Amendment or *Ring*.[34]

Smith also contends for the first time in his reply brief, that his sentence is constitutionally flawed because the trial judge relied in part on guilt-phase findings in imposing his sentence, and because his jurors believed that they were not responsible for his sentence. Neither of these theories demonstrates that the state court acted contrary to, or unreasonably applied, federal law. In finding no constitutional defect in Alabama's capital sentencing scheme, the Eleventh Circuit has previously permitted a trial court to consider the jury's verdict at the guilt-phase when making determinations in the sentencing phase. *Lee*, 726 F. 3d at 1198.

Further, while Smith claims that his sentence violated *Caldwell v. Mississippi*, he points to no record evidence or any argument that was made that would support his claim. 472 U.S. 320 (1985). In *Caldwell*, the Supreme Court held that the following argument, made by the State, was impermissible:

> I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it….
>
> They said 'Thou shalt not kill.' If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

*Id.* at 325–26. No such statement was made in Smith's case, however.

---

[34] That trial judges in Alabama are tasked with determining whether a death penalty is an appropriate sentence is of no moment. That component of Alabama's capital sentencing scheme does not violate the Sixth Amendment. Whether a defendant is *eligible* to receive the death penalty is a determination made by the jury. Only after that determination has been made, and a defendant qualifies as eligible for the death penalty, may the trial court determine whether or not a death sentence is *appropriate*. This comports with *Ring* and the requirements of the Sixth Amendment.

It is, of course, axiomatic that neither the court nor a party may lead the sentencer to believe that the responsibility of determining the appropriateness of the defendant's death rests elsewhere. But there is simply no indication that that happened here. Smith has directed the court to no argument or statement in the record that could have led the jury to come to an improper conclusion about its role. In fact, all he offers is a statement by a juror which states that the juror assumed the judge could accept or disregard the jury's sentencing recommendation. (Doc. # 39 at 98). This is a correct statement of Alabama law, and constitutionally permissible. The state court did not act unreasonably or contrary to federal law. Accordingly, Smith's claim for relief based on Alabama's capital sentencing scheme is denied.

### Q.     Whether Alabama's Method of Execution Violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

Smith alleges that Alabama's method of execution by lethal injection violates the Eighth Amendment. Smith challenges both the constitutionality of lethal injection itself and Alabama's lethal injection protocol, alleging further that the State has no legal alternative method to implement Smith's sentence. (Doc. # 1-2 at ¶ 250). In Smith's petition, he alleges that "[o]ne issue with lethal injection is that doctors rarely participate in the procedure." (*Id.* at ¶ 249).[35] Respondent contends that Smith's claim is not cognizable in habeas and that Smith may only challenge Alabama's execution protocol through a lawsuit filed pursuant to 42 U.S.C. § 1983. (Doc. 27 at 40).

Respondent is correct that the part of Smith's claim attacking the means by which the State intends to execute him -- lethal injection -- rather than the validity of his conviction or

---

[35] In his supporting brief addressing this claim, Smith adds an argument that the sedative that Alabama uses in its three-drug lethal injection protocol "pose[s] a substantial risk of inflicting cruel and unusual punishment." (Doc. # 39 at 100). This argument was not raised in the habeas petition itself, and normally, the court would require that Smith re-plead his claim for the court to consider it. However, because this argument is foreclosed from habeas review under *Glossip v. Gross* and *McNabb v. Comm'r Ala. Dep't of Corr.*, 727 F.3d 1334 (11th Cir. 2013), it would be futile for Smith to amend his petition to add this allegation.

sentence, do not sound in habeas. "[H]abeas corpus law exists," the Eleventh Circuit has noted, "to provide a prisoner an avenue to attack the fact or duration of physical imprisonment and to obtain immediate or speedier release." *Valle v. Sec'y, Fla. Dep't of Corr.*, 654 F.3d 1266, 1267 (11th Cir. 2011). The Supreme Court and this circuit's precedent make clear that challenges directed to execution protocols must be brought in a lawsuit under 42 U.S.C. § 1983. *Glossip v. Gross*, 135 S. Ct. 2726, 2738 (2015) ("a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence."); *Baze v. Rees*, 553 U.S. 35 (2008); *McNabb v. Comm'r Ala. Dep't of Corr.*, 727 F.3d 1334, 1344 (11th Cir. 2013) ("[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures" (quoting *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009)). That portion of Smith's Eighth Amendment claim challenging the procedures that Alabama may use to effect his execution is, therefore, not cognizable in habeas. Smith may raise those allegations in a § 1983 action. *McNabb*, 727 F.3d at 1344. The court will, therefore, dismiss those allegations and turn to Smith's remaining challenge.

Smith challenges the *per se* constitutionality of lethal injection. (Doc. # 1-2 at ¶ 248, 250). Smith raised this claim in state postconviction proceedings. The Alabama Court of Criminal Appeals rejected Smith's claim on appeal from the denial of his Rule 32 petition, explaining that "this issue has been determined adversely to Smith's argument and he has failed to distinguish his claim from established caselaw." *Smith III*, 112 So. 3d at 1149. In his habeas corpus petition, Smith alleges that Alabama has changed its procedures for implementing lethal injection since the last reasoned state court decision, and accordingly the state court decision no longer deserves deference under §2254(d). The court disagrees.

To allege an Eighth Amendment method-of-execution claim in habeas, Smith must allege

that a risk of future harm is "'*sure or very likely* to cause serious illness and needless suffering,'

and give rise to 'sufficiently *imminent* dangers.'" *Baze*, 553 U.S. at 50 (emphasis in original)

(citing *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993)). Further, a method of execution

claim must present an "objectively intolerable risk of harm." *Id.* "Simply because an execution

method may result in pain, either by accident or as an inescapable consequence of death, does

not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual."

*Id.* Indeed, the Supreme Court has never invalidated a state's method of execution as

unconstitutional under the Eighth Amendment, and has specifically upheld lethal injection as a

constitutional method of execution against Eighth Amendment challenges. *Baze*, 553 U.S. at 48;

*Glossip*, 135 S. Ct. at 2732-33 (affirming denial of § 1983 action alleging that Oklahoma's three-

drug lethal injection protocol created an unacceptable risk of severe pain in violation of Eighth

Amendment). The state courts' denial of Smith's challenge to the constitutionality of lethal

injection as a means of execution thus does not constitute an unreasonable application of

Supreme Court precedent.

  *Baze* appears to leaves open the opportunity for a petitioner to offer alternatives to the

challenged method of execution:

> [T]he proffered alternatives must effectively address a "substantial risk of serious
> harm." *Farmer, supra*, at 842, 114 S.Ct. 1970. To qualify, the alternative
> procedure must be feasible, readily implemented, and in fact significantly reduce
> a substantial risk of severe pain. If a State refuses to adopt such an alternative in
> the face of these documented advantages, without a legitimate penological
> justification for adhering to its current method of execution, then a State's refusal
> to change its method can be viewed as "cruel and unusual" under the Eighth
> Amendment.

553 U.S. at 52. However, Smith has presented no evidence regarding the purported deficiencies

in Alabama's current method of execution or argument regarding possible alternative methods of

execution. His contention that "Alabama now uses an untested sedative in its lethal injection

protocol" (Doc. # 39 at 100) is unsupported by any record evidence and the record simply does not present any evidence of an "objectively intolerable risk of harm." *Baze*, 553 U.S. at 50.

In summary, that portion of Smith's method-of-execution claim that challenges the implementation of Alabama's execution protocol is dismissed as lacking habeas jurisdiction. Smith's allegation challenging the validity of lethal injection as a constitutional method to impose his sentence is denied because the state court's decision is not contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

**IV.    Conclusion**

For all these reasons, and after careful review, the court concludes that Smith's petition (Doc. # 1) is due to be denied.  A separate order will be entered.

**DONE** and **ORDERED** this March 28, 2017.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE